# EXHIBIT 1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2

3  _____
   SHAUB AND WILLIAMS, L.L.P.,        )
                                      ) Civil Action No.
4  Plaintiff,                         ) 13-cv-1101(GBD)(jcf)
           - against -                ) ECF Case
5                                     )
                                      )
6  AUGME TECHNOLOGIES, INC.,          )
                                      )
7                   Defendant         )
   _____)
8                                     )
   AUGME TECHNOLOGIES, INC.,          )
9                                     )
                    Counterclaimant,  )
10                                    )
           - against -                )
11                                    )
   SHAUB AND WILLIAMS, L.L.P.,        )
12                                    )
                    Counterclaim      )
13                  Defendant.        )
   _____)
14

15

16       30(b)(6) Deposition of Augme Technologies, Inc.

17    By and Through Todd Wilson, Person Most Knowledgeable

18                   San Diego, California

19                    October 30, 2013

20

21 ATKINSON-BAKER, INC.
   COURT REPORTERS
22 (800) 288-3376
   www.depo.com
23

24 REPORTED BY:  GLORIA D. MAZON, CSR NO. 9356

25 FILE NO.:  A70B6E2

1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2
    _____
3   SHAUB AND WILLIAMS, L.L.P.,     )
                                    ) Civil Action No.
4                   Plaintiff,      ) 13-cv-1101(GBD)(jcf)
                                    ) ECF Case
5           - against -            )
                                    )
6   AUGME TECHNOLOGIES, INC.,       )
                                    )
7                   Defendant       )
    _____)
8                                    )
9   AUGME TECHNOLOGIES, INC.,       )
                                    )
                    Counterclaimant, )
10                                   )
11          - against -            )
                                    )
12  SHAUB AND WILLIAMS, L.L.P.,     )
                                    )
13                  Counterclaim    )
                    Defendant.      )
    _____)
14

15

16

17       30(b)(6) Deposition of Augme Technologies, Inc.

18   By and Through Todd Wilson, Person Most knowledgeable

19  San Diego, California, commencing at 9:00 a.m.,

20  Wednesday, October 30, 2013, before GLORIA D. MAZON,

21  CSR NO. 9356

22

23

24

25

```
 1                A P P E A R A N C E S:

 2

 3        FOR PLAINTIFF:   (via Skype)

 4        SHAUB & WILLIAMS, LLP
          By:  David R. Shaub
 5        Attorney at Law
          12121 Wilshire Boulevard, Suite 205
 6        Los Angeles, CA  90025
          310.826.6678
 7

 8        FOR DEFENDANT TODD WILSON:

 9        GORDON & REES LLP
          By:  Richard P. Sybert
10        Attorney at Law
          101 West Broadway, Suite 2000
11        San Diego, CA  92101
          619.696.6700
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3  WITNESS:  TODD WILSON

 4  EXAMINATION                                    PAGE

 5      By Mr. Shaub                                6

 6

 7

 8  EXHIBITS

 9  NUMBER                PLAINTIFF'S              PAGE
                          DESCRIPTION
10

11  A-    6-page copy document titled, "PLAINTIFF    17
          SHAUB AND WILLIAMS LLP'S FIRST AMENDED
12        NOTICE OF DEPOSITION OF PERSON MOST
          KNOWLEDGEABLE"
13
    B-    3-page copy document titled, "PLAINTIFF    17
14        SHAUB AND WILLIAMS LLP'S NOTICE OF
          DEPOSITION OF TODD WILSON"
15
    C-    2-page copy document titled, "AUGME        18
16        TECHNOLOGIES"

17  D-    2-page copy document titled, "UNITED STATES 19
          SECURITIES AND EXCHANGE COMMISSION
18        WASHINGTON, D.C. 20549"

19  E-    4-page copy document titled, "A Dashboard   26
          You'll Love - Marketing Is Complex. Clarify
20        Your Data And Decisions With Domo."

21  F-    68-page copy document titled, "DECLARATION  27
          OF TODD WILSON IN SUPPORT OF DEFENDANT/
22        COUNTERCLAIMANT'S OPPOSITION TO PLAINTIFF/
          COUNTERDEFENDANT'S MOTION FOR SUMMARY JUDGMENT
23
    G-    30-page copy document titled, "DEFENDANT/   76
24        COUNTERCLAIMANT AUGME TECHNOLOGIES'
          MEMORANDUM OF LAW IN OPPOSITION TO
25        PLAINTIFF/COUNTERDEFENDANT SHAUB AND WILLIAMS,
```

```
1  (Exhibits con't)                                      PAGE

2

   H-    6-page copy document titled, "GORDON &          86
3        REES LLP"

4  I-    14-page copy document titled, "FIRST            101
         AMENDED COUNTERCLAIMS ECF CASE"
5

6            INSTRUCTED NOT TO ANSWER:

7                 Page        Line        Page    Line

8                  32          5           106    10

9                  35         1, 22        110    2, 13

10                 38          8           112    6

11                 43          8           117    20

12                 50         9, 12        118    10

13                 51         4, 23        120    18

14                 52          8

15                 60          3

16                 61          20

17                 64          4

18                 65          18

19                 66          19

20                 69          2

21                 88          23

22                 89          19

23                 92          4

24                 101         9

25                 104         9
```

1                    TODD WILSON,

2            having been first duly sworn, was

3            examined and testified as follows:

4

5                    DIRECT EXAMINATION

6  BY MR. SHAUB:

7      Q    Good morning, Mr. Wilson.

8            I first would like to ask you, if you've ever

9  had your deposition taken before?

10     A    I have.

11     Q    Okay.

12           What kind of case was that?

13     A    It was a personal case where I witnessed an

14 event happening because of --

15     Q    Okay.

16     A    -- yeah; yeah.

17     Q    All right; thank you.

18           I'm going to take a few moments, even though

19 you have had your deposition taken before, to simply give

20 you an overview of the deposition process.

21           This deposition is being taken today pursuant

22 to a combination of notices-and-agreements between

23 counsel, particularly in respect to the Deposition being

24 conducted by our firm at a remote location utilizing

25 Skype and where you're located in San Diego at the

1  offices of your counsel.

2          The Deposition, even though it's taking place

3  under those circumstances and in separate offices,

4  nevertheless has the same force-and-effect as though you

5  were testifying in a court of law, and consequently it's

6  important that you give the best answers you can; you

7  don't have to give perfect answers.  It's also thoughtful

8  if you listen to the question and let me finish the

9  question before you respond.

10         If your counsel objects, I will wait until he

11  finishes his objections and he may have some comments or

12  may not and I will indicate; sometimes you may answer,

13  which means objection in my view, was made for the

14  purpose of preserving a provision on the record, which

15  does not necessarily preclude you from testifying.

16         The questions-and-answers on your part, should

17  be responded to without making gestures or shrugging your

18  shoulders or nodding your head or turning your head,

19  because the reporter is not able to transcribe that so

20  easily.

21         Other than that, though, the reporter will be

22  transcribing all of the information that is part of the

23  Deposition discussion, unless I go off the record as we

24  call it, so that perhaps the side discussions can take

25  place where the reporter is not transcribing the

1    information.

2           You will have an opportunity to review the

3    Deposition transcript, subsequent to the conclusion of

4    the Deposition, you'll have an opportunity to make

5    corrections and if you do make corrections, I can point

6    that out if appropriate at some point in time in the

7    case.

8           But otherwise, I think that's pretty much the

9    Deposition process.

10          Do you have any questions?

11     A    No.

12     Q    Okay.

13          Now it is under penalty of perjury, so remember

14   that when you give your answers.

15          First of all, I'd like to just briefly have you

16   sketch for us your education.

17     A    My education?

18     Q    Yes; just outline your education after high

19   school.

20     A    My Undergraduate Degree is in Finance from the

21   University of Pennsylvania, the Wharton School of

22   Business and I graduated in 1993.

23          And my Graduate Degree is an MBA from the Fuqua

24   School of Business at Duke University, where I graduated

25   in 1989.

1     Q    Okay; thank you.

2          And then, also would you please outline for us,

3     your occupational history.

4     A    I graduated from college in 1993.

5          I worked two years at Merrill Lynch and Company

6     in New York.

7          In 1995, I went to Montgomery Securities, an

8     investment bank based out in San Francisco where I spent

9     a year-and-a-half.

10         Upon graduation from business school, in the

11    summer of 1999, I joined a private equity firm in Detroit

12    by the name of "Wind Point Partners."  I spent three

13    years there.

14         In the summer of 2002, I joined American

15    Capital Strategies, a public business development private

16    equity firm.  I was at American Capital from the Summer

17    of '02, until -- excuse me -- until the end of '09, at

18    which time, I left American Capital.

19         I spent six months without full-time

20    employment.

21         In the summer of 2010, I joined the City of Los

22    Angeles in a role -- in the economic development effort

23    for the City of Los Angeles.  I spent 15 months in that

24    role through September of 2011.

25         And then, since September 2011, I have been a

1   consultant and an investor in small and medium sized

2   businesses under both "Trove Capital Partners" and under

3   "Crane Street Capital."

4           During the time --

5       Q    Okay.

6       A    -- Yes.

7       Q    And in among those companies that you have

8   acted as a consultant for, has that included "Augme

9   Technologies, Inc."?

10      A    It has.  I joined -- yes.

11      Q    Okay.

12          Let's turn to -- let's turn to Augme

13  Technologies Inc., which I'll refer during the course of

14  the Deposition as "Augme."

15          And also additionally, I'll refer to our firm

16  as "Shaub and Williams," instead of "Shaub" by itself.

17          And so, when did you first become acquainted

18  with Augme?

19      A    I became acquainted with Augme in the Spring of

20  2010.

21      Q    And did you have some person or persons, that

22  introduced you to Augme?

23      A    I was introduced to the company by Shelly

24  Meyers, which at the time, was Chairwoman of the Board.

25      Q    Okay.

```
 1              Do you live in the Pacific Palisades?

 2      A    I do.

 3      Q    What's your middle name?

 4      A    Ellis.

 5      Q    Okay; thank you.

 6           MR. SYBERT:  Objection; relevance.

 7  BY MR. SHAUB:

 8      Q    At or prior to the time of this introduction,

 9  had you been acquainted with Shelly Meyers through your

10  business activities?

11           MR. SYBERT:  It's a "yes" or "no" question.

12           THE WITNESS:  No.

13  BY MR. SHAUB:

14      Q    Okay.

15           How did you meet her?

16      A    She was my neigh -- she was and is my neighbor.

17      Q    Okay.

18           And when did you meet her?

19           Just a year is good enough.

20      A    2000 -- Spring 2009.

21      Q    Okay.

22           So going back to the earlier question that I

23  had, which was, when you were introduced to Augme.

24           Who introduced you to Augme itself?

25           MR. SYBERT:  Objection; vague-and-ambiguous.
```

1   BY MR. SHAUB:

2        Q    Let me rephrase the question.

3             When you were introduced to Augme, did the

4   subject of whether you would serve on the Board of

5   Directors at that time arrive?

6        A    I don't recall.

7        Q    Okay.

8             What was -- what were the facts and

9   circumstances surrounding your introduction to Augme by

10  Shelly Meyers?

11       A    Initially she was mentioning it to me, as a

12  company that she was an investor in.

13       Q    And did she give you an overview of the company

14  at that time?

15       A    She did.

16       Q    Can you summarize what she told you?

17       A    She said, if I recall correctly because it was

18  several years ago, we've obviously had lots of

19  suggestions, you know.

20            Initially, she said, "It is a public company

21  that --" this is her words -- she said, "This is a public

22  company that she is an investor in, that --" so that

23  initially, and she described the public company.  She

24  described -- that was initially, as she positioned the

25  company.

1      Q    Okay.

2           Did she, at some later point, tell you what the

3  company did?

4      A    Yes.

5      Q    What was her explanation?

6      A    It was a company that owned intellectual

7  property and had an operating business in the mobile

8  marketing industry.

9      Q    Okay.

10          At the time that you were learning about Augme,

11  did Shelly Meyers introduce you to any other persons that

12  were employed by Augme?

13     A    Initially, no.

14     Q    How about at some point in time, after your

15  initial discussions with her?

16     A    Yes.

17     Q    When did that happen, approximately?

18     A    In -- I would say late Spring, early Summer of

19  2010.

20     Q    Okay.

21          And can you explain to me briefly, how that

22  came about and who you met with?

23     A    She asked me, if I would consider joining the

24  Board.

25          She asked me, if I would consider joining the

1    Board of Augme.

2         Q    Okay.

3              What did you say to her?

4         A    I'd like to learn more about the company.

5         Q    Okay.

6              Did you take some steps to investigate the

7    company?

8         A    I did.

9         Q    Basically, what did you do?

10        A    I read the publicly available information on

11   the company.

12        Q    Okay.

13        A    And I talked to one or two of the management

14   team members.

15        Q    Do you remember who that was?

16        A    I don't recall exactly.

17             I think -- I think it was the guy who -- I'm

18   drawing a blank on his name.

19             The guy who was running -- who was the Chief

20   legal guy at the company.  I think that might have been

21   Jim Lawson.  Although, I might be getting the name

22   incorrectly, but the person who was Chief legal person at

23   that company at the time.

24        Q    Okay.

25             Do you recall anyone else you talked to, other

1    than Shelly Meyers initially and then eventually, you

2    talked to this "Jim Lawson"?

3        A    At the company?

4            I don't recall specifically the company I

5    talked to.

6        Q    At some point, you decided to become a member

7    of the Board.

8            Is that correct?

9        A    I did.

10       Q    Okay.

11           Can you tell me, why you decided to be on the

12   Board?

13       A    I thought it would be interesting and I thought

14   I could add value.

15       Q    Okay.

16           When you made that decision, had you talked to

17   anyone else, other than Shelly Meyers and Jim Lawson?

18       A    At the company?

19       Q    Yes.

20       A    I don't recall for sure.

21       Q    Okay.

22           When was the first time, that you met any of

23   the other Directors at that time?

24       A    I'm sorry, repeat the question.

25       Q    When was the first time, that you met the

1    Directors?

2            In other words, let me rephrase the question.

3            After you decided that you would like to become

4    a Director with the company, did you meet with any of the

5    Directors?

6        A    Of course.

7        Q    Okay.

8            Was that after you had accepted to become a

9    member of the Board?

10       A    Yes.

11           I don't remember who the Board was at the time

12   that I joined, exactly.

13           I don't think that I met any of -- Shelly

14   Meyers was a Board member and the Chairwoman of the

15   Board.  I don't think that I met any other Board members

16   at the time that I joined the Board.

17       Q    Okay.

18           I'm going to just indicate for the record, that

19   we've provided a copy of a couple of documents which I've

20   marked first, which I haven't marked for the record, but

21   which I will mark as "Exhibits A and B" and these are

22   simply two Deposition Notices and I'm not going to ask

23   you any questions about them.

24           And counsel, if you would like, I know you have

25   filed some objections and you're free to at any time ask

1    those as your exhibits, if you'd like, to the Deposition.

2              MR. SYBERT:  Okay.

3              At this point --

4              MR. SHAUB:  -- that doesn't necessarily mean,

5    that I agree to the objection.

6              And, of course, the two Exhibits A-and-B that I

7    would like to have marked by the reporter, are simply for

8    the record.

9              MR. SYBERT:  Mr. Shaub, do you want to

10   specifically identify which document, which report so the

11   reporter can mark them appropriately?

12             MR. SHAUB:  Right; okay.

13             I'm identifying as Exhibit A, "Plaintiff Shaub

14   and Williams LLP's First Amended Notice of Deposition of

15   Person Most Knowledgeable."

16             MR. SYBERT:  Okay.

17             (Plaintiff's Exhibit A, marked for

18   identification.)

19             MR. SHAUB:  And then, as Exhibit B, I'm

20   identifying Plaintiff Shaub and Williams LLP's, Notice of

21   Deposition of Todd Wilson.

22             MR. SYBERT:  Okay.

23             (Plaintiff's Exhibit B, marked for

24   identification.)

25             MR. SHAUB:  And I should indicate for the

1   record, that subsequent to the notices, respective

2   counsel conferred and we agreed upon postponement date

3   until today.

4        And we agreed upon the format of the Deposition

5   taking place via Skype.

6        And I wanted to -- Ms. reporter, you just tell

7   me when you're through marking and then I can move on.

8        COURT REPORTER:  Yes, we're through; thank you.

9        MR. SHAUB:  Okay.

10   Q    I wanted to show you the next two exhibits.

11        One I'll mark "Exhibit C," and that is a

12   document which at the top reads, "Augme Technologies."

13        And then, it has a column in the middle of it

14   says, "Board Members."

15        MR. SYBERT:  That's "C" like "Charlie"?

16        MR. SHAUB:  "C" like "Charlie."  It's two

17   pages.

18        MR. SYBERT:  Okay.

19        (Plaintiff's Exhibit C, marked for

20   identification.)

21        MR. SHAUB:  And then, I wanted to show you

22   Exhibit D, which is simply two pages.  The front page and

23   Page 112 of the form "10-K" for the fiscal year-end

24   "February 28, 2013" filed by Augme.

25        MR. SYBERT:  And we'll object to Exhibit D, an

1    incomplete document.

2          MR. SHAUB:  That's fine.

3          (Plaintiff's Exhibit D, marked for

4    identification.)

5    BY MR. SHAUB:

6       Q    If you would take a moment, please, Mr. Wilson,

7    and look at Exhibit C.

8          (Witness complies.)

9       A    "C" as in "Charlie"?

10      Q    Yeah, "C" as in "Charlie."

11          And you'll see at the top, it has a list of

12   Board Members in the middle column.

13          Do you see that list?

14      A    I do.

15      Q    Okay.

16          And if you turn to Exhibit D, which is the

17   excerpt from the form "10-K," you'll see on the one page

18   that I concluded of that report, up in the upper left-

19   hand corner, you'll see a list of Officers and Directors.

20          Do you see that list?

21      A    I do.

22      Q    Can you tell me, which is the most current list

23   of those two?

24      A    I can.

25      Q    I mean -- go ahead, please.

1     A     The exhibit -- this "Exhibit C"?

2           MR. SYBERT:  Yeah; you can write on it.

3           THE WITNESS:  Yeah; Exhibit C.

4   BY MR. SHAUB:

5     Q     Okay.

6           I noticed there's one difference.  There's a

7   Michael Brochu."

8           Is that how you pronounce his name?

9     A     It is.

10    Q     Okay.

11          He's on that list and he's not on the 10-K

12  list.

13          And then, Mr. Minicola was on the 10-K

14  report?

15    A     "Ms. Minicola."

16    Q     "Ms." okay.  I stand corrected.  Oh, Roberta;

17  okay.

18          Is it correct then, that she missed the filing

19  of the 10-K report, stepped down as the Director?

20    A     That is accurate.

21    Q     Okay.

22          And then is it correct, that Mr. Brochu came in

23  at some time, subsequent to her stepping down?

24    A     It is.

25    Q     Okay.

1              Then looking at Exhibit C, which of the

2    Directors in Exhibit C, were on the Board at the time

3    that you joined the Board?

4         A    John Devlin was on the Board at the time I

5    joined the Board.

6              I think that was the only one.

7         Q    How about "Don Stout"?

8         A    Don Stout, I don't recall the dates exactly,

9    joined I think within a month or two -- within a couple

10   months after I joined the Board.

11             I could be mistaken, but it was around the same

12   time I joined the Board.

13        Q    Okay.

14             Is it correct, that for a short period of time,

15   Paul Arena was actually the Chairman of the Board?

16        A    It is.

17        Q    Do you remember -- well, strike that.

18             First of all, it's correct he's no longer on

19   the Board.

20        A    Yes, that's correct.

21        Q    Do you remember the period during which he was

22   on the Board and then left the Board?

23             MR. SYBERT:  Do you mean what are the dates?

24             MR. SHAUB:  Yeah; the months are good enough.

25             Even if you don't remember the months; just

1  approximately.

2          THE WITNESS:  Repeat the question.

3  BY MR. SHAUB:

4      Q    Do you remember approximately, when he went on

5  the Board and when he left the Board?

6      A    Approximately, he joined the Board when he

7  became CEO in July of 2010.

8      Q    Okay.

9      A    And approximately, he left the Board in

10  December of 2012.

11     Q    Why did he leave the Board?

12          MR. SYBERT:  If you know.

13          MR. SHAUB:  If you know.

14          THE WITNESS:  He was no longer CEO of the

15  Company.

16          I don't know why he left the Board.

17  BY MR. SHAUB:

18     Q    Okay.

19          Were you -- strike that.

20          You were on the Board then, when it was decided

21  that Mr. Arena would no longer be the CEO and that

22  another individual would take his place.

23          Is that correct?

24     A    I'm not sure what the question -- when it was

25  decided?

1          I'm not sure I understand the question.

2     Q    Okay.  I'll step backwards then.

3          Who replaced Mr. Arena as CEO of Augme?

4     A    Bob Hussey became interim CEO of Augme

5  Technologies when Mr. Arena was no longer CEO.

6     Q    And do you know why Mr. Hussey replaced

7  Mr. Arena as CEO?

8          MR. SYBERT:  Counsel, I'm not saying that this

9  line of questioning falls within the topic specified in a

10  30(b)(6) Notice.

11          Am I wrong?

12          MR. SHAUB:  No, you're not wrong.

13          This is the mixture is try to squeeze.  We

14  noticed this gentleman's Deposition separate-and-apart

15  from the 30(b)(6).

16          MR. SYBERT:  That's true.

17          So you're treating both capacities in this

18  Deposition?

19          MR. SHAUB:  Right.

20          Because I want to do my very best, to finish

21  this in one day.

22          MR. SYBERT:  Okay.

23          Can you repeat the question?

24          THE WITNESS:  Please repeat the question.

25          MR. SHAUB:  Yes.

1      Q    Why was Paul Arena replaced by Bob Hussey?

2           MR. SYBERT:   If you know; don't speculate.

3           THE WITNESS:   I'd say Paul Arena -- well,

4    there's a publicly filed separation agreement with Paul

5    Arena and the company needed a CEO and, Mr. Hussey was

6    voted by the Board as interim CEO.

7    BY MR. SHAUB:

8      Q    Okay.

9           During the period of time that you've been on

10   the Board, do you know if the Board considered from time-

11   to-time, issues regarding the litigation that was pending

12   in which Shaub and Williams was representing Augme, Biffa

13   V, Tacoda, AOL, Time Warner and also Yahoo?

14     A    The question is, did we consider the

15   litigation?

16          I'm not sure I understand.

17     Q    Yes.

18          Who had discussed that litigation, while you

19   were on the Board.

20     A    Yes.

21     Q    Okay.

22          And were minutes kept from the discussions?

23     A    Board minutes were kept of the Board meetings.

24          I don't recall the details of the meetings, the

25   minutes of all the meetings.

1        Q    As far as you know, those minutes still

2   exist?

3        A    As far as I know.

4        Q    And who during the period of time that you've

5   been on the Board of Directors, has been the person who

6   has acted as the secretary to maintain those minutes?

7        A    I currently serve as secretary.

8             In the past --

9        Q    I don't agree with you.

10       A    In the past?  I don't recall exactly.

11            I am -- again, I don't know if I should

12   speculate or --

13            MR. SYBERT:  No.

14            You should not speculate.

15            THE WITNESS:  I don't recall exactly.

16            MR. SYBERT:  If you have a belief or

17   understanding, you can say so.  If you know, you can say

18   so.

19            But you're not permitted to speculate.

20            THE WITNESS:  I believe that at one point,

21   Paul Arena served as Secretary.

22            And at one point, Michelle Brochia served as

23   secretary.

24   BY MR. SHAUB:

25       Q    Okay.

1              I have an exhibit here.  I'd just like to

2    identify briefly, "Exhibit E."

3              Do you recognize this, because it has a

4    photograph, looks very similar to what I'm dealing here

5    on the monitor.  It appears to be you.

6              Is that correct?

7        A    It appears to be me.

8        Q    Yes.

9              Exhibit E for the record, is a document taken

10   off the internet.  It includes "Todd Wilson Partner Crane

11   Street Capital" and some brief information.

12             And I just wanted to ask you a simple question.

13             (Plaintiff's Exhibit E, marked for

14   identification.)

15   BY MR. SHAUB:

16       Q    Is this the Crane Street Capital that you

17   mentioned earlier, that you had been acting as consultant

18   for?

19             Or acting as a consultant for other companies

20   in connection with Crane Street Capital?

21       A    I worked with Crane Street, looking at

22   investment opportunities and making investments.

23       Q    Right.

24             MR. SYBERT:  And I object to this photograph,

25   as unflattering.

```
 1              THE WITNESS:  Really is.

 2              MR. SHAUB:  Yeah.

 3              THE WITNESS  Really.

 4              I'm a lot better looking than this.

 5  BY MR. SHAUB:

 6      Q    Okay.

 7              Let's turn to Exhibit F, which is for the

 8  record, a "Declaration of Todd Wilson in Support of

 9  Defendant/Counterclaimant's Opposition to Plaintiff/

10  Counterdefendant's Motion for Summary Judgement."

11              (Plaintiff's Exhibit F, marked for

12  identification.)

13              And it looks like up at the top, it's filed

14  with the United States District Court, Southern District

15  of New York on September 12, 2013.

16              And do you recognize that declaration, sir?

17      A    I do.

18      Q    Okay.

19              At the time that you signed this -- well, let

20  me ask you:

21              Page 5 of that exhibit bear your signature?

22      A    It does.

23      Q    Okay.

24              And you'll note, that the declaration is under

25  penalty of perjury.
```

```
 1              If you look at the paragraph above your

 2  signature.

 3              (Witness complies.)

 4              MR. SYBERT:  Objection; document speaks for

 5  itself.

 6  BY MR. SHAUB:

 7       Q    Were you aware of that, at the time you signed

 8  it?

 9       A    Yes.

10       Q    Were you aware as well, at the time that you

11  signed it, that it would be utilized in regard to

12  providing information to be relied upon by Augme in

13  asserting certain counterclaims and arguments before the

14  District Court --

15              MR. SYBERT:  Objection.

16  BY MR. SHAUB:

17       Q    -- with regard to allege liability or

18  wrongdoing on the part of Shaub and Williams?

19              MR. SYBERT:  Forgive me for interrupting you,

20  counsel, I thought you were finished.

21              I object to the question, to the extent that it

22  seeks Attorney/Client privileged information.

23              If you understand the question, subject to that

24  objection and without any waiving of privilege, you can

25  answer.
```

1           THE WITNESS:  Would you repeat the question?

2 BY MR. SHAUB:

3     Q     I think I'd like the reporter to reread it.

4           (Court reporter complies.)

5           (Record read.)

6           THE WITNESS:  Yes.

7 BY MR. SHAUB:

8     Q     All right.

9           Would you look in your declaration on Page 2.

10          (Witness complies.)

11          In Paragraph 3, in which you've indicated

12 that -- well, let's go back to "Paragraph 2."

13          And Paragraph 2 indicates, that you had

14 knowledge regarding Augme lawsuit against Tacoda, what

15 you refer to as a Tacoda action, a lawsuit against AOL

16 and Time Warner, which you refer to as Time Warner and

17 also with regard to discussions -- well, later on about

18 Yahoo.

19          Then you indicate that in Paragraph 3, that

20 "Based upon my examination of Augme's business

21 records ..."

22          Do You see that phrase?

23    A     I do.

24    Q     Okay.

25          What business records did you examine?

1           MR. SYBERT:  Before the Witness answers,

2    counsel, I don't see any reference here to Yahoo.

3           Where are you getting that?

4           MR. SHAUB:  Withdraw that.

5           For the record, I withdraw that.

6           MR. SYBERT:  Okay.

7    BY MR. SHAUB:

8        Q    Okay.

9        A    So repeat the question, please.

10       Q    Yeah.

11          It says, there's a parenthetical, you say,

12   "Based upon my examination of Augme's business

13   record ..."

14          And then you continue in reference to certain

15   claims which I'll talk about in a minute.

16          But with regard to the phrase, "Based upon my

17   examination of Augme's business records ..."

18          What business records did you examine?

19          MR. SYBERT:  This is "Paragraph 3," counsel?

20          MR. SHAUB:  Yes.

21          MR. SYBERT:  Okay; thank you.

22          THE WITNESS:  Business records that I would

23   have examined, would include write-ups of the patents;

24   overview of the use of the patents of the technologies

25   behind the patents.

1          And, you know, other, I guess, presentations or

2   patent reviews that had been prepared by the company.

3   BY MR. SHAUB:

4      Q    When you say, "by the company," does that

5   include counsel for the company?

6      A    It does.

7      Q    Okay.

8          Did that include Shaub and Williams

9   documentation?

10     A    I have reviewed Shaub and Williams

11  documentation.

12     Q    Did it include Goodwin and Procter

13  documentation?

14         MR. SYBERT:  Well, I object to this question,

15  to the extent it seeks Attorney/Client information.

16         I'll allow you to answer the question, but

17  subject to the objection, we're not waiving any

18  Attorney/Client privilege with respect to Goodwin and

19  Procter.

20         THE WITNESS:  I have --

21  BY MR. SHAUB:

22     Q    Are you going to answer the question?

23     A    I have reviewed Goodwin and Procter

24  information.

25     Q    Did you receive any advice concerning the

31

1  Goodwin Procter information, either from your counsel

2  here today or from Goodwin and Procter counsel?

3              MR. SYBERT:  I object to that question, as

4  seeking Attorney/Client information.

5              And I instruct you not to answer.

6              MR. SHAUB:  I'd like the reporter to mark this

7  page.

8              COURT REPORTER:  Yes, sir.

9              MR. SHAUB:  And describe it as an instruction

10  not to answer; that's good enough.

11             (Reporter complies.)

12  BY MR. SHAUB:

13      Q    If you take a look at Paragraph 3 again of

14  Exhibit F.

15             (Witness complies.)

16             You indicate that, "Based upon your examination

17  of Augme business records, each asserted claim of the

18  patents-in-suit in the Tacoda action requires Augme to

19  establish that the Tacoda system included a "first code

20  module" (e.g. source code responsible for retrieving

21  other source code)" and a "second code module" (e.g.

22  source code responsible for displaying an

23  advertisement)."

24             Do you see that long sentence?

25      A    I do.

1        Q     Okay.

2              What did you mean by the phrase, "patents-in-

3   suit, in the Tacoda action"?

4              MR. SYBERT:   Objection, to the extent it seeks

5   a legal conclusion.

6              THE WITNESS:   What I meant, was the patents

7   that are involved in the Tacoda lawsuit.

8   BY MR. SHAUB:

9        Q     Which patents were those?

10       A     I'd have to -- there was a group of patents

11  obviously, you know, the numbers of which I think I

12  identified above as it relates to various patents in the

13  Tacoda suit in Paragraph 2.

14       Q     Okay.

15              You have a phrase in there, "e.g. source code

16  responsible for retrieving other source code."

17              Where did you obtain that information?

18       A     Based on my review of business records.  My

19  discussion with various individuals at the company and

20  review of various documents.

21              This is not -- this is my understanding of --

22  again, I'm not a technical person -- but this is my

23  understanding of how the software works, with respect to

24  the modules; that the first code module is the first code

25  responsible for retrieving the other source code.

1           And the second, is responsible for displaying

2    the advertisement.

3        Q    Where do you obtain the information, that the

4    second code module was source code responsible for

5    displaying an advertisement?

6           MR. SYBERT:  Objection; asked-and-answered.

7           He just said --

8           THE WITNESS:  I think I just answered that

9    question.

10   BY MR. SHAUB:

11       Q    I asked you earlier, where did you obtain the

12   information from the line above for the conclusion that

13   source code -- that the first code module, was source

14   code responsible for retrieving other source code.

15       A    The similar methodology as I stated above,

16   which was a review of the company's business records,

17   discussion with personnel and review of other documents.

18       Q    Did it involve a discussion with -- did it

19   involve any discussions with your present counsel, or

20   with Goodwin and Procter?

21          MR. SYBERT:  Well, I object to that, to the

22   extent it seeks Attorney/Client information.

23          He can state if he had discussions where this

24   was the patent was the general subject matter, but beyond

25   that, that gets into Attorney/Client privilege and I

1  instruct him not answer beyond the general identification

2  of general subject matter.

3          Do you understand my instruction?

4          THE WITNESS:  I do.

5          MR. SYBERT:  Okay.

6          THE WITNESS:  I have had discussions with my

7  attorneys and Goodwin Procter, where the patents were the

8  subject of the general subject matter.

9  BY MR. SHAUB:

10    Q    Is that where you obtained the information that

11  the source code, that the second code module e.g., was

12  source code responsible for displaying an

13  advertisement?

14         MR. SYBERT:  Objection; asked-and-answered --

15         MR. SHAUB:  Okay; let me ask you this:

16         MR. SYBERT:  -- and --

17  BY MR. SHAUB:

18    Q    What did Goodwin and Procter tell you about the

19  second -- excuse me -- the "second code module being

20  source code responsible for displaying an advertisement"?

21         MR. SYBERT:  I object on grounds of

22  Attorney/Client privilege and instruct the Witness not to

23  answer.

24         MR. SHAUB:  I'd like that marked by the court

25  reporter.

1          THE REPORTER:  Yes, sir.

2          (Reporter complies.)

3  BY MR. SHAUB:

4     Q    Do you contend, that the patents that you

5  reviewed, describe a second code module responsible for

6  displaying an advertisement?

7          MR. SYBERT:  Object to the extent, that it

8  seeks expert testimony.

9          Subject to that objection, you can answer the

10  question.

11          THE WITNESS:  Repeat the question, please.

12  BY MR. SHAUB:

13     Q    Do you contend that the second code module was

14  responsible for displaying an advertisement?

15     A    I do.

16     Q    Okay.

17          And have you ever heard of "Burst Media?

18     A    I have.

19     Q    And what is "Burst Media," or what was "Burst

20  Media"?

21     A    My understanding is, that Burst Media is -- or

22  was -- I'm not sure at the time -- was a division of AOL

23  that was responsible for their display advertisement.

24     Q    From whom did you obtain that understanding?

25     A    My understanding, comes from the review of the

1 business records.  A discussion with various individuals

2 at the company and discussions with counsel.

3      Q    Which counsel?

4           Goodwin and Procter, or your present counsel?

5      A    Goodwin and Procter.

6      Q    Was there any particular person at Goodwin and

7 Procter that you'd spoken to, with regard to the

8 confidence of your declaration?

9           MR. SYBERT:  This declaration, "Exhibit F"?

10          MR. SHAUB:  "F."

11          SYBERT:  Okay.

12          THE WITNESS:  Say it again.

13 BY MR. SHAUB:

14     Q    Is there anyone in particular at Goodwin and

15 Procter, with whom you have had discussion, concerning

16 your understanding of the matters that are set forth in

17 your declaration?

18     A    I'm not sure I understand the question.

19          I want to make sure I answer the question as

20 asked.

21     Q    Let me rephrase it then.  I don't want you to

22 answer the question you're not sure you understand.

23          Has there been anyone in particular that you

24 have spoken to at Goodwin and Procter, that has explained

25 to you any of the aspects of the patents-in-suit?

1           MR. SYBERT:  Well, no stop.

2           That's going beyond identification of the

3    general subject matter.

4           He can state whether he -- he can identify the

5    individuals at Goodwin and Procter with whom he's had

6    discussions on the general subject matter of the patents-

7    in-suit in the Tacoda action.

8           Beyond that, I would instruct him not to

9    answer.

10          MR. SHAUB:  Okay.

11          I'd like that noted for the record.

12      Q   And if you can answer the question, other than

13   what you've been instructed, would you please do so?

14      A   Again, I apologize.

15          But can you ask the question then again,

16   please?

17          MR. SHAUB:  I'll ask the reporter to read it

18          (Court reporter complies.)

19          (Record read.)

20          MR. SYBERT:  Do you understand my instruction?

21          THE WITNESS:  Repeat that.

22          MR. SYBERT:  Okay.

23          He's entitled to have identified the

24   individuals at Goodwin and Procter with whom you've had

25   discussions, where the general subject matter were these

1   patents; that's it.

2          THE WITNESS:  Yeah.

3          So the individuals at Goodwin and Procter where

4   I had discussions where these patents were the general

5   subject matter, have included Tom Scott -- Tom Scott

6   principally, partner of Goodwin and Procter.

7   BY MR. SHAUB:

8      Q    Okay.

9          Did you have any discussions with Tom Scott,

10  concerning Burst Media?

11     A    I don't recall.

12     Q    Have you examined any records, concerning Burst

13  Media?

14     A    "Records"?

15          I guess -- what do you mean by "records"?

16     Q    Documents.

17     A    I've reviewed documents that discussed Burst

18  Media.

19     Q    Do you recall a general content of those

20  documents?

21     A    As I stated before, the general content was

22  they addressed Burst Media's role at AOL as the

23  division -- I'm not sure if that's the right term --

24  within AOL was responsible for the display advertisement.

25     Q    Where did you review these records?

1    A    Physically, where did I review these records?

2    Q    Yes.

3    A    Probably in front of my computer.  I'm not

4  sure.

5         I'm not sure I understand the question --

6    Q    Okay.

7    A    -- beyond that.

8    Q    All right.

9         That's as best as you can recall.

10        Is that correct?

11   A    Correct; yeah.

12   Q    Do you know where the information concerning

13  Burst Media was located?

14   A    I do not recall.

15   Q    Do you know who provided you with the

16  information, concerning Bust Media?

17   A    Again, my knowledge of Burst Media, is a

18  combination of reviewing general business records at

19  Augme.

20        Discussions with individuals at Augme and

21  discussions and information provided by counsel.

22   Q    Okay.

23        Again, when you say "by counsel," do you mean

24  "Goodwin and Procter"?

25   A    Yes.

1     Q    Okay.

2          And you've mentioned several times, you've had

3   discussions with individuals that form the basis of some

4   of the information that you gathered.

5          Can you tell me, if they're primarily any

6   specific individuals you've spoken to at the company?

7     A    There are.

8     Q    Could you name those persons?

9     A    The individuals that I've discussed these

10  issues with at the company --

11    Q    Yes.

12    A    -- include former management team members and

13  current Board members, including Don Stout, Shelly

14  Meyers, Paul Arena, Nate Bradley.

15         There may have been others beyond that.

16    Q    Okay.

17         In your declaration on Paragraph 4 -- well, let

18  me go back and ask you.

19         As far as you know, those Burst Media documents

20  are still available?

21    A    As far as -- there's no reason -- as far as I

22  know, yes.

23    Q    Okay.

24         In "Paragraph 4," there's another sentence

25  which is rather lengthy that I'll read, and this

1   Paragraph 4 of Exhibit F, it reads:

2           "Shaub and Williams, L.L.P. (S&W), our prior

3   patent counsel in the Tacoda action, advanced an

4   infringement theory based on the notion that the Tacoda

5   source code alone comprised both the first code module

6   and the second code module, however, it became clear

7   after S&W's withdrawal from the Tacoda action in April of

8   2011 that this infringement theory was untenable because

9   Tacoda's source code did not perform the limitations

10  required by the claims, namely, the "assembly --" which

11  is in quote marks -- "of the second code module

12  including a --" and then again, in quote marks --

13  "service response."  Unquote.

14          Did anyone assist you in drafting this

15  particular paragraph?

16          MR. SYBERT:  Objection, to the extent this

17  seeks Attorney/Client privilege.

18          THE WITNESS:  So the question is, did someone

19  assist me in, you know, I -- I guess the declaration was

20  made.

21          It's my declaration, that the preparation of

22  which was done in collaboration with counsel.

23  BY MR. SHAUB:

24      Q    Which counsel?

25      A    (No verbal response.)

1    Q    Since we've been talking about your present

2  counsel and not the Goodwin and Procter.

3    A    Present counsel.

4    Q    Okay.

5         So did your present counsel draft this

6  paragraph?

7         MR. SYBERT:  I'm going to object and instruct

8  him not to answer.

9         I think that goes into detail that's protected

10 by privilege.

11        And I'll stipulate with you, that every time I

12 instruct the Witness not to answer, the reporter can note

13 it, if that's what you want.

14        MR. SHAUB:  Yes; that's what I wish to have.

15        MR. SYBERT:  Okay; fine.

16        Is that okay with you, Gloria?

17        COURT REPORTER:  Yes, it is, sir; it's okay

18 with me; thank you.

19        MR. SHUAB:  Okay; thank you.

20    Q    So in that lengthy Paragraph 4, I wanted to

21 ask you some questions about certain phrases.

22        It makes reference, first of all, among other

23 things, to Shaub and Williams in the Tacoda action,

24 quote, "Advanced and infringement theory based on the

25 notion that the Tacoda source code alone comprised both

1  the first code module and the second code module."  End

2  of my quote.

3          Do you know what -- strike that.

4          Do you have an understanding of what that

5  phrase means?

6          MR. SYBERT:  I'm sorry, what phrase?

7  BY MR. SHAUB:

8     Q    Do you have an understanding, of what I just

9  quoted means to you?

10     A    So just the phrase that says -- repeat that

11  question.

12     Q    Yes, I'd be happy to.

13          It reads:  "Shaub -- " I'm going to paraphrase

14  it.

15          "Shaub and Williams are patent counsel in the

16  Tacoda action advanced an infringement theory based on

17  the notion that Tacoda source code alone comprised both

18  the first and the second code module."

19     A    So the question is?

20     Q    What is your understanding, of the meaning of

21  that phrase?

22     A    That means, that the court -- that Shaub and

23  Williams pursued an infringement theory, based on the

24  idea that Tacoda source code alone, served it for both

25  the first and second code module.

1    Q    Okay.

2         In the next phrase I wanted to ask you a couple

3    questions about it.  Following that phrase, it says:

4         "However --" I'll paraphrase it -- "However, it

5    became quite clear after S&W's withdrawal from the Tacoda

6    action in April 2011, that this infringement theory was

7    untenable because Tacoda's source code did not perform

8    the limitations required by the claims."

9         What's the meaning of that phrase?

10        MR. SYBERT:  Objection, unintelligible.

11        It's written in English.  It means what it

12   says.

13   BY MR. SHAUB:

14    Q    Do you have your own understanding, of what you

15   said there?

16    A    Not beyond what I said.

17        I believe what it says speaks for itself.

18    Q    Okay.

19        So in other words, in your mind, you believe

20   personally that this became clear?  Because you said,

21   "However, it became clear that ..." et cetera.

22    A    Yes.

23    Q    Okay.

24        Can you tell me, what was clear to you?

25        MR. SYBERT:  Objection.

1           The document speaks for itself.

2           What are you asking him, counsel?

3           Did he really mean what he said?

4    BY MR. SHAUB:

5        Q    Let me ask you this:

6           Do you contend, that only one theory of

7    infringement would be suitable for the infringement

8    claims under the patents that are referred to in

9    "Paragraph 2"?

10          MR. SYBERT:  Objection, to the extent that it

11   seeks a legal counsel.  Assumes a fact not in evidence;

12   vague-and-ambiguous.

13   BY MR. SHAUB:

14       Q    You understand the question?

15       A    Repeat the question, please.

16       Q    Have the reporter read it.

17          (Court reporter complies.)

18          (Record read.)

19          MR. SHAUB:  Okay.

20          I think I'm going to rephrase the question;

21   withdraw that question.

22          Mr. Wilson, do you hold the belief, based on

23   conferring with counsel, that only one infringement

24   theory could be advanced against Tacoda, in order to be

25   successful in establishing infringement?

1          MR. SYBERT:  Well, I object to that question

2    as seeking a legal conclusion and I also object to it as

3    invading the Attorney/Client privilege, because that

4    information goes beyond identification of the patent as a

5    general subject matter.

6          You can testify, if you have an understanding,

7    you can testify as to what it is.

8          THE WITNESS:  I believe that this infringement

9    theory was untenable, because the source code did not

10   perform limitations required by the claims.

11   BY MR. SHAUB:

12       Q    Which limitationS?

13          MR. SYBERT:  Objection; seeks a legal

14   conclusion.

15          If you have an understanding, you can answer

16   the question.

17          THE WITNESS:  As I said in the document, that

18   the assembly of the source code module -- or that the --

19   the Tacoda source code, did not cover the assembly of the

20   second code module, including a service response.

21   BY MR. SHAUB:

22       Q    Is that what you meant by the phrase

23   "limitations"?

24       A    The "limitations"?

25          The limitations required by the claims.  The

1   question is --

2          MR. SYBERT:  What is the question, counsel?

3   BY MR. SHAUB:

4      Q    Okay.

5          Let me ask you this:

6          What is your understanding, of the process of

7   assembly of the second code module?

8          MR. SYBERT:  Objection, to the extent it seeks

9   expert testimony.

10         THE WITNESS:  I'm not a technical expert.

11         My understanding is, the second code module

12  is -- yeah; I guess it's clear to me, the second -- yeah;

13  I'm not a technical expert, so I don't want to get into

14  the details of that.

15  BY MR. SHAUB:

16     Q    Well, perhaps you could explain what you meant

17  by the phrase that's in quote marks, "service response."

18     A    The second code module is responsible for

19  responding and delivering the display advertisement.

20     Q    So is it your understanding, that the service

21  responses is delivery of a display advertisement?

22     A    That's the second code module includes that;

23  yes.

24     Q    Okay.

25         What is your understanding, of the role that

1    say, Bust Media would happen?

2         A    The role of "Burst Media"?

3              Can you be more specific?

4         Q    I think that's clear, but I'll rephrase it.

5              Do you hold an understanding of the function

6    served by Burst Media for Tacoda?

7              MR. SYBERT:  Are you moving on to "Paragraph 5"

8    now?

9              Or are you asking him independent of this

10   declaration?

11             MR. SHAUB:  I'm asking him with regard to

12   Paragraph 4, following up on his explanation of the

13   service response.

14             MR. SYBERT:  I don't understand that, because

15   Paragraph 4 doesn't identify Burst Media, Paragraph, 5

16   does.

17   BY MR. SHAUB:

18        Q    Departing from Paragraph 4, maybe that confuses

19   you, sir.  Setting aside Paragraph 4 for a moment.

20             What is your understanding, of how -- what is

21   your understanding, of how this service response is

22   delivered?

23        A    At AOL at Tacoda?

24             Is that the question?

25        Q    Yes; at Tacoda.

1     A     Okay.

2          My understanding, is that Tacoda uses Burst

3     Media as a third party system, to provide this

4     advertising to the end-users.

5     Q     Okay.

6          Did you have any discussions with counsel,

7     concerning this understanding?

8          MR. SYBERT:  Objection.

9          And instruct you not to answer, beyond

10    identification of the general subject matter of the

11    patents, which I believe has been asked-and-answered.

12         So I instruct you not to answer.

13    BY MR. SHAUB:

14    Q     In Paragraph 5 --

15         MR. SYBERT:  Well, actually, excuse me,

16    counsel, let me modify that instruction.

17         He can answer, to the extent those discussions

18    were with Shaub and Williams, because clearly in this

19    litigation, that privilege has been waived.

20         Did your question include, discussions with

21    your own law firm?

22         MR. SHAUB:  No, it did not.

23         MR. SYBERT:  Okay.

24    BY MR. SHAUB:

25    Q     Would your answer be the same, if I can find

1  the question, to either your present counsel or Goodwin

2  and Procter?

3          MR. SYBERT:  Then the instruction would be the

4  same, not to answer.

5  BY MR. SHAUB:

6     Q    In Paragraph 5 of your declaration, you

7  indicated in this second sentence, and I'll paraphrase.

8          "The advertisements provided by the Burst Media

9  ad server to end-users are the "service response" set

10 forth in the asserted claims."

11         How did you reach the conclusion that I just

12 paraphrased, taken from Paragraph 5?

13    A    The conclusions that I reached throughout this

14 document, as I said, were derived from reviewing business

15 records discussions with individuals internal to the

16 company and discussions reviewed documents provided by

17 counsel, both Goodwin and Procter; yeah, Goodwin and

18 Procter.

19    Q    Well, did anyone at Goodwin and Procter explain

20 to you, that the advertisements provided by Burst Media

21 ad server to end-users, were the service response set

22 forth in the asserted claims?

23         MR. SYBERT:  I instruct you not to answer, on

24 the grounds previously stated.

25 BY MR. SHAUB:

1        Q    I'll ask you the same question, except I'll ask

2   you a little bit differently.

3           If your present counsel has indicated to you,

4   whether or not the advertisements provided by the Burst

5   Media server and end-users were the service response set

6   forth in the assertive claims?

7           MR. SYBERT:  Same objection.

8           And I instruct him not to answer.  It seeks to

9   invade the Attorney/Client privilege.

10  BY MR. SHAUB:

11       Q    In paragraph 6 --

12          THE WITNESS:  Before we do that, could I take a

13  quick bathroom break, please?

14          MR. SHAUB:  Oh, sure, I'm sorry.

15          THE WITNESS:  Yeah; that's okay.

16          Be back in two minutes.

17          MR. SHAUB:  Okay.

18          (Break.)

19          (Back on the record.)

20  BY MR. SHAUB:

21       Q    Continuing with Exhibit F on Page 3.

22          (Witness complies.)

23          In "Paragraph 6," in the second sentence, you

24  state the following:

25          "Based upon my review of publicly available

1  documents regarding the Burst Media source

2  code ..." et cetera.

3          Can you tell me what "publicly available

4  documents" you reviewed?

5      A    Yeah.

6          I reviewed a number of documents.  To be honest

7  with you, I'm, you know, not sure how to categorize --

8  what information would be categorized and publicly be

9  made available.

10     Q    Okay.

11          Were the publicly available documents, ever

12  provided to you?

13          MR. SYBERT:  Objection; vague-and-ambiguous.

14          THE WITNESS:  Were publicly -- repeat the

15  question, please.

16 BY MR. SHAUB:

17     Q    Yeah, I'll change it.

18          Were the publicly available documents shown to

19  you?

20     A    Shown to me?

21          MR. SYBERT:  Counsel, are you asking where he

22  got the documents?

23          MR. SHAUB:  Not yet.

24          MR. SYBERT:  Okay.

25          THE WITNESS:  I reviewed, as I think I

1    mentioned momentarily, I reviewed a number of documents

2    and a number of pieces of material, some of which was

3    prepared for by the company, some of which had been prior

4    correspondence relationship with counsel.

5              And I'm not sure which part of it was publicly

6    available and which part was not.

7    BY MR. SHAUB:

8         Q    With regard to the documents that you referred

9    to thus far, as we discussed Exhibit F, were any of the

10   documents provided to you to review, given to you or

11   provided by your present counsel?

12        A    My present counsel being whom?

13        Q    This is a lawsuit that represents Augme now.

14        A    Well, they're both Goodwin and Procter because

15   I'm Augme now --

16        Q    I'm sorry, your present counsel today sitting

17   next to you, is the firm that is defending litigation

18   brought by Shaub and Williams?

19        A    I'm sorry --

20             MR. SYBERT:  Objection.

21             THE WITNESS:  Understand.

22             Now repeat the question; sorry.

23   BY MR. SHAUB:

24        Q    Yeah.

25             Has your present counsel in the Shaub and

1   Williams case, provided you with the documents that

2   you've been referring to?

3        A    Have they provided me -- the question is, have

4   they provided me documents related to Burst Media?

5        Q    Yes -- no.

6             Including Burst Media --

7        A    I'm sorry.

8        Q    -- the documents that you referred to, as

9   having reviewed -- having been reviewed by you, prior to

10  executing this declaration.

11       A    Were the -- is the question -- again, were the

12  documents, again they're -- I reviewed documents from a

13  number of different sources.  So ...

14       Q    Were any of those documents provided to you by

15  your present counsel, in the Shaub and William case?

16       A    Yes.

17       Q    And are those documents still available?

18       A    I would assume so.

19       Q    And were any of the documents provided to you,

20  by Goodwin and Procter?

21       A    Were any -- repeat the question, please.

22       Q    Sure.

23            Were any of those documents provided to you by

24  Goodwin and Procter?

25       A    Again, I'm not trying to be -- were any of

1   those documents -- any documents in preparation of this

2   declaration?

3           Did I review any documents from Goodwin and

4   Procter for this declaration?

5       A    Yes.

6           We had -- in this -- there is information used

7   in this declaration from documents that I have -- there

8   were documents and correspondence that I have had with

9   Goodwin and Procter?  Yes.

10      Q    Okay.

11          And is -- strike that.

12          And are those documents still available?

13      A    I presume so.

14          MR. SYBERT:  Just so the record is clear,

15  counsel, to the extent that any such documents would fall

16  within Attorney/Client privilege, we don't waive that

17  privilege.

18  BY MR. SHAUB:

19      Q    In paragraph 6, you indicate that, "Based upon

20  my review of publicly available documents regarding the

21  Burst Media source code, this information would have been

22  integral in proving the second code module limitations of

23  the asserted claims and establishing a third," quote

24  "service response," unquote.

25          You see that sentence?

1          A     I do.

2          Q     Okay.

3                Why do you conclude, that this information

4    would have been integral in proving the second code

5    module limitations of the asserted claims?

6                MR. SYBERT:   Objection, to the extent it seeks

7    expert opinion.

8                You can answer.

9                THE WITNESS:   It is my belief, that this

10   information would have been integral, based on my

11   knowledge of our patents.   My knowledge of Burst Media,

12   our review of the business records, discussion with

13   employees and discussion with counsel.

14   BY MR. SHAUB:

15        Q     And what was your understanding, with regard to

16   Burst Media?

17               MR. SYBERT:   Objection; vague-and-ambiguous;

18   overbroad.

19               THE WITNESS:   Repeat the question, please.

20   BY MR. SHAUB:

21        Q     And what was your understanding of Burst

22   Media?

23        A     Again, I'm not sure I understand the

24   question.

25        Q     Okay.

1              What was your understanding of the

2    functionality of Burst Media, that would have been

3    integral in proving the second code module limitations?

4              MR. SYBERT:  Objection.

5              No foundation; assumes a fact not in evidence;

6    misstates the testimony.

7    BY MR. SHAUB:

8       Q    Is it correct, sir, that you don't understand

9    what you said in Paragraph 6?

10             MR. SYBERT:  Objection; argumentative;

11   misstates the testimony.

12   BY MR. SHAUB:

13      Q    Do you understand what you stated in Paragraph

14   6?

15             MR. SYBERT:  Objection; badgering the Witness;

16   document speaks for itself.

17   BY MR. SHAUB:

18      Q    You may answer.

19      A    This is my declaration and I believe the

20   document speaks for itself.

21      Q    What does it say?

22             MR. SYBERT:  It's --

23   BY MR. SHAUB:

24      Q    Was it explained -- no.  Let me rephrase that

25   question.

1          Can you describe, as you sit here today, what

2    is it about Burst Media source code that would have

3    enabled Augme to prove the second code module limitations

4    of the asserted claims?

5       A    Just a --

6          MR. SYBERT:  Objection, to the extent it seeks

7    expert testimony.

8          Subject to that, you can answer, if you can.

9          THE WITNESS:  Repeat the question again,

10   please.  I'm sorry.

11         MR. SHAUB:  Have it read by the reporter.

12         THE WITNESS:  Okay.

13         (Court reporter complies.)

14         (Record read.)

15         THE WITNESS:  Based on my understanding of the

16   Burst Media source code, it was responsible for the

17   service response as we've said before and therefore,

18   because it was responsible for the service response, it

19   would have been important, integral in asserting our

20   claims, particularly with respect to the second source

21   code.

22   By MR. SHAUB:

23      Q    Did you have any discussions with your present

24   counsel, defending in the Shaub and Williams case or with

25   Goodwin and Procter, in reaching that understanding?

1          MR. SYBERT:  You can identify any discussions,

2    which had as their general subject matters these patents,

3    beyond that, I instruct you not to answer.

4          THE WITNESS:  As I've mentioned before, I have

5    had general discussions regarding these patents with

6    Goodwin and Procter and with my current counsel in

7    defending this case.

8          I have also had detailed discussions with

9    individuals at the company with counsel and have reviewed

10   business documents related to this, and all of that has

11   led to me reaching my conclusions.

12   BY MR. SHAUB:

13      Q    Okay.

14           Later in the same Paragraph 6, it's about 10

15   lines down, there's a sentence that reads:

16           "The Burst Media declaration was wholly

17   deficient because it did not address whether the Burst

18   Media's ad server to end-users was in fact --" again, in

19   quotes marks -- "service response."

20           Have you located that sentence?

21      A    I have.

22      Q    Okay.

23           And for the record, I wanted to indicate that

24   the -- where it says, the first media declaration were

25   referring to an earlier sentence, where you make

1    reference to a declaration of Burst Media provided in

2    response to a subpoena served upon Burst Media by Shaub

3    and Williams.

4            Is that a correct statement?

5            I mean, is that your understanding of what

6    the word -- or where the declaration came from?

7        A    Give me a minute; let me reread this.

8            (Witness reading document.)

9            (Brief pause.)

10           Okay; yes, it is.

11       Q    Okay.

12           Did you have any discussions with your present

13   counsel defending you in this case or Goodwin and

14   Procter, as to why in their view the Burst Media

15   declaration was wholly deficient?

16           Because it did not address whether the Burst

17   Media server to end-users was in fact the service

18   response.

19           MR. SYBERT:  Counsel, you're going to get the

20   same instruction not to answer, whenever you go beyond

21   identification of the general subject matter.

22           I mean, you can ask about any other questions

23   you want, but I'm telling you now, you're going to get

24   that instruction not to answer --

25           MR. SHAUB:  Okay.

1          MR. SYBERT:  -- so don't answer that.

2    BY MR. SHAUB:

3      Q     Do you know what source code was sought by

4    Shaub and Williams in their subpoena of Burst Media?

5      A     Do I know "what source code was sought by Shaub

6    and Williams"?

7              It would be --

8              MR. SYBERT:  Well, objection, because the

9    subpoena will speak for itself.

10             If he has an understanding, he can give that to

11   you.

12             THE WITNESS:  Yeah.  Yeah.

13             This ultimately, the subpoena would speak for

14   itself.

15             My understanding, was that they sought --

16   yeah; the answer is, I -- they understand that they

17   sought the relevance for source code for the second code

18   module.

19             That's my understanding.

20   BY MR. SHAUB:

21     Q     What did Shaub and Williams seek in the

22   subpoena?

23             MR. SYBERT:  Same objection; document speaks

24   for itself.

25             If he has an understanding, he can say so.

1              THE WITNESS:   Again, I don't know exactly what

2    they sought in the subpoena.

3    BY MR. SHAUB:

4         Q    Okay.

5              There's a sentence, and it's below five or six

6    lines that starts with the words, "Thus Augme concluded

7    that this source code was in Burst Media's control and

8    untenable through discovery."

9         A    Okay.

10             "Thus we concluded that the source code was --"

11   yes.  I found the sentence.

12        Q    Other than your present counsel defending this

13   case and Goodwin and Procter, was there anyone else that

14   provided you with the conclusion that the Burst Media

15   source code was in Burst Media's control and obtainable

16   through discovery?

17             MR. SYBERT:   Objection; assumes a fact not in

18   evidence, that he obtained such information from either

19   of those counsel.

20   BY MR. SHAUB:

21        Q    My question is -- okay; strike that.

22             Did you obtain any information from your

23   present counsel defending this case or Goodwin and

24   Procter, that they had concluded that the source code of

25   Burst Media was in its control and obtainable through

1    discovery?

2              MR. SYBERT:  Objection.

3              It seeks Attorney/Client information.

4              I instruct you not to answer.

5    BY MR. SHAUB:

6        Q    Have you reviewed the subpoena and the

7    declaration obtained by Shaub and Williams from Burst

8    Media?

9        A    Have I reviewed the subpoena themselves?

10       Q    Have you reviewed -- let me rephrase it.

11            Have you reviewed the subpoena, caused to be

12   served by Shaub and Williams upon Burst Media for certain

13   documents, and also a related declaration executed by a

14   person on behalf of Burst Media?

15       A    As a -- I guess I would say -- I'll say again.

16            My declaration here is based on a combination

17   of reviewing a number of different business records,

18   discussions with personnel of the company and discussions

19   with counsel, with counsel material.

20            I don't recall, if I have specifically reviewed

21   those subpoenas.

22       Q    Or the declarations?

23       A    Or the declarations.

24       Q    A few lines down, there's a sentence in

25   Paragraph 6, that begins with the word "indeed."

1      A    Okay.

2      Q    And -- okay; it reads:

3           "Indeed, it appears that the only party with

4  the second code module source code necessary for Augme to

5  support its claims of infringement with Burst Media."

6           Can you tell me, who amongst your individuals

7  at the company, reached this belief?

8      A    I can't speak for who else holds this belief.

9           Is that what you're asking me?

10     Q    Yeah; right.

11     A    The company holds this belief.

12          Who within the company holds this belief?

13     Q    Okay.  That's fine; "the company."

14          Can you tell me if Goodwin and Procter advised

15  you, that it held this belief?

16          MR. SYBERT:  I object to that, on the grounds

17  of Attorney/Client privilege.

18          And instruct you not to answer.

19  BY MR. SHAUB:

20     Q    With regard to another sentence, which is at

21  the bottom of the page.  It begins with the sentence:

22          "Thus, based upon my examination ..."

23          Do you see that sentence?

24     A    I do.

25     Q    Reading the entire sentence, it states:

1          "Thus, based upon my examination of Augme's

2    business records, the failure to adequately seek

3    discovery related to the "second code module" from Burst

4    Media's ad server during the discovery period proved

5    fatal to our, Augme's, case for patent infringement."

6          Did you compose that sentence?

7     A    Mr. Shaub, as I've said, this is a declaration

8    that I've made on behalf of the company which I support

9    and believe, that it was made based on the review of

10   information and collaboration with counsel.

11    Q    Okay.

12         Did you draft the declaration?

13    A    Did I physically type the words of the

14   declaration?

15    Q    Correct.

16    A    No.

17    Q    Who did?

18         MR. SYBERT:  To the extent, that your answer

19   would identify counsel, I instruct you not to answer.

20         If somebody else assisted you, you can identify

21   them.

22         THE WITNESS:  I'm not going to answer that.

23   BY MR. SHAUB:

24    Q    Okay.

25         Paragraph 10 on Page 4.

1       A     "Paragraph 10"?

2       Q     "10;" yes --

3       A     Okay.

4       Q     -- of "Exhibit F."

5             (Witness complies.)

6             There is a sentence that reads:

7             "With discovery closed and without issue

8    sanctions, we, Augme, were unable to support our

9    infringement contentions with the specificity I am

10   informed and believe is required under U.S. Patent law,

11   and were effectively obliged to dismiss our case against

12   Tacoda."

13            Do you know what "specificity" was being

14   referred to in "Paragraph 10"?

15      A     So let me read it again.

16            (Witness reading document).

17            (Brief pause.)

18            So your question is -- repeat your question,

19   please, I'm sorry.

20            MR. SHAUB:  I'd like to have the reporter read

21   it back.

22            COURT REPORTER:  Sure.

23            (Court reporter complies.)

24            (Record read.)

25            MR. SYBERT:  Objection; unintelligible.

1          MR. SHAUB:  Yes.

2      Q    We've read -- we've looked at the first

3  sentence of Paragraph 10.

4          And in regard to that first sentence, what

5  specifically was necessary, in order to establish the

6  infringement contentions of Augme under U.S. Patent

7  law?

8      A    What specifically would have been required to

9  establish an infringement?

10         I think what I'm saying is, I'm not an attorney

11  nor an expert, so I don't know specifically would have

12  been required.

13         Based on my belief on discussion with counsel,

14  I believe we were unable to support our infringement case

15  with the appropriate support and information that we

16  needed to, to prevail.

17     Q    Okay.

18         With which counsel are you referring to?

19     A    Sorry; it's based on discussions with

20  individuals at the company and the companies and with

21  our -- and with Goodwin and Procter.

22     Q    Who at Goodwin Procter?

23     A    My principal contact at Goodwin and Procter has

24  been Thomas Scott.

25     Q    And what did he say?

1              MR. SYBERT:  Objection.

2              I'll instruct him not to answer; that's getting

3    into a level of detail that's an Attorney/Client

4    privilege.

5    BY MR. SHAUB:

6        Q    In Paragraph 11 of Exhibit F, you indicate

7    that:

8              "Our damage experts had estimated that had we

9    obtained the necessary evidence from Burst Media to

10   establish infringement, our damages would have been in

11   the tens of millions of dollars rather than zero

12   dollars."

13             Do you see that sentence?

14       A    I do.

15       Q    Or portion of that sentence?

16       A    I do.

17       Q    And who were those damage experts?

18       A    The company has engaged a number of experts in

19   the past, to help us build models about damages.

20             I don't recall the exact names of those, but

21   we've engaged experts to help us understand what the

22   damages would be, specific cases.

23       Q    During what time frame, had they provided these

24   damages analysis?

25       A    Over what time frame?

1              Throughout the life of the case, I guess.  I'm

2    not sure I understand the -- so, yeah.

3         Q    Okay.

4              Have you spoken to any of those experts --

5    strike that.

6              Did you speak to any of those experts, before

7    execution of your declaration?

8         A    Have I -- is the question, "have I ever spoken

9    to any of those experts"?

10        Q    Did you speak to any of those experts, before

11   you executed the declaration?

12        A    I have reviewed information provided by those

13   experts.

14        Q    Before you signed the declaration.

15        A    Prior to me -- so in the past, prior to me

16   signing the declaration?  Yes.

17        Q    Okay.

18             And did you personally discuss with those

19   experts, the damages that they had calculated before you

20   signed this declaration?

21        A    No.

22        Q    With regard to some of your earlier comments in

23   the declaration, did you refer to any experts, technical

24   experts, to assist you in understanding the declaration?

25             MR. SYBERT:  Objection; vague-and-ambiguous.

1          THE WITNESS:  Repeat the question, please.

2    BY MR. SHAUB:

3       Q    Yes.

4          Prior to signing the declaration, did you have

5    any discussion with any technical experts, in order to

6    explain to you the meaning of some of the terminology and

7    phrases in your declaration?

8       A    Prior to signing this, I've had discussions

9    with -- I have read documents and I've had discussions

10   with experts, both technical and nontechnical who --

11      Q    Who is technical -- who were the technical

12   experts?

13      A    I would say, that the technical experts who I

14   had the most discussion with, would be Nate Bradley, the

15   Chief Technical Officer and now former Chief Technical

16   Officer at the company.

17      Q    Okay.

18          In Paragraph 12, you indicate in a portion of

19   the sentence.

20           "Augme would have obtained a settlement

21   similar to the settlement Augme received in the AOL

22   action (in which AOL paid $650,000.)"

23          Can you tell me why you reached this

24   conclusion?

25      A    As I stated in "11" above, it is my belief that

1    had we established an infringement, our damages would

2    have been in the tens of millions of dollars.

3         Q    Okay.

4              So why do you say that Augme, if -- well,

5    strike that.

6              Why do you say, that if Shaub Williams had

7    obtained the necessary discovery to support Augme's

8    infringement contentions in the Tacoda action, that Augme

9    would have obtained the settlement similar to the

10   settlement Augme received in the AOL action?

11        A    What's the question?

12             The question is why did I -- what's the

13   question?

14        Q    You know, why do you conclude that?

15        A    I conclude, as I stated several times before,

16   that Shaub and Williams did not obtain the necessary

17   discovery to support our infringement contentions, that's

18   one comment.

19             My next comment, is based on discussions with

20   damages experts, I believe that had we obtained the --

21   had we obtained a settlement, it would have been

22   substantial.  I don't want to speculate what it would

23   have been, but it would have been substantially above

24   zero.

25        Q    In other words, it was your conclusion that you

1    could have obtained a settlement similar to the

2    settlement received in the AOL action?

3        A    Do I think we could have received -- I don't --

4    yes.  I said that we could have.

5             We would have achieved that settlement, "yes,"

6    was my comment.

7        Q    Okay.

8             Are you aware of any settlement amount that had

9    been proposed by AOL in the past, in either the Tacoda

10   action or the AOL and Time Warner action, separate from

11   the settlement that was reached at "$650,000"?

12       A    I know that there was discussion over -- the

13   answer is yes.

14            Well, repeat the question, excuse me, before I

15   answer.

16            Please repeat the question.

17       Q    Well, I think I'd like to have it read back.

18            COURT REPORTER:  Sure.

19            (Court reporter complies.)

20            (Record read.)

21            THE WITNESS:  So my answer to that question, is

22   I don't specifically recall the amount, because I think

23   it asked for the amounts.

24            I know there was settlement discussions had

25   with the company, with counsel, with AOL and Tacoda, but

1    I don't specifically recall the amounts or the offers,

2    nor the credibility of the offers.

3    BY MR. SHAUB:

4        Q    Do you know of any offer made by Tacoda or AOL

5    to settle the infringement litigation, other than the

6    offer that concluded with the settlement of 650,000?

7        A    I don't recall the exact amounts, but I know

8    there were offers made prior that 650, yes.

9        Q    Made by AOL?

10       A    My understanding is, there were offers made by

11   AOL or I -- yeah; they were made by AOL, yes; that's my

12   understanding.

13       Q    Do you have any recollection or knowledge of

14   any offers made by AOL greater than $650,000, prior to

15   the settlement that was reached with AOL?

16       A    I believe at one point, there was an offer made

17   above the 650,000 level, but I don't recall the

18   specifics.

19       Q    Do you recall when that was made?

20       A    I do not.

21       Q    Do you recall who made the offer?

22       A    I do not.

23       Q    Do you recall the conditions of the offer?

24       A    I do not.

25       Q    Do you recall, who if anyone at the company,

1   responded to the offer?

2        A    I do not.

3        Q    Do you recall actually seeing in writing, such

4   an offer?

5        A    I do not.

6        Q    What's the basis of your belief, that there had

7   been an offer in the past greater than 650,000?

8        A    I'm recalling discussions with individuals at

9   the company.

10       Q    Which individuals?

11       A    I don't recall, whether it was shelly Meyers or

12  Paul Arena or both.

13       Q    Okay.

14            We have here attached as an exhibit, some

15  documents.

16            And just look at G --

17            MR. SYBERT:  Excuse me, counsel --

18            THE WITNESS:  Give me two minutes to go to the

19  bathroom break.  I'm drinking too much water.

20            MR. SYBERT:  -- need a bathroom break here.

21            THE WITNESS:  Thank you.

22            MR. SHAUB:  Okay.

23            (Break.)

24            (Back on the record.)

25  BY MR. SHAUB:

1      Q    Well, I guess we can get started again and go

2   back on the record.

3           And I was at "Exhibit G," which is "Exhibit 1"

4   to Mr. Wilson's declaration.

5           MR. SYBERT:  Counsel, it's up to you, but I

6   would just suggest, this is going to start to get a

7   little confusing if you make the numbered exhibits to the

8   declaration separate exhibits in this Deposition.

9           But it's up to you.

10          MR. SHAUB:  I'm open to a suggestion.

11          I have the -- I can just refer to them as --

12  not as a separate Exhibit.

13          I think I have in "G, H, I, J and K" and --

14          MR. SYBERT:  My suggestion, which obviously

15  you're free to accept or reject, is simply to refer to

16  them as they are as Exhibit 1, 2, 3, 4 and 5 to Exhibit

17  F.

18          MR. SHAUB:  That's fine.

19          (Plaintiff's Exhibit G, marked for

20  identification.)

21          MR. SYBERT:  Okay; thank you.

22          I'm not telling you I still won't be confused.

23  It lowers the risk.

24          MR. SHAUB:  Okay.

25          I understand.  We're all getting older.

1          MR. SYBERT:  What?

2          I couldn't hear you.

3          MR. SHAUB:  I couldn't see you.

4     Q    So Exhibit F, I'm going to talk about some

5  exhibits to your declaration.  First, is Exhibit 1.

6          And is it correct, that that is a document that

7  you have relied upon in regard to your declaration that

8  kind of provides a broad overview of the pending

9  litigation, particularly defending litigation that Shaub

10 and Williams had originally been involved with in regard

11 to Tacoda and while --

12         MR. SYBERT:  Well, I'll object to that, as I

13 think unintentionally misstating the Witnesses

14 declaration.

15         Paragraph 2 of the declaration, simply attaches

16 it.  It doesn't say he relied on it.

17         MR. SHAUB:  Okay.

18    Q    Then let me have you turn then to Exhibit 1, to

19 Note 7, which is at "Page 19 of 43."

20         (Witness complies.)

21    A    Okay.  I'm here.

22    Q    In Note 7, you will note that it's headed up

23 as, "Commitments and Contingencies."

24         And then, underneath that it says,

25 "Litigation."

1       A    Yes.

2       Q    Okay.

3            Can you tell me, Mr. Wilson, if this is a

4  document among others, that you relied upon to get and

5  provide in your declaration, an overview of the

6  litigation that's discussed in your declaration?

7       A    This is one of many documents, I guess I would

8  have reviewed in preparation for my declaration -- I

9  would have -- this is one of the documents, I guess, that

10 contributed to my general knowledge of the material --

11      Q    Okay.

12      A    -- yes.

13           But I don't know to say that I relied upon it

14 for my declaration.  I don't know if that's a fair

15 statement.

16      Q    Okay.

17           In the initial paragraph headed "Augme

18 technologies, Inc., v. Tacoda, Inc. and AOL Inc.,"

19 there's a sentence that reads on "November 14, 2011, the

20 Court issued an order granting in part and denying in

21 part Defendant Tacoda's motion for summary judgement."

22           And it continues:

23           "The court held that Augme could not prove

24 literal infringement under that Court's claim

25 construction ruling previously issued."

1          Do you see that language?

2     A    I do.

3     Q    Okay.

4          Are you familiar with documents that were filed

5    by Augme, in opposition to Defendant Tacoda's motion for

6    summary judgement?

7     A    Am I familiar with ...  I'm not.

8          I'm not intimately familiar with them, but I am

9    aware that we filed documents, obviously.

10          Is there a question in there?

11    Q    No; that was the question.

12          Are you familiar with the documents relating to

13   Augme's defense, against the motion for summary motion by

14   Tacoda?

15          In regard to or following up on your answer,

16   can you tell me first of all, if Goodwin and Procter

17   handled the defense against Tacoda's motion for summary

18   judgement?

19    A    The -- my recollection of the time frame was

20   that we, that Augme dismissed Shaub and Williams in early

21   February of 2011, as counsel on the case and engaged

22   Goodwin and Procter at that time to lead counsel on the

23   case.

24          I don't re -- I'm not aware of the filing date

25   of the objection, but I guess that's my comment.

1        Q      Okay.

2               Do you know the name of the -- strike that.

3               Did Goodwin and Procter engage an expert to

4    assist in opposing the Summary Judgement motion brought

5    by Tacoda in "November of 2011"?

6        A      I don't know the answer to the question.

7        Q      You don't know if they engaged in an expert?

8        A      I do not know.

9        Q      Okay.

10              Turn to Exhibit 2 in your -- well, let me ask

11   you another phrase, before I talk about Exhibit 2, to

12   your declaration.

13              As far as you know, does Goodwin and Procter

14   still have the documents that they used in defending

15   against the motion for Summary Judgement by Tacoda?

16       A      I guess you asked me before, if they depended

17   for Summary Judgement and I think I answered that with a

18   review of the timeline.

19              So there's a presumption there, they defended

20   for Summary Judgement, which I guess I don't think I

21   stated in my answer to your question.

22       Q      Okay; let me revise the question then.

23              Do you have any reason to believe, that Goodwin

24   and Procter does not have records pertaining to its

25   prosecution of the ad infringement litigation against

1   Tacoda and AOL?

2           MR. SYBERT:  Okay.

3           I'm going to let the Witness answer, but I want

4   to make clear on the record, that I am not waiving

5   Attorney/Client privilege.

6           And I also need to say, and I probably should

7   have said this earlier but I'm saying it now, that I

8   don't speak for Goodwin and Procter and they may

9   interpose their own objections if and when the time is

10  appropriate to do so.

11          MR. SHAUB:  Okay.

12          It doesn't mean that I approve to that comment

13  as to its content, but I understand.

14          MR. SYBERT:  Okay.

15          Now with all that colloquy, do you recall the

16  question?

17          THE WITNESS:  No.

18          Did Goodwin and Procter retain it's documents,

19  I think was the gist of the question, but I'm sure it was

20  more detailed than that.

21          MR. SHAUB:  Right.  Right.

22     Q    Exhibit 2 consists of a few pages of a billing

23  statement of Shaub and Williams.

24          And do you have any recollection, as to why

25  this was an exhibit referenced in your declaration?

```
 1            MR. SYBERT:  Well, objection.

 2            The declaration will speak for itself.

 3            MR. SHAUB:  Well, the declaration says --

 4            MR. SYBERT:  Paragraph 13, counsel, I think.

 5  BY MR. SHAUB:

 6      Q    It says, "Chapter 2 as Exhibit 2," is a

 7  true-and-correct copy of an invoice, "dated July 31,

 8  2010" from Shaub and Williams to Augme for legal services

 9  in connection with AOL action.

10            So why was this particular invoice attached, if

11  you know?

12      A    The invoice was attached just to be -- I

13  believe the invoice was attached to merely illustrate an

14  example of a bill that we received from Shaub and

15  Williams as part of the representation.

16      Q    Okay.

17            With regard to Exhibit 3, there's a memorandum

18  "Roman II," Augme patent cases from.

19            Let's see, from David Shaub to Shelly Meyers

20  and Paul Arena on December 29, 2010.

21            In your declaration -- I'm going to have to

22  switch back-and-forth -- you say attached to your two as

23  Exhibit 3, is a true-and-correct copy of a memorandum

24  dated December 29, 2010, from Shaub and Williams to Augme

25  regarding Shaub and Williams billing management for
```

1    Augme.

2            Do you know why that particular memorandum was

3    attached?

4        A    I do.

5            I believe it was attached --

6            MR. SYBERT:  He didn't ask you that.

7            THE WITNESS:  I'm sorry.

8            MR. SHAUB:  Yes.

9        Q    And why was that attached?

10       A    Well, I believe it was attached to show

11   correspondence from Shaub and Williams to management, to

12   provide their perspective on both the status of the case

13   and the billing relationship.

14       Q    Okay.

15           With regard to "Exhibit 4" in your declaration,

16   you indicate, attached here to as Exhibit 4, is a true-

17   and-correct letter, dated June 20, 2011 from David Shaub.

18           Do you know why this is attached to your

19   declaration?

20       A    I do.

21       Q    And why was it attached?

22       A    It was attached again, to provide context of

23   the correspondence between Shaub and Williams and the

24   company with respect to both the work that had been done,

25   the status and the billing relationship.

1      Q    And in regard to Exhibit 5, which is an

2   engagement letter dated, "March 25, 2008, Shaub and

3   Williams and Rosenbaum and Associates."

4           You indicate in your declaration, "Paragraph

5   16," as follows:

6           "Attached here to as Exhibit 5, is a true and

7   correct copy of infringement agreement between Shaub and

8   Williams and Modavox Inc., predecessor company, Augme."

9           Can you tell me why the infringement agreement

10  was attached to your declaration?

11     A    I can.

12     Q    And why was it?

13     A    To provide context for the initial

14  establishment of the contractual working relationship

15  between Shaub and Williams and the predecessor

16  company.

17     Q    I believe it's already been asked-and-answered,

18  but I'll ask you again with regard to, in case I didn't,

19  paragraph of Exhibit L.

20     A    I'm sorry, "Exhibit L"?

21     Q    Yes.

22          I think that's already been briefly referred

23  to.

24          MR. SYBERT:  That's -- I don't think so,

25  counsel.

```
 1              What's "Exhibit L"?
 2   BY MR. SHAUB:
 3       Q    Okay.
 4              It's been described as Defendant
 5   Counterclaimant's Augme Technologies Memorandum of law in
 6   Opposition Plaintiff as Counterdefendant's Shaub and
 7   Williams L.L.P. Motion for Summary Judgement.
 8              MR. SYBERT:  Okay.
 9              I think if that were marked as Exhibit next in
10   order, that would be "Exhibit G."
11              (Plaintiff's Exhibit G, marked for
12   identification.)
13              MR. SHAUB:  Well, let's get G and leave it as
14   based, and I think --
15              MR. SYBERT:  I see.  I see; okay.
16              MR. SHAUB:  All right.
17              We'll -- I want to make a note to change the
18   sequence.  Okay; so this will be G.
19       Q    If you look at the exhibit, which you'll see at
20   the top, it's indicated it was filed with the United
21   States District Court, Southern District of New York on
22   "September 11, 2013."
23              And let's turn to "Page 4."
24              (Witness complies.)
25              Toward the top of the page, "factual
```

 1   background," and if you look at that page, you'll see

 2   several references to the Wilson declaration.

 3            (Witness complies.)

 4            And if you take a look at Page 5, you will find

 5   further references of Mr. Wilson's declaration.

 6            And if you look at "Page 6-and-7," you'll also

 7   see further references to the Wilson declaration.

 8            (Witness complies.)

 9            Do you notice those references?

10       A    I do.

11       Q    Were you aware, at the time that you signed the

12   declaration, that the declaration would be connected to

13   the -- and used to be referenced in regard to filing of

14   papers with the U.S. District Court in the Shaub and

15   Williams versus Augme Technology case?

16       A    I was.

17       Q    Okay.

18            The next, "Exhibit H," which is a letter from

19   Gordon and Rees.  Rees is spelled R-e-e-s, dated October

20   21, 2012, directed to Honorable George B. Daniels of the

21   U.S. District Court.

22            And who is a U.S. District Court Judge in the

23   Southern District of New York.

24            (Plaintiff's Exhibit H, marked for

25   identification.)

1            MR. SYBERT:  All right.

2            Counsel, just for the record, because I wrote

3    this letter.

4            There's a typo.  The date should be "October

5    21, 2013."

6            MR. SHAUB:  Oh, yes.  I didn't even notice it

7    myself; thank you; okay.

8            I've made a correction in the document; perhaps

9    we could stipulate that it was sent out in 2013 and for

10   the purpose of the Deposition, if we could manually

11   correct the date.

12           MR. SYBERT:  Okay.

13           I so stipulate.

14           MR. SHAUB:  Okay.

15           If one of you could mark it.  I don't care

16   which one.

17           MR. SYBERT:  I'm just crossing the "2012" and

18   writing in "2013."

19           Can you see that, counsel?  (indicating)

20           MR. SHAUB:  I can't see it, but I trust you.

21           MR. SYBERT:  Okay.

22           MR. SHAUB:  Okay.

23      Q    This is a letter that contains some portions,

24   of which I wanted to ask you some questions, Mr. Wilson.

25           I wanted to turn to page -- see, "Page 3" of

1    the letter.

2            (Witness complies.)

3            And you'll see in the middle of the page,

4    you'll see a subtitle of the topic and it's underlined

5    and it reads:

6            "Failure to manage expert witnesses --" or I'm

7    sorry, "witness" singular.  So it reads:

8            "Failure to manage expert witness ..."

9       Q    Do you see that phrase?

10      A    I do.

11      Q    Okay.

12           First of all, are you familiar with the fact

13   that an individual by the name of "Andrew Cromarty" had

14   acted as an expert witness, with regard to the technology

15   in the Tacoda action and also the AOL action?

16      A    Yes.

17      Q    Do you understand, that this expert witness's

18   engagement, was negotiated by Shaub and Williams?

19      A    Yes.

20      Q    And how did you reach that understanding?

21           MR. SYBERT:  Mr. Wilson, if you reach that

22   understanding on the basis of discussions with counsel, I

23   instruct you not to answer.

24           If there's another basis, you can answer.

25           THE WITNESS:  I won't answer that question.

1  BY MR. SHAUB:

2       Q    Okay.

3            You have an understanding, that the engagement

4  agreement form, was based upon a template located by

5  Shaub and Williams?

6       A    Is counsel similar --

7            MR. SYBERT:  You can say whether or not you

8  have an understanding, or move to the next question.

9            THE WITNESS:  Yes.

10 BY MR. SHAUB:

11      Q    What is your understanding?

12      A    My understanding is, that the form obtained,

13 was obtained by Shaub as a template for expert

14 witnesses.

15      Q    Okay.

16           And did someone advise you of that conclusion?

17           MR. SYBERT:  Again, Mr. Wilson, if someone

18 other than counsel so advised you, you can so state.

19           Otherwise, I instruct you not to answer.

20           THE WITNESS:  I won't answer that question.

21 BY MR. SHAUB:

22      Q    Okay.

23           Skipping two paragraphs down, there's -- it's a

24 paragraph that begins "at first having signed ..."

25           Do you see that paragraph?

1        A     Yes.

2        Q     Okay.

3              It continues to page -- I'll read it in its

4    entirety, the first sentence.

5              "At first having signed the Cromarty agreement

6    on Shaub's recommendation, Augme paid Mr. Cromarty's

7    exorbitant bills."

8              Did you ever study such bills?

9        A     Did I study the bills?  No.

10       Q     It continues to say:

11             "Eventually, however, Augme questioned the

12   bills and requested a review of his work product."

13             And then it continues:

14             "Mr. Cromarty failed to comply ..."

15             Do you have any understanding, with regard to

16   the questioning of Mr. Cromarty and Mr. Cromarty's

17   failure to comply?

18       A     I do not.

19       Q     Okay.

20             Then it continues:

21             "Augme also instructed Mr. Cromarty to stop

22   conducting additional work but to no avail ..."

23             Are you aware of these facts yourself,

24   personally?

25       A     I am aware of that situation, based on

1    conversations that I've had -- it is my belief that based

2    on conversations I've had with prior management or people

3    at the company, that they instructed Mr. Cromarty to stop

4    conducting this work.

5         Q    Who was that?

6         A    It would have been with Ms. Meyers, Mr. Arena

7    or both.

8         Q    Okay.

9              And then it continues:

10             "All the while, Mr. Cromarty was able to cite

11   to the highly unfavorable agreement that Shaub had

12   approved and recommended, which allowed him to withhold

13   all work product unless Augme paid his exorbitant bills."

14             Did you have such an understanding?

15        A    (No verbal response.)

16        Q    Let me rephrase that.

17             Do you have such an understanding?

18        A    That is my understanding, based on discussions

19   that I've had with people at the company.

20        Q    Okay.

21             The same people?

22        A    Mr. Arena, Ms. Meyers or both; yes.

23        Q    Okay.

24             And have you had any discussions with any

25   counsel, in reaching that understanding?

1          MR. SYBERT:  Well, you can identify any

2   discussions you've had with the general subject matter,

3   with Mr. Cromarty's retention.

4          Beyond that, I instruct you not to answer.

5          THE WITNESS:  I've had discussions with counsel

6   about the general relationship between the company and

7   Mr. Cromarty.

8   BY MR. SHAUB:

9       Q    Okay.

10          By "counsel," which counsel are you referring

11  to?

12      A    I'm referring to Gordon and Rees.

13      Q    Okay; thanks.

14          In the next paragraph, it reads:

15          "As a result of the Shaub's failure to draft a

16  reasonable expert agreement with Mr. Cromarty, Augme was

17  forced to pay Mr. Cromarty without receiving any value."

18      Q    Do you see that sentence?

19      A    I do.

20      Q    Is it your understanding, that Mr. Cromarty was

21  paid a substantial amount of money, but refused to turn

22  over any documentation concerning his analysis?

23      A    It's my understanding, that we paid

24  Mr. Cromarty a substantial amount of money without

25  receiving value.

1      Q    What do you mean, "without receiving value"?

2      A    We did not receive any -- as I stated here,

3  based in my discussions with individuals at the company,

4  we do not believe we received any value from

5  Mr. Cromarty.

6      Q    Well, what do you mean by "value"?

7      A    That --

8           MR. SYBERT:  Well, just a second.  I want to

9  make sure the Witness understands.

10          The Witness didn't write this, I did.  He can

11  testify, as to what he understands by the term "value,"

12  but he can't --

13          MR. SHAUB:  That's a fair statement.

14          MR. SYBERT:  Okay.

15          MR. SHAUB:  Let me rephrase it.

16     Q    Is it your understanding, that Mr. Cromarty did

17  not deliver his analysis of the Tacoda source code to

18  make it available to Augme, after Shaub and Williams was

19  terminated?

20     A    I don't know the answer to that question.

21     Q    Okay.

22          It states in the next sentence:

23          "Ultimately Augme had to hire and pay another

24  expert to replace Cromarty and conduct and draft the same

25  analysis and work that Cromarty had allegedly performed

93

1    but had refused to produce."

2           Is it your understanding, that this is a

3    correct statement?

4        A    Yes.

5        Q    And that's based upon -- is that based upon

6    in the discussions you had?

7        A    It's based on -- again, as it relates to this

8    entire issue, I've had a number of discussions with both

9    counsel and specific individuals at the company,

10   principally Meyers, Arena and Bradley.

11          My view or affirmation of this statement, is

12   based broadly on those conversations.

13       Q    Approximately, when did those conversations

14   take place?

15       A    They took -- they had taken place both at the

16   time, which was -- if I have my dates correctly -- the

17   middle of "2011."

18          And subsequent to the filing of the lawsuit by

19   Shaub and Williams against the company.

20       Q    Well, Shelly Meyers has left the company.

21          Is that correct?

22       A    She's no longer Chairwoman of the company.

23       Q    Is she still an Officer of the company?

24       A    No.

25       Q    Is she an employee of the company?

1      A    No.

2      Q    Is she a consultant to the company?

3      A    Not that I'm aware of.

4      Q    Does she do any work for the company?

5      A    Not that I'm aware of.

6      Q    Do you know why she left the company?

7      A    She was never an Officer.

8           As far as I understand, she was never an

9  Officer of the company.  She was Chairwoman of the Board.

10     Q    Do you know why she left the company as the

11  Chairwoman?

12     A    You have to ask her that.

13     Q    Do you know why?

14     A    Do I know why?

15          It would be speculative.

16          MR. SYBERT:  Don't speculate.

17  BY MR. SHAUB:

18     Q    Did she ever tell you, her reasons for leaving

19  the company?

20     A    Did she ever tell me, her reasons for leaving

21  the company?

22          I don't believe I could accurately answer the

23  question on her behalf, as to her reasons for leaving the

24  company.

25     Q    I'm just asking you, if she ever told you her

1    reasons?

2         A    She and I talked often about the company.

3         Q    What did she tell you in those talks, about the

4    reason she left the company?

5         A    That she no longer wanted to serve on the Board

6    of the company.

7         Q    Did she tell you why she no longer wanted to

8    act for the company?

9         A    She did not believe that she was best suited to

10   continue to be Chairwoman of the company.

11        Q    Did she tell you why she believed she was not

12   best suited to remain Chairman of the company?

13        A    That her strategic view of the company was

14   different than the Board and Management strategic view of

15   the company.

16        Q    Did she tell you what her strategic view of the

17   company was?

18        A    Not in detail; no.

19        Q    Did she tell you generally was her view?

20        A    That -- I don't think I could accurately

21   reflect what she told me was her view.  I don't think I

22   can.

23        Q    Can you tell me, as best you recall, what she

24   told you was her strategic view of the company that

25   differed from that of the Management and Board?

1     A     I believe it was a general -- the answer is

2  specifically no.  I believe it was a general differing of

3  opinion as to the direction of the company.

4          Beyond that, it would be more speculative than

5  anything else.

6     Q     What did she tell you, was her opinion as to

7  the direction of the company?

8     A     I'm trying to recall.

9          This would have been in September.  I don't

10 recall exactly, to be honest with you.  It would be

11 speculative.

12    Q     I don't need for you to say exactly, just what

13 you do recall she said.

14    A     I recall that she said --

15    Q     What her view of the direction of the company

16 versus that of the Management of the Board.

17    A     She believed -- she said, that she believed

18 that her voice was not being heard on the Board and she

19 could have limited effectiveness as a Board Member and

20 Chairwoman.

21    Q     She's a neighbor of yours still.

22          Is that correct?

23    A     She is.

24    Q     Still have discussions with her on occasion?

25    A     "Discussions"?

1      Q    No.

2            Just, you know, I'm not asking, you know,

3  company -- I mean, do you still talk to her?

4      A    I still see her walking her dog often and we

5  say --

6      Q    Do you talk to her?

7      A    We say hello.

8      Q    Okay.

9            Previous to that, would you describe yourself

10  as friends?

11      A    We were neighbors and acquaintances and

12  friendly, but I would not call us friends -- I'm sorry --

13  by "previous to that," do you mean prior to me joining

14  the Board?  Or --

15      Q    No.

16            I meant, prior to-and-after you were on the

17  Board.

18            I'm talking about past tense, though.

19      A    Were we "friends"?

20            I would say we were friendly and we were

21  business associates.

22      Q    That's fine; thank you.

23            At about the time that she left the Board, did

24  the two of you have any falling out?

25      A    No.

1       Q     Okay.

2             Turning again to the exhibit and -- and let's

3    see, "Exhibit H."

4             (Witness complies.)

5             And on Page 3, where we left off.

6       A     Okay.

7       Q     It indicates:

8             "Since then Augme has incurred attorney's fees

9    and costs in responding to Mr. Cromarty's continued

10   demands for payment, to the point of now having to defend

11   an arbitration proceeding filed by Cromarty to collect

12   what he claims is owed him."

13      Q     Do you see that sentence?

14      A     I do.

15      Q     Okay.

16            Is that arbitration proceeding in progress, at

17   the present?

18      A     I'm not sure of the status of the proceeding.

19            I know that the dispute has not been

20   resolved.

21      Q     Okay.

22            Do you know before, what administrative

23   tribunal the arbitration is taking place?

24      A     I do not.

25      Q     Okay.

```
 1              Do you know where the arbitration is taking

 2    place?

 3        A    I do not.

 4        Q    Do you know if it's taking place in

 5    California?

 6        A    I do not.

 7        Q    Okay.

 8              Have you participated in any way, in the

 9    proceedings?

10        A    I have not.

11        Q    Okay.

12              Have you had any discussions with counsel, in

13    regard to those proceedings?

14        A    The proceedings between the company and

15    Mr. Cromarty?

16        Q    Correct.

17        A    I have not.

18        Q    If you will, please, in the same Exhibit H,

19    turn to Page 5.

20              (Witness complies.)

21              You'll see in the second to last paragraph, it

22    states:

23              "Shaub billed Augme for $1,035,135 --"

24    "$1,035,135.20."

25        Q    Do you see that sentence?
```

1        A    I do.

2        Q    Okay.

3             Are you aware of any experts by Augme, who are

4   working on review of invoices of Shaub and Williams?

5             MR. SYBERT:  Now, I object to that as seeking

6   the premature exposure of expert witnesses and seeking to

7   invade Attorney/Client privilege and attorney work

8   product.

9             And I instruct you not to answer.

10  BY MR. SHAUB:

11       Q    In Exhibit I.

12            THE WITNESS:  If we're switching exhibits, I'm

13  going to do a quick bathroom break.

14            I'm drinking too much water; backed up.

15            (Break.)

16            (Back on the record.)

17            MR. SYBERT:  You're up counsel.

18            MR. SHAUB:  (No verbal response.)

19            THE WITNESS:  Are we back?

20            MR. SHAUB:  Yes; okay.

21       Q    I think the next exhibit is "Exhibit I."

22            (Plaintiff's Exhibit I, marked for

23  identification.)

24            The first amended Counterclaim was filed,

25  "October 21, 2013," as a proposed amended pleading.

1          Do you see that document?

2     A    I do.

3     Q    Okay.

4          If you would please turn to "Page 3."

5          (Witness complies.)

6          "Paragraph 12," which reads:

7          "Shaub misunderstood the patents-in-suit and

8     the accused Tacoda/AOL technology."

9          And then it goes on to say:

10         "Specifically without limitations, Shaub did

11    not correctly identify the "second code module" of the

12    Tacoda system."

13         Do you have any understanding, of what the

14    identification was of the second code module of the

15    Tacoda system?

16         MR. SYBERT:  I'm sorry, can you repeat that

17    last sentence?

18         MR. SHAUB:  Sure.

19    Q    Do you have any understanding, of what would be

20    the correct identification of the second code module of

21    the Tacoda system?

22         MR. SYBERT:  Okay.

23         Well, I object to this question on the grounds

24    of no foundation, in that, there's no foundation that

25    Mr. Wilson either wrote this or had any role in writing

1   it.

2           Subject to that objection, if you can answer,

3   go ahead.

4           THE WITNESS:  Yes.

5           I'm not specifically without limitation.  Shaub

6   did not correctly identify the second code module of the

7   Tacoda system.

8   BY MR. SHAUB:

9       Q    Yeah.

10          My question is, is premised on this particular

11  line.

12          But my question to you is, independent of this

13  document, and ignoring whoever may have prepared it.

14      A    Okay.

15      Q    The question is:

16          Do you hold an understanding that Shaub

17  misunderstood the patents-in-suit and in the accused

18  Tacoda/AOL technology?

19      A    Yes.

20      Q    And what was that misunderstanding, based on

21  your belief?

22      A    Because of the -- based on the

23  misunderstanding -- based on the discovery, what Shaub

24  shows to discover and their lack of additional inquiry

25  and investigation into Burst Media.  I believe they did

1   not understand the patents-in-suit.

2        Q    Okay.

3             Did you have any discussions with either your

4   present counsel on defending the Shaub and Williams case,

5   or with Goodwin and Procter that supported -- supports

6   your conclusion you just indicated?

7             MR. SYBERT:  I object, because that question

8   goes beyond the identification of general subject matter.

9             And therefore, instruct you not to answer.

10  BY MR. SHAUB:

11       Q    Turn to "Page 4, Paragraph 14 of Exhibit H --"

12  or excuse me, "I."

13            (Witness complies.)

14            Paragraph 14 reads in part, in the first

15  sentence:

16            "Due to Shaub's failure to obtain the relevant

17  source code before the close of discovery in the Tacoda

18  Action, Augme was eventually forced to dismiss the Tacoda

19  Action."

20       Q    Do you see that sentence?

21       A    I do.

22       Q    Okay.

23            Do you have any understanding, that the

24  settlement -- excuse me, strike that.

25            Do you have any understanding, that the

1 dismissal of the Tacoda action was as a consequence of

2 Shaub and Williams failure to obtain relevant source code

3 from Burst Media, before the close of discovery in the

4 Tacoda action?

5      A    I'm sorry, I think that's what this sentence

6 stated, so I'm not sure I understand the question.

7      Q    I'm not trying to paraphrase the document or

8 the paragraph.

9      A    Okay.

10     Q    As just, you know, first of all, the containing

11 of the proposed complaint and secondly, the guides to

12 asking you a question but independent of the proposed

13 counterclaim.  My question is:

14          Do you have an understanding, that Augme was

15 forced to dismiss the Tacoda action, because of Shaub's

16 failure to obtain relevant source code from Burst Media

17 before the close of the discovery in the Tacoda action?

18          MR. SYBERT:  Objection; asked-and-answered

19 about an hour ago, I think.

20          THE WITNESS:  Yes.

21 BY MR. SHAUB:

22     Q    Is that "yes," was asked or "yes --"

23     A    I believe it was "yes," and-answered

24 previously.

25          I believe it was asked-and-answered previously,

105

1    is what I meant.

2        Q    And the answer was "yes"?

3        A    Correct.

4        Q    Okay.

5            And did you have discussions with your present

6    counsel, defending the Shaub and Williams case?

7            Or Goodwin and Procter, that led to this belief

8    in your part?

9            MR. SYBERT:  Same objection.

10           And instruction not to answer, beyond

11   identification of general subject matter.

12           MR. SHAUB:  Okay.

13       Q    And in "Paragraph 15," again, I'm not saying

14   you drafted this agreement of this document; okay.

15           It reads:

16           "On or around February 2011, while the Tacoda

17   Action was still pending, Augme informed Shaub that it

18   would be replaced by another, much larger law firm with

19   substantially more experience in patent litigation,

20   Goodwin Procter."

21           Did you have such an -- do you have such an

22   understanding?

23       A    An understanding, as to the fact that Shaub was

24   replaced?

25           Or an understanding -- an understanding of

1    what?

2         Q    Fair question.

3              Did you have an understanding, that first of

4    all, Shaub and Williams was informed that it would be

5    replaced in February 2011 -- let me rephrase that; that's

6    not good.

7              Do you have an understanding, that in February

8    2011, Shaub and Williams was informed that it was

9    replaced by, or would be replaced by Goodwin and

10   Procter?

11        A    Yes.

12        Q    Did you ever have see any documents to that

13   affect?

14        A    Documents that, other than a press release

15   announcing Goodwin and Procter as counsel canceling.

16             I have not seen a document canceling the

17   relationship.

18        Q    Okay.

19             So it's your testimony, that in "February 2011"

20   date, in your mind, was the date when Goodwin and Procter

21   engagement was announced by a press release?

22        A    I'm sorry, is the question -- what was the

23   question?

24        Q    Is it your understanding, that Goodwin -- I'll

25   break it down.

1              Is it your understanding, that Goodwin and

2    Procter was engaged in February 2011, when a press

3    release to that effect was published?

4        A    I would use slightly different words.

5              I would say, it was my understanding, they were

6    engaged and a press release was released.

7        Q    Okay.

8        A    I'm not -- the press release wasn't them being

9    engaged.  They were engaged -- it is my understanding,

10   that they were engaged in early February 2011 and the

11   press release was released.

12       Q    Okay.

13             And is it also your understanding, that in

14   February 2011, Shaub and Williams was informed that it

15   would be replaced by Goodwin Procter?

16       A    Yes.

17       Q    Okay.

18             And do you have any understanding, of when that

19   replacement would take place?

20       A    In early February 20 -- it wasn't -- ask the

21   question again, please.

22       Q    And did you have any understanding, of when --

23   strike that.

24             The sentence here reads:

25             "Augme informed Shaub and Williams that it

1    would be replaced by another in February 2011."

2          Do you have any understanding, of when we were

3    to effectively be replaced?

4      A    It's my understanding, that you were -- that

5    Shaub and Williams was replaced effective early February

6    2011, and told to be pencils down, unless directed by the

7    company.

8      Q    I see.

9          On Page 5, there's a title in the middle of

10   Page 3, "Failure to Manage Expert Witnesses."

11         And in Paragraph 20, "On behalf of Augme, Shaub

12   engaged the services of Andrew Cromarty as an expert

13   witness for the underlying technology in the Tacoda

14   Action and the AOL Action."

15         Do you see that language?

16     A    Yes.

17     Q    Is it your belief, that Shaub and Williams

18   engaged the services of Andrew Cromarty, as an expert

19   witness?

20     A    On behalf of the company?  Yes.

21     Q    Okay.

22         Have you been informed such, by either your

23   counsel defending against the Shaub and Williams action,

24   or by someone at Goodwin and Procter?

25         MR. SYBERT:  I object to that, as invading the

1   Attorney/Client.

2            And I instruct him not to answer.

3

4   BY MR. SHAUB:

5       Q    Have you provided any information to your

6   present counsel defending the case brought by Shaub and

7   Williams, concerning the problems that have been alleged

8   to have occurred, with regard to the engagement of

9   Mr. Cromarty?

10           MR. SYBERT:  I object to that question, as

11  calling for the disclosure of the Attorney/Client

12  communications.

13           And I instruct you not to answer.

14  BY MR. SHAUB:

15      Q    In Page 7, there's Defendant Rees in "Paragraph

16  23," second sentence.

17           "Augme also had to duplicate all of

18  Mr. Cromarty's alleged work by hiring another expert."

19           Is it correct, that you -- this is an expert

20  whose name -- you don't know the name of any such expert?

21           MR. SYBERT:  Objection; asked-and-answered.

22           MR. SHAUB:  Okay.

23      Q    Are you familiar with the fact that --

24           MR. SYBERT:  I didn't instruct him not to

25  answer.

1          MR. SHAUB:  Oh.

2          THE WITNESS:  Could you repeat the question,

3  please?

4  BY MR. SHAUB:

5     Q    In regard to this reference here to Augme

6  having to duplicate Mr. Cromarty's work by hiring another

7  expert, do you know the name of any such expert?

8     A    I do not.

9     Q    Okay.

10         And the next sentence reads:

11         "Augme has also incurred attorney's fees and

12  costs in responding to Mr. Cromarty's continued demands

13  for payment, as well as litigating a Triple A arbitration

14  matter filed by Mr. Cromarty."

15         Do you see that sentence?

16    A    Yes.

17    Q    Do you know the name of the attorneys who are

18  defending the litigation, regarding this arbitration?

19    A    I am not sure who is handling that

20  litigation.

21    Q    Do you know, if your present counsel defending

22  you in the Shaub and Williams case, is providing any

23  consultation or services in regard to that arbitration?

24    A    I do not know.

25    Q    Are you aware, that Augme has incurred

1    attorney's fees and costs in responding to Mr. Cromarty's

2    arbitration proceedings?

3        A    Yes.

4        Q    And how did you become aware of that?

5             MR. SYBERT:  To the extent that you became

6    aware through communications from counsel, I instruct you

7    not to answer.

8             If you became aware through non-attorney

9    communications, you may answer.

10            THE WITNESS:  Through discussions with the

11   Chief Financial Officer of the company.

12   BY MR. SHAUB:

13       Q    And who is that at the present?

14       A    Tom Virgin.

15            COURT REPORTER:  Is that "V-i-r"?

16            THE WITNESS:  Yeah; V-i-r, yeah, Virgin;

17   spelled the way it sounds.

18            COURT REPORTER:  Thank you.

19   BY MR. SHAUB:

20       Q    Page 8 of Exhibit I in "Paragraph 30," it

21   reads:

22            "Also in material breach of the engagement

23   agreement, Shaub regularly billed Augme at rates higher

24   than what the parties had agreed upon."

25            Are you aware of that practice, in any

1    instances?

2        A    Based on the information I have, I believe it

3    to be true.

4        Q    What information did you have?

5        A    I -- there have been several agreements,

6    including one exhibited in my declaration, which outlined

7    the agreed upon fees for select categories of attorneys.

8        Q    Isn't it correct, that that particular exhibit

9    shows, that all of those charges were corrected and

10   credited to the benefit of Augme?

11       A    I'm not sure I understand the question.

12       Q    I'll state it another way.

13            Isn't it correct, that any such fees that were

14   incorrectly billed at -- excuse me, let me strike that

15   again.

16            Isn't it true, that any hourly rates that were

17   included in billings from Shaub and Williams --

18            COURT REPORTER:  Hold on, Mr. Shaub, can you

19   repeat that.

20            I apologize, your voice trailed.

21            MR. SYBERT:  She missed you.

22            MR. SHAUB:  Okay.  I'll rephrase it.

23       Q    Isn't it correct, that in any instances where

24   Shaub and Williams found that it had included in any of

25   its billings an incorrect billing rate, that it corrected

1    that missed billing rate and credited any overcharge to

2    the benefit of Augme or Modavox?

3         A    I'm not familiar enough with the details of the

4    bills to answer that question.

5         Q    Do you know if Mr. Virgin, I think was his

6    name, has gone over the bills?

7         A    Has he gone -- I believe he has.

8         Q    Okay.

9              Turn to "Page 10, Paragraph 42."

10             (Witness complies.)

11             The paragraph begins:

12             "In addition, in April 2011, Shaub breached its

13   duty of implied covenant of good faith and fair dealing

14   when Shaub threatened Augme with alleged violations of

15   securities law disclosure requirements if Augme did not

16   pay Shaub's excessive, allegedly unpaid bills in full."

17        Q    Do you see that sentence?

18        A    I do.

19        Q    Okay.

20             Are you familiar with the surrounding

21   circumstances that relate to any event, that is referred

22   to in "Paragraph 42"?

23        A    Am I directly familiar?  No.

24             I am broadly familiar, based on general

25   knowledge and conversations with various people at the

1    company.

2        Q    What people?

3        A    Ms. Meyers and Mr. Arena.

4        Q    When were those conversations?

5        A    At the time, so in the Summer of '0 -- Spring,

6    Summer of '11.

7        Q    What do you recall?

8            MR. SYBERT:  Objection; overbroad; calls for a

9    narrative.

10           THE WITNESS:  Could you specify the question,

11   please?

12   BY MR. SHAUB:

13       Q    Yeah.

14           What do you recall, was told to you by Shelly

15   Meyers and Paul Arena?

16       A    And/or I had discussions with both of them.

17           That Shaub was threatening to -- that Shaub

18   was -- I'm sorry.

19           That Shaub was -- that Shaub was reminding and/

20   or threatening Augme, that it needed to appropriately

21   reflect unpaid bills in its financial reports, or that it

22   would be a violation of securities law.

23       Q    Okay.

24           And in what context did Shaub and Williams

25   raise this issue?

1      A     I don't know.

2      Q     Earlier, we saw a fee agreement that was

3  entered into between Shaub and Williams, Rosenbaum and

4  Associates and Modavox.

5            Do you recall that the fee agreement there was

6  a reference to awards being received by Shaub and

7  Williams as a success fee?

8      A     I do.

9      Q     Now, in regards to that agreement, did Shaub

10 and Williams ever receive any warrants?

11     A     I don't believe so, but I'm not sure.

12           I don't believe so.

13     Q     Are you aware of the fact, that in the pending

14 action brought by Shaub and Williams against Augme, that

15 there's no request for any warrants?

16     A     I believe it's merely a request for a

17 cumulative dollar value.

18     Q     In some of the documentation that we've

19 reviewed today, there has been other reference to

20 excessive billing by Shaub and Williams.

21           Are you familiar at all, with the financial

22 arrangement that was reached with Goodwin and Procter?

23           MR. SYBERT:  Mr. Shaub, your voice kind of

24 faded in-and-out on that question.

25           Could you repeat it?

```
 1              MR. SHAUB:  I'm sorry, I'll repeat it again;
 2   yeah --
 3              MR. SYBERT:  Thank you.
 4              MR. SHAUB:  -- I moved around a little too
 5   much; got away from the mic.
 6              So I'll start over again.
 7              MR. SYBERT:  Thank you.
 8   BY MR. SHAUB:
 9      Q    In regard to the document that we've gone
10   through today, there are references to excessive billing
11   by Shaub and Williams.
12              Are you familiar with the fee engagement
13   agreement with Goodwin and Procter, after they were
14   engaged in "February 2011"?
15              MR. SYBERT:  Well, I'm -- I'm going to object
16   to this line of questioning, because of where I think
17   it's headed.
18              And if you're going to ask him for details of
19   Augme's fee arrangements with Goodwin and Procter, I'm
20   going to instruct him not to answer on the grounds that
21   that goes into the Attorney/Client privilege.
22              MR. SHAUB:  Okay.
23              THE WITNESS:  Can I answer this question?
24              MR. SHAUB:  Yeah; you can answer the question.
25              MR. SYBERT:  He's just asking if you're going
```

```
 1   to --

 2              THE WITNESS:  Yes.

 3              "Yes," is the answer to the question.

 4   BY MR. SHAUB:

 5      Q    And in regard to your being familiar with that

 6   engagement agreement, can you tell me, if you had an

 7   agreement that provided for Goodwin and Procter's

 8   compensation, based on either an hourly rate or a

 9   contingent fee, or a combination of the two?

10              MR. SYBERT:  I instruct you not to answer that

11   question, on the grounds of Attorney/Client privilege.

12              THE WITNESS:  I'm not going to answer that

13   question.

14              MR. SHAUB:  Yeah.  Yeah; okay.

15              Is Augme in possession of any billing

16   statements received from Goodwin and Procter, with regard

17   to their representation in the litigation with Yahoo,

18   Tacoda, or AOL/Time Warner?

19      A    I assume so.

20      Q    Who would have those records, "Mr. Virgin"?

21              Or rather, his office?

22      A    I believe that the CFO Office would have the

23   records --

24      Q    Okay.

25      A    -- so, yes.
```

1      Q      With regard to the minutes of the Board of

2  Directors, did those minutes also include information

3  regarding the engagement of Goodwin and Procter?

4      A      I don't know the answer to that question.

5      Q      Can you tell me, for during the period of time

6  that you've been on the Board of Directors, what kind of

7  procedures followed to keep the Board of Directors

8  informed of significant events that take place, that may

9  have a material effect on the company?

10     A      The question you're asking me, are Governance

11 Procedures at the Board level?

12     Q      Yes.

13     A      The company held -- generally, the company held

14 quarterly in-person Board meetings and intermittently

15 in-between the quarterly and personnel Board meetings,

16 would hold telephonic Board meetings.

17            At such Board meetings, there would be a

18 Chairman presiding over the meetings, general discussion

19 around the business in each of the meetings.

20            And generally, there would be minutes kept at

21 the minutes as well.

22     Q      Okay.

23            And were the matters that were addressed by the

24 Board, matters that were brought to the Board's attention

25 by the Executives of the company?

```
 1       A    There would be two things governing matters

 2   that were brought in front of the board.

 3            Those things, according to the charter in legal

 4   documents, as to what needed to be approved by the Board

 5   and brought in front of the Board and voted out by the

 6   Board, which is laid out in the bylaws and the charter.

 7            And then two, there would be issues raised by

 8   either management or Board members related to the general

 9   business and strategy of the company as well.

10       Q    Okay.

11            Is it correct, that with regard to the $650,000

12   settlement with AOL, that the $650.000 was to be

13   delivered to Goodwin and Procter?

14       A    I don't think I should --

15            MR. SYBERT:  No.  No; yeah.

16            I'm going to -- I should have been a little

17   quicker on this.

18            I'm going to instruct the Witness not to answer

19   that, on grounds of Attorney/Client privilege.

20            MR. SHAUB:  Okay.  I want to take a break.

21            Let's see, it's 12:30, but I don't want to

22   recess yet.

23            If you could hold on for a minute.  I just want

24   to take a break.

25            MR. SYBERT:  I don't understand, this is not
```

1    the lunch break?

2             MR. SHAUB:  No.

3             This is not going to be a long break.  I just

4    want a brief break.

5             MR. SYBERT:  Can I ask you how long, when you

6    were planning on taking a lunch break?

7             MR. SHAUB:  That's what I was going to discuss

8    that too, so when I get back with you in five minutes --

9             MR. SYBERT:  Okay.

10            MR. SHAUB:  -- I can cover that as well.

11            MR. SYBERT:  All right; thank you.

12            MR. SHAUB:  Sure.

13            (Brief break.)

14            (Back on the record.)

15   BY MR. SHAUB:

16       Q    Let's resume.

17            This is surprising for you, but I think what

18   I'm going to do now, is in the Deposition for today, I'm

19   going to adjourn it.

20            And I think, you know, I covered all the

21   questions that I need to cover, but I'm going to adjourn

22   it until counsel for Augme and our firm meet and confer a

23   little bit more with regard to their objections, and

24   hopefully, we can deal with those after today.

25            MR. SYBERT:  Okay.

1          Well, I don't want to mislead you, counsel, it

2     will be our position that if you end the Deposition, it

3     will be terminated.  It will not be adjourned and we will

4     object any effort to resume it, absent a court order.

5          MR. SHAUB:  Okay; understand that.

6          With regard to the procedures, with respect to

7     the preparation of the transcript, I would propose a

8     stipulation that the court reporter be relieved of the

9     normal procedures set forth and instead, as set forth in

10    the Rules of Evidence and Procedure.

11         And instead, that the transcript be provided to

12    counsel here today on behalf of Augme and give the

13    Witness an opportunity to review the transcript.

14         And I would propose, that the Witness be given

15    the period of 30 days to review the transcript, provided

16    that if it becomes necessary, we could utilize the

17    transcript even before it's corrected and if need be, for

18    ongoing proceedings, or if in the event that we don't get

19    any corrections from the Witness and more than 30 days

20    goes by.

21         In either event, what I'm saying, is we would

22    like to be able to utilize the transcript until its been

23    signed and corrected, and/or signed.

24         MR. SYBERT:  I understand that, counsel, and I

25    would so stipulate with the caveat, that either side

1  would have to option during that intervening period prior

2  to review and correction of asserting that what's in the

3  unsigned, unreviewed, uncorrected copy is not correct.

4           MR. SHAUB:  Oh, I see; okay.  I understand.

5           Then we would, we also would request that the

6  original transcript be sent to us once it has been

7  received by counsel.

8           If you could do so as a courtesy, even before

9  it's executed, they'll be -- the reporter, I assume

10 you're going to provide a copy of the transcript?

11          COURT REPORTER:  That's correct.

12          MR. SHAUB:  Yeah.

13          So we'll be getting a copy, but we'd like to

14 get a copy of the original as well, because that'll bear

15 the reporter's signature.

16          And any other loose ends?

17          MR. SYBERT:  I'm a little confused.

18          Isn't there an obligation, that the Witness

19 review and sign the original?

20          MR. SHAUB:  Yeah.

21          And that's why you are going to get the

22 original.

23          Well, you are, counsel, you will be with your

24 Client.

25          MR. SYBERT:  Because I thought you just said --

1   I may have misunderstood you, so I apologize, but I

2   thought you just said that the reporter should send the

3   original to you.

4           MR. SHAUB:  No.  No.  No.

5           I'm asking you, counsel, if you as a courtesy,

6   once your Witness has had the opportunity to review the

7   transcript, edited or corrected as he wishes, signs it,

8   that you would then send it to us.

9           MR. SYBERT:  Oh, sure.

10          If you'll assume responsibility for maintaining

11  it through and including trial and make it available;

12  sure.

13          MR. SHAUB:  Oh, absolutely, of course.

14          COURT REPORTER:  And are you going to want a

15  copy?

16          MR. SYBERT:  I don't think so; no.

17          COURT REPORTER:  Thank you.

18          Is this going to be Volume I?

19          MR. SYBERT:  No.

20          And you have your own set of the exhibits,

21  right?

22          MR. SYBERT:  Yes, we do.

23          And so does the reporter.

24          MR. SHAUB:  Good.

25          Okay; good.  All right.

1          Well, I think that's all.

2          I wanted to thank you, Mr. Wilson, for your

3  being available today; appreciate it.

4          THE WITNESS:  Thank you.

5          MR. SYBERT:  Thank you very much, Mr. Shaub,

6  bye, bye.

7          MR. SHAUB:  Okay; thank you, sir, bye.

8          Bye, Gloria.

9          COURT REPORTER:  Thank you, Mr. Shaub; bye.

10          (Whereupon the Deposition proceeding concluded

11  at 12:40 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FILE NO.: A70B6E2                          DATE: November 18, 2013

ERRATA SHEET

DEPOSITION OF: Todd Wilson, PMK

DATE OF DEPOSITION: October 30, 2013

RE:  Shaub and Williams, L.L.P.  vs.  Augme Technologies, Inc.

The following are the corrections which I have made to my transcript:

| PAGE# | LINE# | CORRECTION | REASON FOR CORRECTION |
|-------|-------|------------|----------------------|
| 8 | 25 | Year graduated should be | 1999 |
|   |   | for | accuracy |
|   |   |   |   |
|   |   |   |   |
|   |   |   |   |
|   |   |   |   |
|   |   |   |   |
|   |   |   |   |
|   |   |   |   |

I, the undersigned, declare under penalty of perjury, that I have read the above-referenced deposition transcript and have made any corrections, additions or deletions that I was desirous of making; that the Transcript contains my true and correct testimony.

EXECUTED this ___3rd___ day of __Dec__ , 20_13_,

at __L A__ , __CA__ ,
    (City)                (State)

_____
(Deponent)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHAUB AND WILLIAMS, L.L.P.,  :

        Plaintiff,  :

-against-  :

AUGME TECHNOLOGIES, INC.,  :

        Defendant.  :

:
:
:
:

---

AUGME TECHNOLOGIES, INC.  :

        Counterclaimant,  :

-against-  :

SHAUB AND WILLIAMS, L.L.P.,  :

        Counter Defendant.  :

:

---

Civil Action No. 13-cv-01101 (GBD) (jcf)

**DECLARATION OF TODD WILSON IN SUPPORT OF DEFENDANT/COUNTERCLAIMANT'S OPPOSITION TO PLAINTIFF/COUNTERDEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, Todd Wilson, declare as follows:

1.      I am Chairman of the Board and Corporate Secretary for Augme Technologies, Inc. ("Augme"), which has recently changed its corporate name to Hipcricket, Inc. Except where otherwise stated, I have personal and/or corporate knowledge of the matters stated herein, and if sworn as a witness could and would testify competently thereto. As to matters stated on information and belief, I believe them to be true. Each document, including contracts and correspondences, relied on or referenced in this declaration has been kept in the course of a regularly conducted business activity, and it has been the regular practice of Augme to create and maintain these records as part of its regularly conducted business activity.

2.      I have knowledge regarding Augme's lawsuit against Tacoda, Inc. in the Southern District of New York for patent infringement of claim 21 of U.S. patent no. 6,594,691 (the "691 Patent) and claims 1, 3, 14, 20 and 23 of U.S. patent no. 7,269,636 (the "636 Patent") in Case no. 1:07-cv-0708 8-CM ("Tacoda action") as well as knowledge regarding Augme's lawsuit against AOL, Inc. ("AOL") and Time Warner, Inc. ("Time Warner") based upon the above mentioned patents and similar or identical claims in Case no. 1:09-cv-04299-RWS, later transferred to the Honorable Colleen McMahon and assigned the new docket number, Case no. 2:12-cv-05439-CM-GWG ("AOL action").  Attached hereto as Exhibit 1 is a true and correct copy of Augme's Form 10-Q filing with the United States Securities and Exchange Commission disclosing the nature and substance of the above mentioned lawsuits.

3.      Based upon my examination of Augme's business records, each asserted claim of the patents-in-suit in the Tacoda action requires Augme to establish that the Tacoda system included a "first code module" (*e.g.* source code responsible for retrieving other source code) and a "second code module" (*e.g.* source code responsible for displaying an advertisement).  The first code module in four of the six asserted claims, must issue a first command to retrieve the second code module, and the second code module must be: (1) assembled by a server system, (2) include a service response, and (3) downloaded to the end-user's computer and executed.

4.      Shaub and Williams, L.L.P. ("S&W"), our prior patent counsel in the Tacoda action, advanced an infringement theory based on the notion that the Tacoda source code alone comprised both the first code module and the second code module, however, it became quite clear after S&W's withdrawal from the Tacoda action in April 2011 that this infringement theory was untenable because Tacoda's source code did *not* perform the limitations required by the claims, namely, the "assembly" of the second code module including a "service response."

5.      In reality, Tacoda contracted with and incorporated a third-party's system—specifically, Burst Media's ad server—to provide advertisements to end-users.  The advertisements provided by the Burst Media ad server to end users are the "service response" set forth in the asserted claims.

2

6.     S&W subpoenaed Burst Media in the Tacoda action requesting documents and
source code from Burst Media.  Based upon my review of publicly available documents regarding
the Burst Media source code, this information would have been integral in proving the second code
module limitations of the asserted clams and establishing a "service response."  However, rather
than producing documents responsive to the subpoena, Burst Media objected to the subpoena and
failed to produce the relevant source code.  Ultimately, S&W agreed to accept a declaration from
Burst Media in lieu of the requested documents, evidence and source code.  The Burst Media
declaration was wholly deficient because it did not address whether the Burst Media's ad server to
end-users was in fact the "service response" set forth in the asserted claims, thus, this declaration
was virtually useless to Augme in the Tacoda action.  Moreover, Burst Media did not affirmatively
state in this declaration that the requested information concerning the second code module was
outside its possession, custody or control and therefore unobtainable through discovery.  Thus, we,
Augme, concluded that this source code *was* in Burst Media's control and obtainable through
discovery.  Augme attempted to obtain the necessary information regarding the second code module
from other sources but to no avail.  Indeed, it appears that the only party with the second code
module source code necessary for Augme to support its claims of infringement was Burst Media.
Although Tacoda may have been in possession of such information, this information was apparently
destroyed by Tacoda since it was communicated to Augme that Tacoda did not retain prior versions
of this source code.  Thus, based upon my examination of Augme's business records, the failure to
adequately seek discovery related to the "second code module" from Burst Media's ad server during
the discovery period proved fatal to our, Augme's, case for patent infringement.

7.     Augme's subsequent counsel in the Tacoda action, Goodwin Proctor LLP
("Goodwin Proctor"), sought to cure the inability of S&W to procure essential discovery evidence
related to the second code module in the Tacoda action by requesting at a hearing in late September
2011 that discovery be reopened.  Though this request was initially granted, shortly after the
hearing, and before Augme could obtain any meaningful discovery related to the second code
module source code, the Defendants in the Tacoda action sent a letter to the court requesting that

discovery again be closed pending final resolution of their summary judgment motion. The Tacoda court reconsidered its position and immediately closed discovery.

8. When the Tacoda court finally denied Tacoda's summary judgment motion in June 2012, the court took the position that discovery in the case was already closed. Thus, Augme was unable to procure the required discovery after S&W's departure from the Tacoda action and forced to voluntarily dismiss the Tacoda action.

9. S&W did file a motion for sanctions for spoliation of evidence due to Tacoda's failure to cooperate in the discovery process and its intentional or grossly negligent destruction of key evidence in the Tacoda action. However, this motion failed because the brief that S&W submitted was, according to the Court, "incomprehensible."

10. With discovery closed and without issue sanctions, we, Augme, were unable to support our infringement contentions with the specificity I am informed and believe is required under U.S. patent law, and were effectively obliged to dismiss our case against Tacoda. Failure of S&W to acquire adequate discovery prior to the close of discovery or seek and obtain appropriate issue sanctions caused irreversible damage to Augme in the Tacoda action. Without the required evidence or issue sanctions, Augme was unable to support its infringement contentions.

11. Our damage experts had estimated that had we obtained the necessary evidence from Burst Media to establish infringement, our damages would have been in the tens of millions of dollars rather than zero dollars, which is what the Tacoda action ultimately settled for.

12. On information and belief, had S&W obtained the necessary discovery to support Augme's infringement contentions in the Tacoda action, Augme would have obtained a settlement similar to the settlement Augme received in the AOL action (in which AOL paid $650,000). AOL had acquired Tacoda during the pendency of the Tacoda action, and the cases involved the same patents and similar technology.

13. Attached hereto as Exhibit 2 is a true and correct copy of an invoice dated July 31, 2010 from S&W to Augme for legal services in connection with the AOL action.

4

14.     Attached hereto as <u>Exhibit 3</u> is a true and correct copy of a memorandum dated December 29, 2010 from S&W to Augme regarding S&W's Billings Management for Augme.

15.     Attached hereto as <u>Exhibit 4</u> is a true and correct copy of a letter dated June 20, 2011 from David Shaub.

16.     Attached hereto as <u>Exhibit 5</u> is a true and correct copy of the engagement agreement between S&W and Modavox, Inc., the predecessor company to Augme.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on September 11, 2013, in Los Angeles, California.

_____
Todd E. Wilson

# EXHIBIT 1

Case 1:13-cv-01101-GBD-JCF Document 87-1 Filed 01/14/14 Page 134 of 195
Case 1:13-cv-01101-GBD Document 68-1 Filed 09/11/13 Page 2 of 46
Page 1 of 42

10-Q 1 a12-13074_110q.htm 10-Q
<u>Table of Contents</u>

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended May 31, 2012

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission File Number 333-57818

# AUGME TECHNOLOGIES, INC.
(Exact name of registrant as specified in its charter)

| DELAWARE | 20-0122076 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**350 7th AVENUE, 2nd FLOOR**
**NEW YORK, NY 10001**
(Address of principal executive offices)
(Zip Code)

**(855) 423-5433**
(Registrant's telephone number, including area code)

(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period than the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer," and "large accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer ☐ | Accelerated filer ☒ |
|---|---|
| Non-accelerated filer ☐ | Smaller reporting company ☐ |

Case 1:13-cv-01101-GBD-JCF   Document 87-1   Filed 01/14/14   Page 135 of 195
Case 1:13-cv-01101-GBD   Document 66-1   Filed 09/12/13   Page 3 of 43

Page 2 of 42

(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐  No ☒

As of July 9, 2012 the issuer has 97,740,158 shares of common stock, par value $.0001, issued and outstanding.

Case 1:13-cv-01101-GBD-JCF  Document 87-1  Filed 01/14/14  Page 136 of 195
Case 1:13-cv-01101-GBD  Document 68-1  Filed 09/12/13  Page 4 of 48
Page 3 of 42

Table of Contents

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **PART I** | FINANCIAL INFORMATION | |
| **Item 1.** | Financial Statements | |
| | Consolidated Balance Sheets as of May 31,2012 (unaudited) and February 29, 2012 | 1 |
| | Consolidated Statements of Operations for the three months ended May 31, 2012 and 2011 (unaudited) | 2 |
| | Consolidated Statement of Stockholders' Equity for the three months ended May 31, 2012 (unaudited) | 3 |
| | Consolidated Statements of Cash Flows for the three months ended May 31, 2012 and 2011 (unaudited) | 4 |
| | Condensed Notes to Consolidated Financial Statements (unaudited) | 5 |
| **Item 2.** | Management's Discussion and Analysis of Financial Condition and Results of Operations | 14 |
| **Item 3.** | Quantitative and Qualitative Disclosures About Market Risk | 22 |
| **Item 4.** | Controls and Procedures | 22 |
| **PART II** | OTHER INFORMATION | 23 |
| **Item 1.** | Legal Proceedings | 23 |
| **Item 2.** | Unregistered Sales of Equity Securities and Use of Proceeds | 23 |
| **Item 6.** | Exhibits | 24 |
| **SIGNATURES** | | 25 |

Case 1:13-cv-01101-GBD-BCF Document 871 Filed 01/14/14 Page 137 of 195
Case 1:13-cv-01101-GBD Document 68-1 Filed 09/12/13 Page 3 of 48
Page 4 of 42

Table of Contents

**AUGME TECHNOLOGIES, INC.**
**CONSOLIDATED BALANCE SHEETS**

|  | May 31, 2012 (unaudited) | February 29, 2012 |
|---|---|---|
| **ASSETS** |  |  |
| **CURRENT ASSETS:** |  |  |
| Cash and cash equivalents | $ 3,242,640 | $ 11,428,825 |
| Accounts receivable, net | 3,727,113 | 3,734,945 |
| Prepaid expenses and other current assets | 552,900 | 487,321 |
| Total current assets | 7,522,653 | 15,651,091 |
|  |  |  |
| Property and equipment, net | 234,400 | 292,492 |
| Goodwill | 47,484,708 | 47,484,708 |
| Intangible assets, net | 41,135,654 | 36,798,085 |
| Long-term investment | 200,000 | — |
| Deposits | 252,067 | 365,700 |
|  |  |  |
| **TOTAL ASSETS** | $ 96,829,482 | $ 100,592,076 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** |  |  |
| **CURRENT LIABILITIES:** |  |  |
| Accounts payable | $ 3,199,141 | $ 2,613,238 |
| Accrued liabilities | 1,711,497 | 1,599,792 |
| Deferred revenue | 860,013 | 1,050,369 |
| Acquisition related contingent consideration | 24,000,500 | 26,000,500 |
| Total current liabilities | 29,771,151 | 31,263,899 |
|  |  |  |
| **LONG TERM LIABILITIES:** |  |  |
| Accrued liabilities | 92,964 | 113,277 |
|  |  |  |
| **TOTAL LIABILITIES** | 29,864,115 | 31,377,176 |
|  |  |  |
| Commitments and contingencies (Note 7) |  |  |
|  |  |  |
| STOCKHOLDERS' EQUITY: |  |  |
| Common stock, $.0001 par value; 250,000,000 shares authorized; 96,468,600 and 94,434,817 shares issued and outstanding, respectively | 9,647 | 9,443 |
| Additional paid-in capital | 147,049,787 | 141,738,528 |
| Accumulated deficit | (80,094,067) | (72,533,071) |
| Total stockholders' equity | 66,965,367 | 69,214,900 |
|  |  |  |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 96,829,482 | $ 100,592,076 |

See accompanying notes to the consolidated financial statements.

1

Case 1:13-cv-01101-GBD-JCF Document 87-1 Filed 01/14/14 Page 138 of 195
Case 1:13-cv-01101-GBD Document 66-1 Filed 09/12/13 Page 6 of 48
Page 5 of 42

Table of Contents

**AUGME TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(UNAUDITED)**

| | Three Months Ended | |
|---|---|---|
| | May 31, 2012 | May 31, 2011 |
| REVENUE | $ 5,078,351 | $ 1,205,786 |
| COST OF REVENUES | 1,935,945 | 362,932 |
| OPERATING EXPENSES: | | |
| Selling, general, and administrative | 9,211,366 | 4,621,282 |
| Depreciation and amortization | 1,494,681 | 252,532 |
| Total operating expenses | 10,706,047 | 4,873,814 |
| LOSS FROM OPERATIONS | (7,563,641) | (4,030,960) |
| OTHER INCOME: | | |
| Interest income, net | 2,645 | 14,374 |
| NET LOSS | $ (7,560,996) | $ (4,016,586) |
| BASIC AND DILUTED NET LOSS PER SHARE | (0.08) | (0.06) |
| WEIGHTED AVERAGE SHARES OUTSTANDING | | |
| Basic and diluted | 94,489,673 | 69,414,383 |

See accompanying notes to the consolidated financial statements.

2

Case 1:13-cv-01101-GBD-JCF   Document 87-1   Filed 01/14/14   Page 139 of 195
Case 1:13-cv-01101-GBD   Document 68-1   Filed 09/12/13   Page 7 of 43
Page 6 of 42

Table of Contents

**AUGME TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY**
**FOR THE THREE MONTHS ENDED MAY 31, 2012**
**(UNAUDITED)**

| | Common Stock | | Paid-in Capital | Accumulated Deficit | Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balances, February 29, 2012 | 94,434,817 | $ 9,443 | $ 141,738,528 | $(72,533,071) | $ 69,214,900 |
| Common stock issued for cash for: | | | | | |
| Option /Warrant exercise | 129,316 | 13 | 86,870 | — | 86,883 |
| Common stock issued for: | | | | | |
| Cashless option exercise | 44,002 | 4 | (4) | — | — |
| Purchase of intangible assets | 1,860,465 | 187 | 3,813,766 | — | 3,813,953 |
| Employee share-based compensation | — | — | 1,238,466 | — | 1,238,466 |
| Warrant expense | — | — | 172,161 | — | 172,161 |
| Net loss | — | — | — | (7,560,996) | (7,560,996) |
| Balances, May 31, 2012 | 96,468,600 | $ 9,647 | $ 147,049,787 | $(80,094,067) | $ 66,965,367 |

See accompanying notes to the consolidated financial statements.

3

Case 1:13-cv-01101-GBD-JCF Document 87-1 Filed 03/12/14 Page 140 of 195
Case 1:13-cv-01101-GBD Document 68-1 Filed 09/11/13 Page 8 of 43

Page 7 of 42

Table of Contents

**AUGME TECHNOLOGIES, INC.**
**CONSOLIDATED STATEMENT OF CASH FLOWS**
**(UNAUDITED)**

| | Three Months Ended | |
|---|---|---|
| | May 31, 2012 | May 31, 2011 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net loss | $ (7,560,996) | $ (4,016,586) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 1,494,681 | 252,532 |
| Bad debt expense | 23,145 | 25,106 |
| Stock option and warrant expense | 1,410,627 | 1,642,233 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (15,313) | (767,774) |
| Prepaid expenses and other current assets | (65,579) | (72,746) |
| Deposits | 113,633 | 31,764 |
| Accounts payable and accrued liabilities | 697,608 | 522,175 |
| Deferred revenue | (190,356) | 803,816 |
| Long-term liability | (20,313) | — |
| NET CASH USED IN OPERATING ACTIVITIES | (4,112,863) | (1,579,480) |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Cash paid for purchase of patents | (566,983) | — |
| Cash paid for acquisition related contingent consideration | (2,000,000) | |
| Cash paid for patent defense costs | (1,393,222) | (637,989) |
| Cash paid for long-term investment | (200,000) | |
| | | |
| NET CASH USED IN INVESTING ACTIVITIES | (4,160,205) | (637,989) |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Proceeds received from the exercise of stock options and warrants, net | 86,883 | 937,915 |
| | | |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | 86,883 | 937,915 |
| | | |
| NET CHANGE IN CASH AND CASH EQUIVALENTS | (8,186,185) | (1,279,554) |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 11,428,825 | 11,182,356 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 3,242,640 | $ 9,902,802 |
| | | |
| SUPPLEMENTAL CASH FLOW INFORMATION: | | |
| Interest paid | $ — | $ — |
| Income taxes paid | — | — |
| Non-cash investing activity: | | |
| Stock issued for asset purchase | $ 3,813,953 | $ — |

See accompanying notes to the consolidated financial statements.

4

Case 1:13-cv-01101-GBD-JCF Document 68-11 Filed 09/12/13 Page 9 of 48
Case 1:13-cv-01101-GBD-JCF Document 68-11 Filed 09/12/13 Page 141 of 195
Page 8 of 42

Table of Contents

## AUGME TECHNOLOGIES, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 1 — ORGANIZATION AND BASIS OF PRESENTATION

The accompanying unaudited interim financial statements of Augme Technologies, Inc. ("Augme" or the "Company") have been prepared in accordance with accounting principles generally accepted in the United States of America and the rules of the Securities and Exchange Commission, and should be read in conjunction with the audited financial statements and notes thereto contained in Augme's Annual Report filed with the SEC on Form 10-K.

In the opinion of management, all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of financial position and the results of operations for the interim periods presented have been reflected herein. The results of operations for the interim periods are not necessarily indicative of the results to be expected for the full year. Notes to the financial statements that would substantially duplicate the disclosures contained in the audited financial statements for the fiscal year ended February 29, 2012 as reported in the Company's Annual Report on Form 10-K have been omitted.

#### *Description of Business*

Augme Technologies™, Augme® ("Augme"), AD LIFE® ("AD LIFE"), AD SERVE® ("AD SERVE"), A+® ("A+"), Hipcricket® ("Hipcricket"), Boombox® ("Boombox") and the Company logos are trademarks of Augme.

Augme provides strategic services and mobile technology to leading consumer and healthcare brands. We were formerly known as Modavox, Inc. and changed our name to Augme Technologies, Inc. in February 2010. Augme owns the "Method and System for Adding Function to a Webpage" portfolio of patents, which cover technical processes and methods that are believed to be a foundational component of behavioral targeting — the automatic provision of customized content to individuals based on information such as past web activity, personal preferences, geography, or demographic data. Augme's AD LIFE mobile marketing technology platform allows marketers, brands, and agencies the ability to plan, create, test, deploy, and track mobile marketing programs. Through the use of Consumer Response Tags ("CRTs") such as 2D codes, UPC codes, Short Message Services ("SMS"), and image recognition, AD LIFE facilitates consumer brand interaction and the ability to track and analyze campaign results. Using its own patented device-detection and proprietary mobile content adaptation software, AD LIFE solves the mobile marketing industry problem of disparate operating systems, device types, and on-screen mobile content rendering. Augme also provides business to consumer utilities including national mobile couponing solutions, strategic mobile healthcare tools, custom mobile application development and consumer data tracking and analytics.

Augme operates under one reporting unit and is headquartered in New York City with an office location near Seattle, Washington. Additionally, the Company maintains offices in Atlanta, Tucson, Dallas, Chicago, Miami, San Francisco and Los Angeles.

#### *Liquidity*

The financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. As of May 31, 2012 and February 29, 2012, the Company has accumulated deficits of $80.1 million and $72.5 million, respectively. The Company is subject to the risks and challenges associated with companies at a similar stage of development including dependence on key individuals, successful development and marketing of its products and services, integration of recent business combinations, competition from substitute products and services and larger companies with greater financial, technical management and marketing resources. Further, the Company will require additional capital to execute on its key business strategies and fund operations.

The Company operates in the mobile marketing industry and accordingly, can be affected by a variety of factors. For example, management of the Company believes that any of the following factors could have a significant negative effect on the Company's future financial position, results of operations and cash flows: unanticipated fluctuations in quarterly operating results, adverse changes in the Company's relationship with significant customers or failure to secure contracts with other customers, intense competition, failure to attract and retain key personnel, failure to protect intellectual property, decrease in the migration trends from traditional advertising methods to digital and mobile media and the inability to manage growth.

On June 29, 2011, we filed a Form S-3 registration statement with the Securities and Exchange Commission for the purpose of raising up to $75.0 million through sales of our securities. The registration statement was declared effective on July 13,

Case 1:13-cv-01101-GBD-JCF  Document 87-1  Filed 01/14/14  Page 143 of 195
Case 1:13-cv-01101-GBD-JCF  Document 66-1  Filed 09/12/13  Page 10 of 43
Page 9 of 42

2011. The registration statement allows us to raise capital by engaging in securities offerings from time-to-time, as funds are needed. On November 17, 2011, we completed a public offering pursuant to which we sold 9.4 million shares of the common stock registered on the Form S-3

5

Case 1:13-cv-01104-GBD-JCF Document 87-1 Filed 01/24/14 Page 143 of 195
Case 1:13-cv-01104-GBD-JCF Document 66-1 Filed 09/12/13 Page 11 of 39
Page 10 of 42

Table of Contents

registration statement at a price to the public of $2.15 per share. We raised $18.5 million in proceeds, net of $1.7 million in costs related to the offering, leaving approximately $55.0 million of the $75.0 million registered on Form S-3.

We expect, during the second quarter of fiscal 2013, that we will need to raise additional funds through IP licensing, non-dilutive debt financing or through an offering of our securities in order to meet liquidity needs. Funding may not be readily available or may not be on terms that are favorable to the Company. Certain financing terms could be dilutive to existing shareholders or could result in significant interest or other costs, or require the Company to license or relinquish certain intellectual property rights. If we are unable to raise capital or if capital is available only on a limited basis or under unacceptable terms, then the Company could be required to substantially reduce or discontinue its investments in intellectual property, new customers and new products; reduce operating, marketing, general and administrative costs related to its continuing operations; or limit the scope of its continuing operations. Due to the nature of the operations and financial commitments of the Company, including contingent acquisition obligations, patent litigation costs to protect intellectual property and employee costs, the Company may not have the discretion to reduce operations in an orderly manner to a more sustainable level without impacting future operations or the intellectual property held by the Company.

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the U.S. necessarily requires management to make estimates and assumptions that affect the amounts reported in the financial statements. We regularly evaluate estimates and judgments based on historical experience and other relevant facts and circumstances. Actual results could differ from those estimates. Significant estimates relate to fair value of assets acquired and liabilities assumed in business combinations, acquisition related contingent consideration, allowances for tax assets, the use of the Black-Scholes pricing model for valuing stock option and common stock warrant issuances, estimates of future cash flows used to evaluate impairment of long-lived assets, revenues earned from percentage of completion contracts and the period in which revenues should be recorded.

### Summary of Significant Accounting Policies

The condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America, which we refer to as U.S. GAAP, and pursuant to the rules and regulations of the Securities and Exchange Commission, which we refer to as the SEC. The same accounting policies are followed for preparing the quarterly and annual financial information unless otherwise disclosed in the notes below.

## NOTE 2 — STOCKHOLDERS' EQUITY

During the three months ended May 31, 2012, Augme issued 1.9 million shares of common stock in connection with the acquisition of all of the outstanding common stock and preferred stock of a company the assets of which comprises patents and intellectual property.  See Note 5.

## NOTE 3 — SHARE-BASED PAYMENTS

### Stock-Based Compensation

Stock-based compensation cost is measured at the grant date based on the fair value of the award. We currently use the Black-Scholes option pricing model to determine the fair value of stock options and warrants. The determination of the fair value of stock-based awards on the date of grant using an option pricing model is affected by our stock price as well as assumptions regarding a number of complex and subjective variables. These variables include our expected stock price volatility over the expected term of the awards, actual and projected employee stock option exercise behaviors, a risk-free interest rate and any expected dividends.

## OPTIONS:

The assumptions used to value our option grants were as follows:

| | Three Months Ended May 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| Expected dividends | —% | —% |
| Expected term (in years) | 3.50 | 3.50 |
| Weighted-average volatility | 60.00% | 78.13% |

Case 1:13-cv-01101-GBD-JCF Document 87-1 Filed 01/14/14 Page 144 of 195
Case 1:13-cv-01101-GBD Document 66-1 Filed 09/12/13 Page 12 of 43
Page 11 of 42

| | | |
|---|---|---|
| Risk-free rate | 0.54% | 1.89% |

6

Case 1:13-cv-01104-CBB-JSF Document 87-1 Filed 01/24/14 Page 145 of 195
Case 3:13-cv-01104-CBB Document 66-1 Filed 09/12/13 Page 13 of 43

Page 12 of 42

Table of Contents

The effect on our results of operations of recording share-based compensation expense for the three months ended May 31, 2012 and 2011 was as follows, which is included in selling, general and administrative expenses within the consolidated statements of operations:

| | Three Months Ended May 31, | |
| | 2012 | 2011 |
|---|---|---|
| Total stock-based compensation expense | $ 1,238,466 | $ 1,081,823 |

The Company maintains stock incentive plans for its employees. The 2010 Stock Incentive Plan provides for the grant to employees, officers, directors and consultants of options, restricted shares, and other stock based awards to purchase up to an aggregate of 15,000,000 shares of common stock. The stock based awards may consist of both incentive stock options and non-qualified options. The Company has granted 13.3 million stock options under this plan as of May 31, 2012.

The Company has also issued non-qualified stock options to consultants and vendors for services provided, as well as employees, including officers, directors and consultants.

The summary of activity for Augme's stock options is presented below:

| | Number of Options | Weighted Average Exercise Price | Average Remaining Contractual Term (In Years) |
|---|---|---|---|
| Options outstanding at February 29, 2012 | 20,153,219 | $ 2.09 | 4.07 |
| Granted | 382,364 | 2.20 | |
| Exercised | (209,316) | 0.51 | |
| Forfeited and expired | (213,524) | 3.67 | |
| Options outstanding at May 31, 2012 | 20,112,743 | 2.09 | 3.77 |
| Options exercisable at May 31, 2012 | 10,479,391 | 1.89 | 3.57 |

As of May 31, 2012, there was $8.9 million of unrecognized share-based payment expense, which is expected to be recognized through May 2015 over the remaining weighted average expected life of 2.11 years.

The aggregate intrinsic value of the exercisable options at May 31, 2012 was $6.3 million. The aggregate intrinsic value was calculated based on the positive differences between the market value of the Company's common stock on May 31, 2012 of $2.16 per share and the exercise prices of the exercisable options.

The exercise prices of options outstanding at May 31, 2012 ranged from $0.25 to $4.10. The weighted average fair value of options granted was $0.94 per share for the three months ended May 31, 2012.

The total intrinsic value of options exercised during the three months ended May 31, 2012 was $0.3 million. The intrinsic value is calculated as the difference between the market value on the date of exercise and the exercise price of the shares.

**WARRANTS:**

The estimated fair values of our stock warrant awards issued to service providers and employees were estimated with the following weighted average assumptions for warrants granted in the first quarter of the prior fiscal year:

| | Three Months Ended May 31, 2011 |
|---|---|
| Expected dividends | —% |
| Expected term (in years) | 3.00 |
| Weighted-average volatility | 77.78% |
| Risk-free rate | 1.17% |

7

Table of Contents

The fair value of the stock warrants issued is expensed over the vesting term. The warrant expense for the three months ended May 31, 2012 and 2011 was as follows, which is included in selling, general and administrative expense within the consolidated statements of operations:

|  | Three Months Ended May 31, | |
|  | 2012 | 2011 |
|---|---|---|
| Total warrant expense | $ 172,161 | $ 560,410 |

The summary of activity for Augme's warrants is presented below:

|  | Number of Warrants | Weighted Average Exercise Price | Average Remaining Contractual Term (In Years) |
|---|---|---|---|
| Warrants outstanding at February 29, 2012 | 10,787,641 | $ 1.86 | 3.11 |
| Granted | — | | |
| Exercised | — | | |
| Forfeited, cancelled and expired | — | | |
| Warrants outstanding at May 31, 2012 | 10,787,641 | 1.86 | 2.86 |
| Warrants exercisable and outstanding at May 31, 2012 | 10,198,473 | $ 1.84 | 2.65 |

The aggregate intrinsic value of the exercisable warrants at May 31, 2012 was $6.3 million. The aggregate intrinsic value was calculated based on the positive differences between the market value of the Company's common stock on May 31, 2012 of $2.16 per share and the exercise prices of the exercisable warrants.

The exercise prices of warrants outstanding at May 31, 2012 ranged from $1.00 to $4.00. As of May 31, 2012, there was $234,932 of unrecognized expense, which is expected to be recognized through December 2014 over the remaining weighted average vesting period of 1.8 years.

## NOTE 4 — LOSS PER SHARE

Basic net income per share is based on the weighted average number of common shares outstanding. Diluted net income per share is based on the weighted average number of common shares and common share equivalents outstanding. Common share equivalents included in the computation represent shares issuable upon assumed exercise of outstanding stock options and warrants except when the effect of their inclusion would be anti-dilutive. As of May 31, 2012 and 2011, there were potentially dilutive securities of options exercisable to purchase 10.5 million and 5.2 million shares of common stock, and warrants exercisable to purchase 10.2 million and 10.7 million shares of common stock. As the inclusion of these outstanding stock options and warrants would be anti-dilutive, they were excluded from the computation of loss per share. Accordingly, basic net loss per share and diluted net loss per share are identical for each of the periods presented in the accompanying statements of operations.

## NOTE 5 — BUSINESS ACQUISITIONS

*Acquisition of Hipcricket, Inc. Assets:* On August 25, 2011, Augme completed its acquisition of the business and substantially all of the assets of Hipcricket pursuant to the Amended and Restated Asset Purchase Agreement dated August 25, 2011 between Augme and Hipcricket. The acquisition provides Augme with expanded mobile marketing solutions for consumer brands, agencies, pharmaceutical/health, and media companies. The Company accounted for the acquisition as a business combination. The results of Hipcricket's operations have been included in the financial statements of the Company since the date of the acquisition.

The estimated fair value of the acquisition consideration was $62.8 million, which included $3.0 million in cash, $35.5 million in Augme's common stock (11,457,359 shares at a price of $3.10), a $1.0 million promissory note, which has been subsequently paid off in cash, and $2.0 million of seller tax liabilities, which was paid during the quarter ended May 31, 2012. In addition, the transaction calls for a twelve-month earn-out payment to Hipcricket shareholders and employees, which if achieved will be no less than $15.0 million and may be as high as $27.5 million. The amount of contingent consideration will be based on the amount of revenue recognized in the earn-out period and may be paid in Augme's

Case 1:13-cv-01104-GBD-JCF Document 87-1 Filed 01/14/14 Page 148 of 195
Case 1:13-cv-01104-GBD-JCF Document 66-1 Filed 09/12/13 Page 16 of 43

Page 15 of 42

common stock or a combination of common stock and cash at Augme's discretion, provided that the transaction remains a tax-free reorganization. The contingent consideration recorded at the time of the

8

Table of Contents

acquisition was $23.3 million plus the seller tax liabilities of $2.0 million, resulting in an aggregate liability on the transaction date of $25.2 million. The $2.0 million was paid during the quarter ended May 31, 2012. We used a probability-weighted income-based model, which is based on Level 3 inputs, to determine the fair value of the contingent consideration. As of May 31, 2012, the Company has determined that the fair value of the contingent consideration is a liability of $24.0 million. The estimated fair value of the contingent consideration is re-measured at each reporting period. No fair value adjustment was necessary during the period. The contingent consideration will be determined based upon the revenue recognized during the earn-out period, and will be paid 50% to former Hipcricket shareholders and 50% to those Hipcricket employees and employee-shareholders that became employees of Augme subsequent to the acquisition. Based on an evaluation of the factors surrounding the transaction and the terms of the purchase agreement, the potential amount due under the earn-out provisions is accounted for as acquisition consideration. We concluded that the contingent consideration to be paid to employees was a significant component of the transaction date valuation of the acquired business and the calculation of the contingent payment was based upon factors established at the date of the transaction and will be paid upon meeting the established revenue criteria of the acquired business, the post transaction employment arrangements of the continuing employees are at market rates and the formula for determining the contingent consideration is consistent with the business valuation methodologies, based upon a revenue multiplier of revenue recognized from the acquired business for the twelve month period following the business combination.

***Unaudited Pro-Forma Results of Operations for Hipcricket Acquisition***

The results of this acquisition are included in the financial statements from the date of acquisition. The unaudited pro-forma results of operations data are being furnished solely for informational purposes and are not intended to represent or be indicative of the results of operations that we would have reported had the Hipcricket acquisition been completed on March 1, 2011 of the fiscal quarter presented, nor are they necessarily indicative of future results. Pro-forma results include the discount of the present value of the contingent consideration over the period presented. The pro-forma results of operations for the three months ended May 31, 2011 are as follows:

| | |
|---|---|
| Revenues | $ 3,350,840 |
| Net loss | (5,119,455) |
| Weighted average common shares | 80,871,742 |
| Basic and diluted net loss per share | $ (0.06) |

***Asset Acquisition — Patents and Intellectual Property***

On May 24, 2012, the Company acquired all of the common stock and all of the preferred stock of Geos Communications IP Holdings, Inc. ("Geos IP"). By acquiring the Geos IP stock, the Company acquired 5 U. S. patents covering Voice over Internet Protocol ("VoIP") and other critical mobility inventions and 7 U.S. patent applications and 18 pending international patent applications covering related invention families within the field of mobile VoIP. The patents will allow the Company to expand its mobile marketing and mobile advertising technology offerings to include adaptive voice technologies for any mobile environment, VoIP-enabled mobile marketing and advertising, VoIP-enabled E-Commerce and VoIP-enabled services and support features within the Company's AD LIFE mobile marketing and mobile advertising platform.

The Company determined that the Geos IP assets acquired did not constitute a business as defined under ASC Topic 805 on the basis that the Geos IP assets were not an integrated set of activities or assets that were capable of being conducted or managed in a manner that would provide economic benefits or return to the Company. As a result, the Company accounted for this acquisition as an asset purchase. The total consideration paid has been allocated to the intangible assets acquired based upon their relative fair values at the date of acquisition.

The fair value of the consideration given for the acquisition of the Geos IP stock was $4.2 million, which included $355,000 in cash and $3.8 million in Augme's common stock (1,860,465 shares at a price of $2.05 per share). The Company is indemnified against certain losses resulting from breaches of any representation, warranty, covenant or agreement of Geos IP. In order to secure payment of any loss, the Company will retain possession of the approximate 1.9 million shares of Augme's common stock for a period of up to 14 months following the closing date of the acquisition. See Note 9 for details regarding the direct and indirect material interest of key management personnel in the acquisition.

9

Case 1:13-cv-01041-CBD-JCF Document 87-1 Filed 01/14/14 Page 150 of 195
Case 1:13-cv-01041-GBD-JCF Document 66-1 Filed 09/12/13 Page 150 of 195
Page 17 of 42

Table of Contents

## NOTE 6 — INTANGIBLE ASSETS

The following table presents the gross carrying value of the components of intangible assets and accumulated amortization:

| | Weighted Average Amortization Period (In months) | Gross Carrying Amount | Accumulated Amortization | Net Carrying Value |
|---|---|---|---|---|
| | | | As of May 31, 2012 | |
| **Indefinite Lived Intangible:** | | | | |
| Trade name | Indefinite | $ 8,700,000 | $ — | $ 8,700,000 |
| **Definite Lived Intangibles:** | | | | |
| Patent litigation | 84 | 6,864,329 | 1,174,274 | 5,690,055 |
| Patents | 120 | 10,721,236 | 489,012 | 10,232,224 |
| Acquired technology | 60 | 7,270,000 | 1,375,250 | 5,894,750 |
| Customer relationships | 60-72 | 12,850,000 | 2,240,208 | 10,609,792 |
| Software | 36 | 2,095,706 | 2,095,706 | — |
| Non-compete agreements | 36 | 212,000 | 203,167 | 8,833 |
| Trade names | 24 | 44,000 | 44,000 | — |
| Total intangibles | | $ 48,757,271 | $ 7,621,617 | $ 41,135,654 |

| | Weighted Average Amortization Period (In months) | Gross Carrying Amount | Accumulated Amortization | Net Carrying Value |
|---|---|---|---|---|
| | | | As of February 29, 2012 | |
| **Indefinite Lived Intangible:** | | | | |
| Trade name | Indefinite | $ 8,700,000 | $ — | $ 8,700,000 |
| **Definite Lived Intangibles:** | | | | |
| Patent litigation | 84 | 5,471,107 | 950,150 | 4,520,957 |
| Patents | 120 | 6,340,300 | 292,297 | 6,048,003 |
| Acquired technology | 60 | 7,270,000 | 1,011,750 | 6,258,250 |
| Customer relationships | 60-72 | 12,850,000 | 1,605,625 | 11,244,375 |
| Software | 36 | 2,095,706 | 2,095,706 | — |
| Non-compete agreements | 36 | 212,000 | 185,500 | 26,500 |
| Trade names | 24 | 44,000 | 44,000 | — |
| Total intangibles | | $ 42,983,113 | $ 6,185,028 | $ 36,798,085 |

Intangible assets relate to patent filing and patent protection litigation costs as well as customer relationships, trade names and technology obtained in past acquisitions, including the acquisitions of Hipcricket and JAGTAG during fiscal 2012. With the exception of the Hipcricket trade name carried at $8.7 million, the intangible assets have finite lives and, as such, are subject to amortization. Amortization of intangible assets was $1.4 million and $0.2 million for the three months ended May 31, 2012 and 2011.

Amortization in future fiscal periods is expected to be as follows:

| | | |
|---|---|---|
| Remainder of 2013 | $ | 4,541,537 |
| 2014 | | 6,043,604 |
| 2015 | | 5,965,438 |
| 2016 | | 5,817,243 |
| 2017 | | 3,781,472 |
| Thereafter | | 6,286,360 |
| Total | $ | 32,435,654 |

Case 1:13-cv-01104-GBD-JCF Document 67-1 Filed 01/14/14 Page 151 of 195
Case 1:13-cv-01104-GBD-JCF Document 66-1 Filed 09/12/13 Page 152 of 195
Page 18 of 42

Table of Contents

**NOTE 7 — COMMITMENTS AND CONTINGENCIES**

**Litigation**

In the normal course of business, we may become involved in various legal proceedings.  Except as stated below, we know of no pending or threatened legal proceeding to which we are or will be a party that, if successful, might result in a material adverse change in our business, properties or financial condition.

**Litigation Update**

*Augme Technologies, Inc. v. Tacoda, Inc. and AOL, Inc.*, Civil Action No. 1:07-cv-07088-CM-GWG (the "Tacoda litigation"), a patent infringement lawsuit pending in the U.S. District Court for the Southern District of New York since August, 2007.  On November 14, 2011, the Court issued an order granting in part and denying in part Defendant Tacoda's motion for summary judgment. The Court held that Augme could not prove literal infringement under that Court's claim construction ruling previously issued. However, the Court reserved judgment on the issue of whether Augme could prove infringement under the doctrine of equivalents. The Court's order invited further briefing from Augme to establish whether the Data Agent combined with the Data Tag employed in the Defendants' advertising network operates in essentially the same manner as claimed within the patents-in-suit. Augme filed an Opposition Brief on December 5, 2011 asserting that infringement exists under the Doctrine of Equivalents.

On May 31, 2012, the Court agreed with Augme that the case should proceed to trial on the issue of whether Defendants' system infringes Augme's patent under the Doctrine of Equivalents. On June 14, 2012, the Court issued a memorandum and final scheduling order in the case, setting the date for the Final Pre-Trial Conference for November 2, 2012. The Court had indicated in a separate memorandum to counsel that the case is expected to proceed to trial "just after Thanksgiving" of this year.

*Augme Technologies, Inc. v. AOL, Inc. and Time Warner, Inc.*, Civil Action No. 1:09-cv-04299-RWS (the "BOOMBOX litigation"), a patent infringement and trademark infringement lawsuit pending in the U.S. District Court for the Southern District of New York (transferred from the U.S. District Court for the Central District of California) since September 10, 2008. On January 19, 2010, the Court entered an Agreed Order staying the patent claims until such time as there was a disposition in the *Tacoda* litigation, or until further order of the Court.

In December 2011, in effect lifting the stay order, the Court required the parties to attend a pretrial conference on February 1, 2012. At that conference, the Court ordered the parties to begin discovery with respect to the patent issues and placed the parties into the District Court's Patent Pilot Program. Both parties were required to provide the discovery contemplated pursuant to the Patent Pilot Program by May 1, 2012, at which time the parties were to reconvene with the Court. The Court ordered the parties to submit a status report on the status of discovery efforts by April 20, 2012. AOL counsel on behalf of all the defendants sought to stay discovery pending the outcome of the Tacoda litigation. By an order dated March 5, 2012, the Court rejected that request and required discovery relating to the patent infringement claims to proceed. Defendants, however, have not yet provided discovery. With respect to the trademark issues, the parties agreed to mediation, which took place on June 8, 2012. No settlement of the trademark infringement claims was reached.

On May 25, 2012, Defendants filed a motion to dismiss the case and a second motion to sever and transfer the alleged patent infringement claims to Judge McMahon. Augme filed oppositions to both motions on June 11, 2012. The court held a hearing on these motions on June 13, 2012.

On June 13, 2012, this case was transferred from The Hon. Robert Sweet to The Hon. Colleen McMahon, who is also presiding over the *Tacoda* case. Judge McMahon immediately stayed the case pending the outcome of the *Tacoda* trial which is expected to take place in December.

*Augme Technologies, Inc. v. Gannett Co., Inc., LucidMedia Networks, Inc. and AOL, Inc.*, Civil Action No. 1:11-cv-05193-CM (previously *Augme Technologies, Inc. v. Gannett Co., Inc., LucidMedia Networks, Inc. and AOL, Inc.*, Civil Action No. 3:11-cv-00282-HEH) (the "Gannett litigation"), a patent infringement lawsuit filed in the U.S. District Court for the Eastern District of Virginia on April 29, 2011, subsequently transferred to the U.S. District Court for the Southern District of New York (case no. 1:11-cv-05193-CM).

On June 24, 2011, LucidMedia Networks, Inc. filed a counterclaim against Augme in the U.S. District Court for the Eastern District of Virginia.

Case 1:13-cv-01101-GBD-JCF   Document 87-1   Filed 01/14/14   Page 152 of 195
Case 1:13-cv-01101-GBD-JCF   Document 66-1   Filed 09/12/13   Page 20 of 43
Page 19 of 42

On April 26, 2012, Augme announced a final settlement agreement was reached with Defendant. LucidMedia's counterclaims against Augme, pending in the Eastern District of Virginia, were dismissed pursuant to the settlement as well as Augme's claims against

11

Case 1-13-cv-01101-GBD-JCF Document 66-1 Filed 01/24/14 Page 153 of 195
Case 1:13-cv-01101-GBD-JCF Document 87-1 Filed 01/24/14 Page 245 of 195
Page 20 of 42

Table of Contents

LucidMedia pending in the Southern District of New York. The case is still pending with regards to the remaining defendants, and the parties are engaged in the early stages of discovery. The parties' Opening Claim Construction briefs were submitted on Friday, June 22, 2012.

*LucidMedia Networks, Inc. v. Augme Technologies, Inc.*, Civil Action 3:11-cv-282-HEH (the "LucidMedia litigation") was severed from the Gannett litigation that was transferred out of Virginia and to New York. This severed counterclaim for alleged patent infringement was filed in the U.S. District Court for the Eastern District of Virginia as an Amended Complaint on August 9, 2011. On January 23, 2012, LucidMedia and Augme agreed on a preliminary settlement of all issues, and the Court entered an order staying all proceedings in the Eastern District of New York pending settlement discussions. On April 26, 2012, Augme announced a final settlement agreement was reached with defendant LucidMedia through a cross licensing and services agreement. Thus, LucidMedia's case against Augme, as well as Augme's case against LucidMedia pending in the Southern District of New York, has been dismissed. This cross licensing and services agreement did not have a material impact on our financial results for the period ended May 31, 2012, and the agreement is not expected to have a material impact on future periods.

*Augme Technologies, Inc. v. Yahoo! Inc.*, Civil Action No. 3:09-cv-05386-JCS (the "Yahoo! litigation"), a patent infringement lawsuit pending in the U.S. District Court for the Northern District of California since November 16, 2009. On December 14, 2011, a *Markman* hearing was held to construe certain terms in the Yahoo! patents which are the subject of Yahoo!'s counterclaim. A claim construction order on the Yahoo! patents was entered on January 3, 2012. On January 6, 2012, a case management conference was held during which the Court scheduled Augme's case against Yahoo! for a trial commencing on January 7, 2013. At the case management conference, Yahoo!'s counterclaim was severed from Augme's claim. The trial of Yahoo!'s counterclaim, if necessary, will take place following the conclusion of the trial of Augme's case against Yahoo!

Augme is currently conducting discovery. During the fact discovery process, Augme learned that Yahoo!'s Yield Manager System (one of the products at issue) actually consisted of three separate advertisement serving systems. Court intervention was required to compel Yahoo! to provide appropriate discovery on all of the accused systems.

On June 11, 2012, Yahoo! renewed its Motion for Summary Judgment of non-infringement. The Court will hear argument on the summary judgment issues on July 20, 2012.

*Augme Technologies, Inc. v. Pandora, Inc.*, Civil Action No. 1:11-cv-00379 (the "Pandora litigation"), a patent infringement lawsuit pending in the U.S. District Court for the District of Delaware as of April 29, 2011. A *Markman* hearing was held on February 27, 2012. The Court has yet to issue its claim construction order. Fact discovery has concluded. Expert discovery has been delayed pending the Court's issuance of a claim construction order.

*Augme Technologies, Inc. v. Velti, USA*, Civil Action No. 1:12-cv-00294 (the "Velti litigation"), a patent infringement lawsuit pending in the U.S. District Court for the District of Delaware as of March 9, 2012. Augme has filed a patent infringement lawsuit in the United States District Court of Delaware against Velti USA, Inc., a global provider of mobile marketing and advertising technology and solutions. Augme is asserting three causes of action involving alleged patent infringement related to Augme-owned United States Patent No. '721 ("Method and Code Module for Adding Function to a Web Page"), United States Patent No. '636 ("Method and Code Module For Adding Function to a Web Page") and United States Patent No. '691 ("Method and System for Adding Function to a Web Page"). On May 4, 2012, Velti filed a Motion to Dismiss For Failure to State a Claim Under Federal Rule of Civil Procedure 12(b)(6), but withdrew its Motion once Augme filed its First Amended Complaint. Velti then filed its Answer to the Amended Complaint on June 6, 2012.

Augme seeks injunctive relief to prevent Velti USA from continuing the alleged infringement of Augme's patents. In addition, Augme seeks a recovery of monetary damages resulting from Velti's past infringement of these patents and all legal fees associated with this patent enforcement effort.

*Augme Technologies, Inc. v. Millennial Media, Inc.*, Civil Action No. 1:12-cv-00424 (the "Millennial Media litigation"), a patent infringement lawsuit pending in the U.S. District Court for the District of Delaware as of April 5, 2012. Augme filed a case against Millennial Media, Inc., asserting three causes of action involving alleged patent infringement related to Augme-owned United States Patent No. 7,783,721 ("Method and Code Module for Adding Function to a Web Page"), United States Patent No. 7,269,636 ("Method and Code Module For Adding Function to a Web Page") and United States Patent No. 6,594,691 ("Method and System for Adding Function to a Web Page").

On May 30, 2012, Millennial Media filed a Motion to Dismiss For Failure to State a Claim Under Federal Rule of Civil Procedure 12(b)(6). Augme filed an amended complaint and an answer brief on June 18, 2012.

Case 1:13-cv-01101-GBD-JCF Document 87-1 Filed 01/14/14 Page 154 of 195
Case 1:13-cv-01101-GBD-JCF Document 66-1 Filed 09/12/13 Page 21 of 43
Page 21 of 42

12

Case 1:13-cv-01101-GBD-JCF Document 67-1 Filed 03/14/14 Page 255 of 195
Case 1:13-cv-01101-GBD-JCF Document 66-1 Filed 03/14/14 Page 25 of 195
Page 22 of 42

Table of Contents

Augme seeks injunctive relief to prevent Millennial Media from continuing the alleged infringement of Augme's patents. In addition, Augme seeks a recovery of monetary damages resulting from Millennial Media's past alleged infringement of these patents and all legal fees associated with this patent enforcement effort.

***Brandofino Communications vs. Augme Technologies, Inc.*** On September 27, 2011 Brandofino Communications, Inc. ("Brandofino") filed suit against Augme and New Aug LLC in the Supreme Court of the State of New York, New York County. The complaint alleges, *inter alia*, breach of contract and unjust enrichment claims arising from work Brandofino allegedly performed for Augme pursuant to a marketing agreement entered into by Brandofino and Augme. The complaint seeks damages in excess of one million dollars. Augme has served its Answer and set forth counterclaims for breach of contract, unfair competition, tortious interference with business relations, and violations of New York General Business Law Section 349 (relating to violations of Augme's intellectual property rights). The Company intends to vigorously defend against Brandofino's claim and pursue its counterclaims.

## NOTE 8 — CONCENTRATION OF RISK

During the quarter ended May 31, 2012, three clients accounted for approximately 11 percent, 9 percent and 6 percent, respectively, of the Company's revenue and no other client accounted for over 5 percent of revenue.

At May 31, 2012, three customers accounted for 31 percent of accounts receivable, the largest is 15 percent. At February 29, 2012, three customers accounted for 25 percent of accounts receivable, the largest of which accounted for 10.8 percent.

## NOTE 9 — RELATED PARTY TRANSACTIONS

The Company has been a party to one transaction in which key management personnel had a direct or indirect material interest. On May 24, 2012, the Company acquired all of the common stock and all of the preferred stock of Geos Communications IP Holdings, Inc. ("Geos IP"). The fair value of the consideration given for the acquisition of the Geos IP stock was $4.2 million, which included $355,000 in cash and $3.8 million in Augme's common stock (1,860,465 shares at a price of $2.05 per share). The Company is indemnified against certain losses resulting from breaches of any representation, warranty, covenant or agreement of Geos IP. In order to secure payment of any loss, the Company will retain possession of the approximate 1.9 million shares of Augme's common stock for a period of up to 14 months following the closing date of the acquisition.

The Company's Chief Executive Officer, Paul Arena, was a director of Geos Communications, Inc. (the "Parent"), which is the parent company of Geos IP, until March 8, 2010 and is the owner of 1,625,276 shares of the Parent's common stock and options to purchase 476,389 shares of the Parent's common stock. The Company's director, Ernest W. Purcell, and Phillip C. Rapp, Jr., the Company's Executive Vice President of Strategic Planning, are preferred stockholders of Geos IP. Mr. Purcell owned 76,168 shares of Geos IP preferred stock and Mr. Rapp owned 100,000 shares of Geos IP preferred stock. For each 2.988 shares of Geos IP preferred stock, the preferred stockholders will receive 1 share of the Company's common stock after the indemnification period is concluded. Therefore, Mr. Purcell will receive 25,492 shares of the Company's common stock and Mr. Rapp will receive 33,468 shares of the Company's common stock. Mr. Arena did not receive any consideration in the transaction.

13

Case 1:13-cv-01016-RBJ-GJF Document 66-1 Filed 01/24/14 Page 156 of 195
Case 1:13-cv-01016-GBD Document 87-1 Filed 01/14/14 Page 24 of 43
Page 23 of 42

Table of Contents

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis summarizes the significant factors affecting our results of operations, financial conditions and liquidity position for the three months ended May 31, 2012 and 2011, and should be read in conjunction with our consolidated financial statements and related notes included elsewhere in this filing.*

This report contains forward-looking statements. These statements relate to future events or to our future financial performance and involve known and unknown risks, uncertainties and other factors which may cause our actual results, performance or achievements to be materially different from any future results, performances or achievements expressed or implied by the forward-looking statements.

Factors that might affect our forward-looking statements include, among other things:

- overall economic and business conditions;

- the demand for our products and services;

- competitive factors in the industries in which we compete;

- the emergence of new technologies which compete with our product and service offerings;

- other capital market conditions, including availability of funding sources; and

- changes in government regulations related to our industry.

In some cases, you can identify forward-looking statements by terms such as "may," "will," "should," "could," "would," "expects," "plans," "anticipates," "believes," "estimates," "projects," "predicts," "potential" and similar expressions intended to identify forward-looking statements. These statements reflect our current views with respect to future events and are based on assumptions and are subject to risks and uncertainties. Given these uncertainties, you should not place undue reliance on these forward-looking statements. We discuss many of these risks in greater detail under the heading "Risk Factors" included in other reports we file with the Securities and Exchange Commission. Also, these forward-looking statements represent our estimates and assumptions only as of the date of the document containing the applicable statement.

Unless required by law, we undertake no obligation to update or revise any forward-looking statements to reflect new information or future events or developments. Thus, you should not assume that our silence over time means that actual events are bearing out as expressed or implied in such forward-looking statements.

## OVERVIEW

Augme Technologies™, Augme® ("Augme"), AD LIFE® ("AD LIFE"), AD SERVE® ("AD SERVE"), A+® ("A+"), Hipcricket® ("Hipcricket"), Boombox® ("Boombox") and the Company logos are trademarks of Augme.

Augme provides strategic services and mobile technology to leading consumer and healthcare brands. For the quarter ended May 31, 2012, approximately 53% of revenues related to SaaS-based sales, approximately 27% of revenues related to mobile advertising solutions and approximately 20% of revenues were generated from other sources, including individual campaign fees, development work for marketing campaigns and shorter term licenses.

We hold a portfolio of patents related to the "Method and System for Adding Function to a Webpage," which cover technical processes and methods that we believe are an indispensable component of behavioral targeting — the automatic provision of customized content to individuals based on information such as past web activity, personal preferences, geography, or demographic data. Our technology allows marketers, brands, and agencies the ability to plan, create, test, deploy, and track mobile marketing programs across mobile channels, including SMS, 2D/QR codes, mobile websites, advertising networks, social media and branded apps. AD LIFE 4.0 facilitates consumer brand interactions and the ability to track and analyze campaign results. We believe that our patented device-detection and proprietary mobile content adaptation software provides a solution to the mobile marketing industry problem of disparate operating systems, device types, and on-screen mobile content rendering. We also provide business to consumer utilities including national mobile couponing solutions, strategic mobile healthcare tools, custom mobile application development, and consumer data tracking and analytics. We are headquartered in New York City.

Case 1:13-cv-01101-GBD-JCF Document 87-1 Filed 01/14/14 Page 157 of 195
Case 1:13-cv-01101-GBD-JCF Document 66-1 Filed 09/12/13 Page 25 of 43
Page 24 of 42

On August 25, 2011, we completed our acquisition of the business and substantially all of the assets of Hipcricket.  Hipcricket provides a cloud-based mobile marketing and advertising SaaS platform, HIP 7.0 that empowers its clients to engage customers, drive

14

Table of Contents

loyalty, and increase sales by creating, analyzing, and optimizing integrated mobile marketing campaigns and enterprise class solutions. The HIP 7.0 platform has been combined into the AD LIFE 4.0 platform to offer clients the combined functionality of both platforms. Hipcricket's clients connect with consumers across every mobile channel, including SMS, 2D/QR codes, mobile Web sites, advertising networks, social media and branded apps. Hipcricket has also created the first comprehensive permission-based mobile ad network, targeting customers via location and highly-specific demographic information across SMS, display, rich media and video.

On July 22, 2011, we completed our acquisition of the business and substantially all of the assets of JAGTAG. As part of that acquisition, the Company acquired certain patents which amounted to date to 3 U.S. patents and 9 U.S. patents pending related to ambient targeting and is in the process of deploying this capability into its service offering.

On May 24, 2012, we completed our acquisition of all of the common stock and all of the preferred stock of Geos Communications IP Holdings, Inc. ("Geos IP"). By acquiring the Geos IP stock, the Company acquired 5 U. S. patents covering Voice over Internet Protocol ("VoIP") and other critical mobility inventions and 7 U.S. patent applications and 18 pending international patent applications covering related invention families within the field of mobile VoIP. The patents will allow the Company to expand its mobile marketing and mobile advertising technology offerings to include adaptive voice technologies for any mobile environment, VoIP-enabled mobile marketing and advertising, VoIP-enabled E-Commerce and VoIP-enabled services and support features within the Company's AD LIFE mobile marketing and mobile advertising platform.

## Trends, Events and Uncertainties

The Company operates in the mobile marketing industry and, accordingly, can be affected by a variety of factors. For example, management of the Company believes that any of the following factors could have a significant negative effect on the Company's future financial position, results of operations and cash flows: unanticipated fluctuations in quarterly operating results, adverse changes in the Company's relationship with significant customers or failure to secure contracts with other customers, intense competition, regulation that may adversely impact the Company's operations, failure to attract and retain key personnel, failure to protect intellectual property, decrease in the migration trends from traditional advertising methods to digital and mobile media and the inability to manage growth.

The mobile marketing and advertising landscape, while in its early stages, is highly competitive. Many of the landscape's significant providers are focused on delivering point solutions targeting a specific segment of the mobile marketing and/or advertising landscape. We believe Augme differentiates itself from the competition by offering complete, end-to-end mobile advertising and marketing solutions delivered through its SaaS AD LIFE platform.

In late 2010, the FTC and the Department of Commerce each issued a staff report proposing new frameworks for consumer privacy protection; the FTC report called for federal "Do Not Track" legislation. If "do not track" legislation is passed, it could negatively impact our mobile ad network. Any significant restriction on our ability to utilize the functions of our technology could have a material adverse result on our business, revenues and results of operations.

### Industry Overview

We believe that the convergence of several factors is fundamentally changing the way advertisers reach their audience. We anticipate consumers will continue to increase their usage of mobile devices as their medium for content consumption, creating a significant opportunity for mobile advertising. These factors include:

> *Adoption of faster and more functional mobile connected devices create greater mobile advertising and marketing opportunities.*

The ubiquity and utility of mobile devices continue to grow, empowering advertisers and marketers with a wider audience and greater delivery capabilities than ever seen before. There has been widespread adoption of mobile connected devices, driven by intuitive user interfaces, lower price points, increased functionality, faster processing speeds, better graphics processors and advanced display technologies with touch capabilities. It has become possible to deliver innovative, interactive and engaging consumer media experiences on a wide variety of mobile connected devices. A 2011 report by Cisco Systems projects that the number of mobile connected devices worldwide will reach 7.1 billion by 2015. According to IDC, the number of smartphones shipped by vendors is expected to increase from approximately 305 million in 2010 to more than one billion by 2015, representing a compound annual growth rate of approximately 27%. IDC also estimates that nearly 63 million tablets will be shipped in 2011, growing to 135 million tablets in 2015, representing a compound annual growth rate of 22%.

Case 1:13-cv-01041-GBD-JCF   Document 87-1   Filed 01/14/14   Page 159 of 195
Case 1:13-cv-01041-GBD-JCF   Document 66-1   Filed 09/12/13   Page 27 of 43

Page 26 of 42

15

Case 1:13-cv-01016-GBD-JCF Document 87-1 Filed 09/12/14 Page 160 of 195
Case 1:13-cv-01016-GBD-JCF Document 66-1 Filed 09/12/14 Page 26 of 195

Page 27 of 42

Table of Contents

*Mobile usage has disrupted how content is consumed.*

Consumers are increasingly using their mobile devices instead of their personal computers and other traditional media to access content. For example, according to industry research conducted by Kleiner Perkins Caufield & Byers, a venture capital firm, 33% of the traffic on Facebook came from mobile devices in 2011, up from 1% in 2008. Consumers use their mobile devices in all aspects of their daily lives, such as reading the news, playing games, checking sports scores, shopping, checking the weather, banking, obtaining maps and directions and listening to the radio. According to eMarketer, Inc., which publishes data, analysis and insights on digital marketing, media and commerce, the amount of time spent by consumers with their mobile devices is rising at a faster rate than the time spent viewing other types of media.

*Advertising industry is being disrupted by mobile advertising.*

As advertisers seek to maximize the effectiveness of their campaigns, we believe the attractiveness of traditional advertising media, such as outdoor billboards, newspapers, magazines, radio and even television, is declining relative to digital advertising. We believe this decline is due to several inherent limitations in traditional advertising, such as its limited ability to target specific audiences, its limited ability to measure audience reach, performance and in some cases, its limited geographic range. According to a December 2011 report by eMarketer, consumers are spending a larger proportion of their time with digital media, while there has been a concurrent decline in the share of time spent with traditional media. However, according to the eMarketer report, advertising spending is significantly lower on mobile than it is for other types of media, relative to consumer time spent with each type of media. Although there is still significant spending on traditional advertising, advertisers are shifting their budgets to digital channels, both online and mobile.

As consumers spend more time online using their personal computers, we believe digital advertising can be more effective than traditional advertising because it allows for user interaction, provides better measurement and achieves an expanded reach.

However, even PC-based online digital advertising suffers from a number of significant limitations, including:

*Limited personalization.* Computers often have multiple users, thus yielding audiences with limited personalization. This limits the ability of advertisers to target end users on an individual basis.

*Limited real-time accessibility.* Computers are typically used at home or in the office. Even laptops that can physically be with the user when traveling are usually used from a fixed location at their destination, where they are turned on and wirelessly connected to the Internet. As a result, user engagement with ads is generally limited to the time spent in front of the computer screen in a fixed location.

*Limited location targeting.* Most location targeting through personal computers is limited to a broad geographic area based on the records of the user's Internet service provider. This limits the ability to deliver highly targeted advertising that is relevant to a consumer.

**Our Solution**

We believe mobile advertising provides significant benefits both to developers and to advertisers over traditional advertising media and PC-based online digital advertising. For developers, mobile advertising provides the opportunity to make money, acquire users and gain insight into mobile application ("app") usage. For advertisers, the combination of the personal nature of mobile devices, their enhanced functionality and the rise of app-enabled experiences creates a powerful platform for highly targeted and effective advertising. Additionally;

*Anytime, anywhere access.* Mobile devices generally accompany users at all hours of the day and are typically turned on at all times. This provides advertisers the opportunity for nearly continual access to the user. An advertiser can reach audiences at all stages of the purchase decision — awareness, research, opinion, consideration and ultimately, purchase — in order to increase the likelihood that the viewer will become a purchaser of the product or service being advertised. This ability to target audiences at all times of the day, regardless of location, makes mobile advertising an attractive opportunity for advertisers, especially compared to newspapers, magazines, television and radio or to digital advertising delivered through personal computers.

*Personalization.* Mobile devices are inherently personal and are most often used by one person. Users often download and use a variety of apps that reflect their personal preferences and interests. In addition to customized apps, users can personalize and provide target ability via scans and messaging interactions with their mobile devices

Case 1:13-cv-01101-GBD-JCF Document 87-1 Filed 01/14/14 Page 161 of 195
Case 1:13-cv-01101-GBD-JCF Document 66-1 Filed 09/12/13 Page 29 of 43
Page 28 of 42

delivering a multi-channel mobile interface experience for the end users. When a user downloads any one of these mobile channels to his or her individual device, data is often exchanged that can provide information about the user's interests. As the user downloads and registers,

16

Case 1:13-cv-01101-GBD-JCF Document 87-1 Filed 01/24/14 Page 163 of 195
Case 1:13-cv-01101-GBD-JCF Document 66-1 Filed 09/12/13 Page 36 of 42
Page 29 of 42

Table of Contents

more data can be collected about this user's preferences, which provides an opportunity to personalize the mobile advertising experience.

*Location targeting and relevance.* Data from mobile devices is often shared in a manner that can identify the device's location. This enables location-targeted advertising, which has the potential to increase the impact and relevance of an ad to the user. For example, in PC-based online advertising, firms can assess a user's browsing behavior to provide limited targeting of advertising to that user. With mobile advertising, on the other hand, an ad can be targeted to a consumer who is in close proximity to a specific location, such as a retail store, or to a consumer who recently visited that store. We believe the ad also has the potential to influence the user to walk into a nearby store.

*More complete user engagement.* Apps on mobile connected devices typically show one or two ads on each page view. We believe this limited number of ads on a small device screen can often capture the attention of the user better than the many banner ads on a typical PC-based web page. Furthermore, ads on a mobile device can take advantage of features of the device itself, such as the touch screen, swipe functionality and the accelerometer, which detects motion, to enable the user to manipulate and more deeply engage with the ad. Mobile device users can also act upon an ad immediately by, for example, downloading an app or other content, calling an advertiser directly from the mobile phone, or using the map on the device to find a nearby retail store or service provider. In some cases, mobile users can even take their device to a store to physically redeem an offer from an ad.

*Enhanced audience targeting.* Due to the significant amount of data collected from a mobile device, highly specific audiences can be created based on location and behavioral and demographic preferences to match advertisers' objectives. We believe this ability to create and deliver highly relevant audiences also enhances the value of advertising space for developers.

AD LIFE allows Augme to provide clients a full suite of mobile marketing and advertising solutions, thus providing an end-to-end, one-stop mobile campaign management software system. The Platform delivers the following benefits to customers:

- Device recognition technology that formats traditional digital assets into content that can be optimized for virtually any mobile device regardless of operating system or network provider;
- Open architecture which we believe offers the widest variety of CRTs in the mobile market today, including SMS, MMS, 2D / QR codes, logo, and audio recognition, allowing consumers to use their mobile devices to easily and instantly access on-demand digital content;
- Ability to measure campaign effectiveness using data analysis gathered and processed using proprietary techniques; these key metrics and results of client campaigns include demographic and behavioral data;
- Ability to deliver multimedia to both smartphones and standard phones, without requiring the consumer to download an application prior to use;
- Ease of implementation and integration with a brand's existing enterprise resource planning and CRM systems provides the ability to optimize campaigns and fulfillment; and
- The software platform enables customers to implement mobile campaigns in a short time frame, typically 10-20 days, and is significantly more cost effective than sourcing technology compared to current market competition.

The key differentiating feature of Augme's end-to-end platform is its ability to serve clients throughout the entire customer lifecycle. The Platform's post-click engagement capabilities enable marketers to continuously re-engage with users for re-marketing purposes. Additionally, our platform allows our customers the ability to deliver content to any mobile network, operating system or device, regardless of how the device landscape changes. This ensures that brands have the capacity to reach 100% of any intended mobile marketplace for their messaging, whether through text, quality resolution code, or other means.

**Our Strategy**

Our strategy is based on multi-faceted monetization through IP and the Hipcricket operating business. The Company intends to be one of the leading providers of mobile marketing and advertising solutions across multiple media types and channels. The principal elements of our strategy are to:

- capitalize upon our existing patented technology to further develop new product innovations and licensing opportunities, including the use of ambient targeting in our mobile ad serving technology;

Case 1:13-cv-01101-GBD-JCF Document 87-1 Filed 01/14/14 Page 163 of 195
Case 1:13-cv-01101-GBD-JCF Document 66-1 Filed 09/12/13 Page 34 of 43
Page 30 of 42

- deepen our existing customer relationships by providing expanded services as our customers increase their use of mobile marketing and mobile ads to gain and further engage their customers;

17

Case 1:13-cv-01104-GBD-JCF Document 87-1 Filed 01/14/14 Page 164 of 195
Case 3:13-cv-01104-GBD Document 66-1 Filed 03/14/14 Page 31 of 42
Page 31 of 42

Table of Contents

- add new customer relationships as our markets expand by adding to our sales force, furthering our channel sales and expanding our product offerings;

- enhance our platform by addressing technology shifts and customer driven opportunities in mobile devices, including such areas as analytics, self-service and end to end integration of mobile strategies and delivery;

- continue expansion and pursue strategic partnerships and acquisitions; and

- expand our mobile ad capabilities by investing in technology and hiring additional staff.

We believe our mobile marketing solutions, together with our patents which are critical to behavioral targeting, will enable us to pioneer a new era in marketing and new media communications with Internet applications and services for targeted consumers and communities worldwide.

**Intellectual Property Summary**

Through our own invention process and by making acquisitions, we continually seek to enhance and maintain our intellectual property ("IP") portfolio to better serve our clients and protect shareholder value. Our IP consists of patents, trademarks, copyrights, applications for the same, and trade secrets. We believe that our IP creates significant value in our business. Our objective with our IP is to provide protection, exclusivity and unique technologies for our customers in the mobile marketing industry.

We seek to monetize our unique IP through our business operations and licensing our IP to others and, when necessary, we enforce our IP rights through litigation. We have and will continue focused efforts to collect royalties and appropriate compensation from those that use our patented inventions and brands without authorization. We believe the prospect of infringement damages in connection with enforcement of our IP rights may also carry significant value. Assuming collection of any such infringement damages, we believe that such collection would provide a return on our investment in invention, licensing and enforcement.

To date, Augme's patent portfolio covers technology inventions with patent protection from 1999 to 2026, which protects technology that enables the following:

1) Customized content delivery to any Internet enabled device;
2) Device, browser, software, and profile detection with content targeting;
3) Content targeting based on profiles and ambient conditions;
4) Content targeting based on profiles within virtual environments;
5) Adaptive voice technologies for mobile environments;
6) Voice advertising capability;
7) Voice over Internet Protocol ("VoIP")-enabled mobile marketing — click-to-call;
8) VoIP-enabled E-Commerce; and
9) VoIP-enabled services and support.

We believe that the combined Augme and Hipcricket mobile marketing and advertising technology businesses are well positioned to capitalize on the growth of Internet enabled smartphones that have become a leading driver of growth in Internet traffic and utilization by consumers. Due to that explosive growth, marketers are refocusing to reach consumers through mobile advertising and mobile marketing strategies, initiatives and campaigns. We believe that our IP will be instrumental in our efforts to capture the marketing budgets and mobile marketing advertising spends of the future. We believe the growth in mobile marketing and mobile advertising spending by our customers across an array of industry verticals will continue to rise. Augme's objectives within its IP management include the commercialization of our inventions, on-going licensing through product sales, non-litigation licensing, litigation and the complete monetization of our inventions.

With over 150 million unique visitors over an industry-leading 200,000 campaigns completed through our patented technology platforms, we continue to develop new and innovative technologies and inventions. We project to have over 100 new patent assets under Augme's management by the end of our 2013 fiscal year.

We believe that growth in the mobile Internet market space may enhance our patent enforcement initiative because it has contributed to the creation of an emerging group of companies that have developed revenue streams that we believe are infringing on Augme's patents. Augme's inventions have solved device, infrastructure and customized content distribution problems facing Internet publishers in 1999. Now in 2012, well within the coverage of the patent protection, the identical

Case 1:13-cv-01104-GBD-JCF Document 87-1 Filed 01/14/14 Page 165 of 195
Case 1:13-cv-01104-GBD-JCF Document 66-1 Filed 09/12/13 Page 33 of 43
Page 32 of 42

problems are repeating in the mobile Internet and we believe that Augme's inventions again present the solution for mobile internet publishers and service providers. We believe that the growing number of market entries by highly capitalized companies and the highly sought after massive consumer

18

Case 1:13-cv-01041-GBD-JCF Document 68-1 Filed 03/12/14 Page 166 of 195
Case 1:13-cv-01041-GBD-JCF Document 66-1 Filed 03/12/14 Page 34 of 43
Page 33 of 42

Table of Contents

audience emerging on the mobile internet makes it likely that infringement of our patents is occurring. Companies that implement and monetize their solutions may have developed revenue streams subject to licensing and infringement damages by Augme.

Augme owns 13 patents and owns an additional 80 patents pending in the U.S. and internationally. Augme also has 11 international patents pending with near term objectives of filing more than 50 patents in various international markets involved in alignment with the strategic growth plan of the Hipcricket operating business.

Augme's first family of patented inventions plays an integral role in technology platforms and services and enables targeting of content to end-users. The patents are foundational to the methods used in two primary types of Mobile Internet operations:

1) Device Detection and Mobile Content Targeting; and
2) Customized Content & Mobile Advertising Delivery

Augme's "Method and System for Adding Function to a Webpage" family of patents teaches a two-code-module system that enables any networked content to be customized based on end-user criteria. The Augme patents thus enable a single Web page (traditional Internet and mobile Web) to have an infinite number of tailored service responses that allow Web page visitors to receive content that is customized to the user's unique computing environment, connectivity, bandwidth level, geographic location, gender, age, or any other information about the Web page visitor (targeting criteria) such as behavioral marketing data. Augme's two-code-module Web page customization process has widespread application in the fields of Targeted Advertising, E-Commerce, Mobile Marketing/Advertising and other customized content delivery operations.

Augme's patented methods and systems add function to web pages through an easily distributed software code module. The method and system deliver responses to client (computer user) requests that are customized based upon visitor information and preferences. When a web page is downloaded, the technology automatically executes a first code module embedded in the Web page. The first code module issues a first command to retrieve a second code module, via a network connection, from a server system. Next, a second code module is assembled based upon the visitor information. Finally, the assembled second code module, with a service response, is returned to the visitor's device, where, upon execution, the response is rendered on the visitor's processor platform (computer or mobile device). The patent portfolio has been granted 3 continuation patents under this family and is pursuing 2 additional patents including a "Method and System for adding Targeted Marketing to a Webpage," now allowed by the USPTO, and expected to be issued to us within 60 to 90 days.

Augme's patent portfolio was expanded in 2011 with the filing of the now pending "Method and System for Generation of Anonymous Profiles from a Tri-Level Mapping of Mobile Network Marketing Econometrics" that solves critical mobile marketing consumer privacy issues by protecting users' identities and movements through a mobile network. The invention also allows for brand centric rich media and mobile marketing engagements to be tracked and presented in way that provides data in three layers of utility within the areas of retail, product and consumer engagement. The data interface resulting from this technology allows brands to manage mobile marketing technology in a way that increases the knowledge base and strategic actionable information mapping anonymous consumer behavior and data.

U.S. Patent Number 7,958,081 ("the '081 patent") was issued to Augme on June 7, 2011 and is entitled, "Apparatuses, Methods and Systems for Information Querying and Serving on Mobile Devices Based on Ambient Conditions." Augme expanded again and has been already granted patents in continuation of the '081 patent and added to its portfolio patents issued on November 29, 2011, U.S. Patent Number 8,069,169, entitled "Apparatuses, Methods and Systems for Information Querying and Serving on the Internet Based on Profiles" and "Apparatuses, Methods and Systems for a Graphical Code-Serving Interface." Augme filed these applications on September 28, 2006 and the issuing claims detail the implementation of apparatuses, methods, and systems for information querying and serving on the mobile and consumer Internet based on profiles. Information and/or advertisement providers are enabled to leverage profile information to serve context, demographic, and behavior targeted information to users on the mobile Internet using this invention.

On May 24, 2012, we acquired a family of five issued U.S. patents. The patents cover VoIP and other critical mobility inventions. The acquired patents include U.S. Patent Number 7,606,217 entitled "System and Method for Routing Telephone Calls over a Voice and Data Network"; U.S. Patent Number 7,460,480 entitled "Dynamically Adapting the Transmission Rate of Packets in Real-Time VoIP Communications to the Available Bandwidth"; U.S. Patent Number 7,676,599 entitled "System and Method of Binding a Client to a Server"; U.S. Patent Number 7,782,878 entitled "System and Method for Sharing an IP Address"; and U.S. Patent Number 7,957,401 entitled "System and Method for using Multiple Communication Protocols in Memory Limited Processors."

Case 1:13-cv-01101-GBD-JCF Document 87-1 Filed 01/14/14 Page 167 of 195
Case 1:13-cv-01101-GBD-JCF Document 66-1 Filed 09/12/13 Page 35 of 43
Page 34 of 42

Aside from its patents and pending patents, Augme also owns 18 trademarks protecting the names of its products and identity in the marketplace.

19

---

Case 1:13-cv-01104-GBD-JCF   Document 66-1   Filed 03/12/14   Page 168 of 195
Case 1:13-cv-01104-GBD-JCF   Document 66-1   Filed 02/24/14   Page 368 of 395
Page 35 of 42

Table of Contents

Augme is engaged in several legal disputes with companies that Augme alleges are infringing the Augme patent portfolio. Currently pending patent infringement lawsuits and related matters are described in the section of this document titled "Legal Proceedings."

Augme's patents are an integral and foundational component of Augme's technology platforms and services as well as providing potential for attractive partnership opportunities with third parties who have been identified to license the technology within prescribed market verticals. Augme is pursuing certain strategic licensing arrangements with companies that Augme has identified as using Augme's patented methods and processes. In addition, Augme is obtaining organic licenses through Hipcricket's clients' use of Augme's core technology and inventions.

*Liquidity and Capital Resources*

Net cash used in operating activities was $4.1 million in the quarter ended May 31, 2012. Net cash used in operating activities primarily reflects the net loss for the quarter, which was partially offset by depreciation and amortization, employee share-based compensation and changes in operating assets and liabilities. Net cash used in operating activities for the quarter ended May 31, 2011 was $1.6 million, reflecting the net loss for the quarter, partially offset by employee share-based compensation and changes in operating assets and liabilities.

Net cash used in investing activities was $4.2 million in the quarter ended May 31, 2012. Cash of $2.0 million was used for partial payment of the Hipcricket acquisition-related contingent consideration and $1.4 million was used for legal actions supporting our patent enforcement initiatives, which we capitalize as intangible assets. Additionally, the Company used cash of $0.2 million for a long-term investment.

On May 24, 2012, the Company acquired all of the common stock and all of the preferred stock of Geos Communications IP Holdings, Inc. ("Geos IP"). We paid $355,000 in cash and $3.8 million in Augme's common stock (1,860,465 shares at a price of $2.05 per share) for the purchase.

Net cash used in investing activities for the quarter ended May 31, 2011 was $0.6 million, which was used for legal actions supporting our patent enforcement initiatives.

Net cash provided by financing activities during the quarter ended May 31, 2012 was $87,000 of net proceeds received from the exercise of stock options. Net cash provided by financing activities during the quarter ended May 31, 2011 was $0.9 million, received from the exercise of stock options and warrants.

The financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. As of May 31, 2012 and February 29, 2012, the Company has accumulated deficits of $80.1 million and $72.5 million, respectively. The Company is subject to the risks and challenges associated with companies at a similar stage of development including dependence on key individuals, successful development and marketing of its products and services, integration of recent business combinations, competition from substitute products and services and larger companies with greater financial, technical management and marketing resources. Further, the Company will require additional capital to execute on its key business strategies and fund operations.

On June 29, 2011, we filed a Form S-3 registration statement with the Securities and Exchange Commission for the purpose of raising up to $75.0 million through sales of our securities. The registration statement was declared effective on July 13, 2011. The registration statement allows us to raise capital by engaging in securities offerings from time-to-time, as funds are needed. On November 17, 2011, we completed a public offering pursuant to which we sold 9.4 million shares of the common stock registered on the Form S-3 registration statement at a price to the public of $2.15 per share. We raised $18.5 million in proceeds, net of $1.7 million in costs related to the offering, leaving approximately $55.0 million of the $75.0 million registered on Form S-3.

We expect, during the second quarter of fiscal 2013, that we will need to raise additional funds through IP licensing, non-dilutive debt financing or through an offering of our securities in order to meet liquidity needs. Funding may not be readily available or may not be on terms that are favorable to the Company. Certain financing terms could be dilutive to existing shareholders or could result in significant interest or other costs, or require the Company to license or relinquish certain intellectual property rights. If we are unable to raise capital or if capital is available only on a limited basis or under unacceptable terms, then the Company could be required to substantially reduce or discontinue its investments in intellectual property, new customers and new products; reduce operating, marketing, general and administrative costs related to its continuing operations; or limit the scope of its continuing operations. Due to the nature of the operations and financial commitments of the Company, including contingent acquisition obligations, patent litigation costs to protect intellectual

Case 1:13-cv-01041-GBD-JCF  Document 87-1  Filed 01/14/14  Page 169 of 195
Case 1:13-cv-01041-GBD-JCF  Document 66-1  Filed 09/12/13  Page 37 of 43

Page 36 of 42

property and employee costs, the Company may not have the discretion to reduce operations in an orderly manner to a more sustainable level without impacting future operations or the intellectual property held by the Company.

20

Case 1:13-cv-01101-GBD-JCF Document 67-1 Filed 09/12/14 Page 37 of 195
Case 1:13-cv-01101-GBD-JCF Document 66-1 Filed 09/12/14 Page 38 of 195

Page 37 of 42

Table of Contents

**Critical Accounting Policies**

Our critical accounting policies, as described in our Annual Report on Form 10-K for the fiscal year ended February 29, 2012, relate to capitalized legal patent costs, income taxes, business combinations, goodwill, intangible assets, share-based payments, revenue recognition, and research and development costs. There have been no material changes to our critical accounting policies as disclosed in our Annual Report on Form 10-K for the fiscal year ended February 29, 2012.

**Results of Operations**

The discussions below are not necessarily indicative of the results, which may be expected for any subsequent periods and pertains only to the results of operations for the quarters ended May 31, 2012 and May 31, 2011. Our prospects should be considered in light of the risks, expenses and difficulties that we may encounter. We may not be successful in addressing these risk and difficulties.

***Comparison of Three Months Ended May 31, 2012 to Three Months Ended May 31, 2011***

*Revenue*

Revenues are generated through providing access to our SaaS mobile marketing platforms and services through term license fees, support fees and mobile marketing and advertising campaigns. Through our platform we deliver campaigns and other mobile marketing services using SMS, Multimedia Messaging Service ("MMS") messages, QR codes, Geo-fencing, Mobile Web, Mobile Apps, and analytics. We also provide professional services and extensive integration into customer CRM systems using Application Programming Interfaces ("APIs"). The revenues from these multiple elements of a contract are generally recognized over the term of the contract. For the quarter ended May 31, 2012, revenues were $5.1 million compared with $1.2 million in the quarter ended May 31, 2011, an increase of 321%. The increase was mostly due to addition of the operations of Hipcricket in August 2011 and JAGTAG in July 2011. Additionally, we saw a higher demand for our AD LIFE Platform. During the quarter ended May 31, 2012, approximately 26% of our revenues were generated by three customers.

*Cost of Revenue*

Cost of revenues includes the costs of hosting, short codes and mobile ad inventory. For the quarter ended May 31, 2012, cost of revenue increased 433% to $1.9 million from $0.4 million in the quarter ended May 31, 2011, as a result of higher revenues, mostly from the acquisition of Hipcricket in August 2011. The gross profit margin for the quarter ended May 31, 2012 was 61.9% compared with 69.9% in the quarter ended May 31, 2011. The change in margin is primarily a result of the shift in business towards mobile ad network sales.

*Selling, General and Administrative*

Selling, general and administrative expenses were $9.2 million for the quarter ended May 31, 2012 compared with $4.6 million for the quarter ended May 31, 2011, an increase of $4.6 million, or 99%. The increase in expenses is primarily related to additional headcount and other increased activities resulting from the acquisition of Hipcricket and organic growth. We experienced a $1.1 million increase in general and administrative expenses, a $2.2 million increase in sales and marketing expenses and a $1.1 million increase in technical development costs as a result of the addition of the business of Hipcricket and organic growth. Intellectual property and patent research increased $0.4 million as we continue to invest in our patent portfolio. Employee share-based compensation expense was $1.2 million for the quarter ended May 31, 2012 compared with $1.1 million for the quarter ended May 31, 2011, due to additional headcount. Approximately $0.4 million of patent acquisition and other transaction costs are included in selling, general and administrative expenses for the quarter ended May 31, 2012.

*Depreciation and Amortization*

Depreciation and amortization expense of $1.5 million for the quarter ended May 31, 2012 increased by $1.2 million from $0.3 million for the quarter ended May 31, 2011. This increase is related to the additional amortization expense from intangibles acquired with the purchases of Hipcricket and JAGTAG during the second quarter of 2011 and to the amortization of costs to generate and defend patents.

*Net Loss*

Case 1:13-cv-01016-RBJ-JSF Document 87-1 Filed 01/14/14 Page 171 of 195
Case 1:13-cv-01016-RBJ-JSF Document 66-1 Filed 09/12/13 Page 39 of 43
Page 38 of 42

Our net loss was $7.6 million for the quarter ended May 31, 2012 compared with net loss of $4.0 million for the quarter ended May 31, 2011.  The $3.6 million increase in net loss was mostly attributable to increased selling, general and administrative expenses related to the expansion of the Company both organically and through acquisitions.

21

Case 1:13-cv-01041-GBD-JCF Document 87-1 Filed 01/14/14 Page 172 of 195
Case 3:13-cv-01041-GBD-JCF Document 66-1 Filed 09/12/13 Page 40 of 43

Page 39 of 42

Table of Contents

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Market risk is the potential loss arising from adverse changes in market rates and prices, such as interest rates and our stock price risk. As of May 31, 2012, we held no positions with market risk that could potentially have a material impact on our consolidated financial statements.

**ITEM 4. CONTROLS AND PROCEDURES**

**Disclosure Controls and Procedures**

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is reported, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. It should be noted that the design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote. Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, has concluded that, as of May 31, 2012, our disclosure controls and procedures are effective.

**Changes in Internal Control over Financial Reporting**

During the first quarter ended May 31, 2012, the Company continued to make improvements to our internal control over financial reporting. During January and through the February 29, 2012 year end close process, management implemented a more formalized process for the preparation and review of financial statement reconciliations and for reviewing and establishing appropriate accounting policies and procedures related to complex and unusual transactions. During the first quarter, these controls were in place and improvements have been made. We expect that these changes to our internal controls over financial reporting will remediate our previously identified material weaknesses. Additionally, under the direction of the Audit Committee, management will continue to review and make any changes it deems necessary to the overall design of the Company's internal control over financial reporting, including implementing improvements in policies and procedures.

Other than described above, there have been no material changes in our internal controls over financial reporting that occurred during the quarter ended May 31, 2012 that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

22

Case 1:13-cv-01101-GBD-JCF Document 87-1 Filed 01/14/14 Page 173 of 195
Case 1:13-cv-01101-GBD-JCF Document 66-1 Filed 09/12/13 Page 41 of 43
Page 40 of 42

Table of Contents

## PART II - OTHER INFORMATION

### ITEM 1. LEGAL PROCEEDINGS

We are involved in legal proceedings that are described in Note 7, Commitments and Contingencies, of Notes to the Consolidated Financial Statements included in this report which information is incorporated by reference into this item.

### ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

In conjunction with the purchase of all of the common stock and preferred stock of Geos IP, we issued 1,860,465 shares of our common stock. Information about this transaction is included in the Current Report on Form 8-K we filed on May 29, 2012.

On May 31, 2012, an accredited investor executed a cashless exercise of 50,000 options for 44,002 shares of the Company's common stock. The exercise price was $0.25 per share. The offering was exempt from registration in accordance with Section 3(9) of the Securities Act of 1933.

23

Case 1:13-cv-01106-BCB-JCF Document 87-1 Filed 01/14/14 Page 174 of 195
Case 1:13-cv-01106-BCB-JCF Document 66-1 Filed 09/12/13 Page 42 of 43

Page 41 of 42

Table of Contents

**ITEM 6. EXHIBITS**

| Exhibit Number | Document |
|---|---|
| 3.1 | Certificate of Incorporation and all amendments thereto (Incorporated herein by reference as an exhibit to our Form 10-K filed May 8, 2012). |
| 3.2 | Bylaws, as amended (Incorporated herein by reference as an exhibit to our Current Report on Form 8-K filed April 28, 2006). |
| 10.1 | Stock Purchase Agreement between the registrant and Geos Communications IP Holdings, Inc., Geos Communications, Inc. and the Preferred Stockholders Listed on Schedule I (Filed on May 24, 2012 as an exhibit to our Current Report on Form 8-K, and incorporated herein by reference.). |
| 10.2 | Letter dated May 24, 2012 amending closing date of Stock Purchase Agreement. (Filed on May 24, 2012 as an exhibit to our Current Report on Form 8-K, and incorporated herein by reference.) |
| 31.1 | Certification of Chief Executive Officer required by Rule 13a-14(b) or Rule 15d-14(a) and Section 302 of the Sarbanes Oxley Act of 2002 (filed herewith). |
| 31.2 | Certification of Chief Financial Officer required by Rule 13a-14(b) or Rule 15d-14(a) and Section 302 of the Sarbanes Oxley Act of 2002 (filed herewith). |
| 32.1 | Certification of Chief Executive Officer and Chief Financial Officer required by Rule 13a-14(b) or Rule 15d-14(a) and Section 906 of the Sarbanes Oxley Act of 2002 (filed herewith). |
| 101.INS | XBRL Instance Document (filed herewith). |
| 101.SCH | XBRL Taxonomy Extension Schema Document (filed herewith). |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document (filed herewith). |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document (filed herewith). |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document (filed herewith). |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document (filed herewith). |

24

Case 1:13-cv-01101-GBD-JCF  Document 87-1  Filed 01/14/14  Page 175 of 195
Case 1:13-cv-01101-GBD-JCF  Document 66-1  Filed 09/12/13  Page 48 of 43
Page 42 of 42

Table of Contents

## SIGNATURES

In accordance with Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**AUGME TECHNOLOGIES, INC.**
(Registrant)

Date: July 10, 2012

By:  /s/ Paul R. Arena
    Paul R. Arena
    Chief Executive Officer


By:  /s/ Thomas J. Virgin
    Thomas J. Virgin
    Chief Financial Officer

25

# EXHIBIT 2

*( Revised )*
DIR
August 2

# SHAUB & WILLIAMS LLP

12121 Wilshire Boulevard
Suite 205
Los Angeles, California 90025
tel. (310)-826-66-78     fax. (310)-826-8042
lawfirm@sw-law.com

Attn: Debbie Saxer
Augme Technologies, Inc
Augme Technologies, Inc
1900 W. University Dr., Suite 230
Tempe, AZ  85281

| | |
|---|---|
| Statement Date: | July 31, 2010 |
| Statement No. | 1973 |
| Account No. | 2232.03 |
| Page: | 1 |

RE: Augme (Formerly Modavox) v. AOL

#### Fees

| | | Rate | Hours | |
|---|---|---|---|---|
| **06/01/2010** | | | | |
| SM | Review correspondence from H. Rimm, along with attached proposed correspondence to Court, revise that correspondence and send to H. Rimm, follow up correspondence with H. Rimm. | 325.00 | 0.50 | 162.50 |
| DRS | Research sources of questions for Falco and Clarizio; reviewed and revised emails to Tabler re Version 3.7 and redactions | 500.00 | 1.80 | 900.00 |
| LM | Meet with S. Morgan on mediation follow-up and obtaining new dates. | 425.00 | 0.10 | 42.50 |
| **06/02/2010** | | | | |
| DRS | Meeting with Cassandra Lamb to outline memo Antje Nicken search tasks while on vacation re second code module with service response as reflected in AOL code as well as Tacoda's; review of new targeting engine and other ad targeting emails | 500.00 | 1.50 | 750.00 |
| **06/03/2010** | | | | |
| DRS | Telephone conference with Dave Rosenbaum and then meeting with Cassandra Lamb re beginning final infringement contentions | 500.00 | 1.00 | 500.00 |
| **06/04/2010** | | | | |
| LC | summary of article re counsel opinions - willful infringement | 150.00 | 0.80 | 120.00 |
| **06/08/2010** | | | | |
| LM | Follow-up on mediation. | 425.00 | 0.80 | 340.00 |
| **06/09/2010** | | | | |
| SM | Draft email to M. Litvack regarding mediation. | 325.00 | 0.20 | 65.00 |
| **06/10/2010** | | | | |
| LM | Review discovery and meet with Cassandra Lamb re same. Review documents relating to depositions. | 425.00 | 2.30 | 977.50 |
| **06/11/2010** | | | | |
| LC | memo | 150.00 | 0.60 | 90.00 |

Augme Technologies, Inc

Page: 2
07/31/2010
Account No:     2232-03
Statement No:        1973

Augme (Formerly Modavox) v. AOL

|  |  | Rate | Hours |  |
|---|---|---|---|---|
| **06/15/2010** | | | | |
| SM | Discussion with L. Bosshart regarding status, email to M. Litvack. | 325.00 | 0.20 | 65.00 |
| LM | Conference call with Dave Rosenbaum and D. Shaub re experts, motion to amend.  Meet with D. Shaub and S. Morgan on depositions and stipulation re amendment to complaint. Call with counsel for Randy Falco and S. Morgan re scheduling and subject matter of deposition. | 425.00 | 1.50 | 637.50 |
| DRS | Meeting with and later discussion with Lisbeth Bosshart and S. Morgan re stipulation and related depositions of AOL executives ; meeting with Katya Mezek selecting matters to outline for Paul Arena re all pending cases, revised and added to memo | 500.00 | 2.90 | 1,450.00 |
| **06/16/2010** | | | | |
| DRS | Meeting with Katya Mezek to give her several assignments; review of Litvack email and discussion with S. Morgan re schedule re TM mediation | 500.00 | 0.90 | 450.00 |
| LM | Follow-up with trademark mediation. | 425.00 | 0.80 | 340.00 |
| **06/17/2010** | | | | |
| DRS | Preparation of agenda outline for meeting with Paul Arena and Shelly Meyers | 500.00 | 0.90 | 450.00 |
| **06/18/2010** | | | | |
| DRS | Put together strategy and critical matters checklist re pending cases, drafted email report letter to Paul Arena and Shelly Meyers re same, related emails and calls from Shelly Meyers and discussion with S. Morgan and Lisbeth Bosshart relating to same. | 500.00 | 7.90 | 3,950.00 |
| KM | Help David and Lisbeth draft letter to Paul Arena and Shelly Meyers. | 225.00 | 0.80 | 180.00 |
| **06/20/2010** | | | | |
| DRS | Review of article on Enterprise software as related to AOL systems; reviewed and revised memo on Gupta's posturing that Tacoda/AOL system is "static" not "dynamic as ours; reviewed and revised first draft of infringement table for Tacoda/AOL combined; Edited memo on Rule 11 to use as necessary; review of ad delivery order process and related order entry forms | 500.00 | 2.80 | 1,400.00 |
| **06/21/2010** | | | | |
| SM | Discussion with K. Mezek and DRS regarding supplemental disclosures. | 325.00 | 0.10 | 32.50 |
| DRS | | 500.00 | | |
| DRS | Telephone conference with Jim Lawson  and discussion with S. Morgan and Lisbeth Bosshart re depositions of Clarisio, Minson and Armstrong | 500.00 | 1.30 | 650.00 |
| DRS | Proof read memo on "static" argument by Orrick and other infringement documents revised by Diana Olyai ; telephone conference with Jim Lawson re status of matters before my vacation; reviewed and revised meet and confer letter to Gupta | | | |

Augme Technologies, Inc

Augme (Formerly Modavox) v. AOL

| | | Rate | Hours | |
|---|---|---|---|---|
| | re depositions | 500.00 | 1.50 | 750.00 |
| **06/22/2010** | | | | |
| DRS | Review of Nate Bradley email attachment on monetizing patents; telephone conference with Paul Arena with Shelly Meyers present and Lisbeth Bosshart | 500.00 | 4.40 | 2,200.00 |
| LM | Conference call with Shelly Meyers, Paul Arena and David Shaub. | 425.00 | 4.40 | 1,870.00 |
| **06/24/2010** | | | | |
| SM | Email to M. Litvack regarding mediation issues. | 325.00 | 0.20 | 65.00 |
| **06/25/2010** | | | | |
| DRS | Review of S. Morgan memo on Orrick's opposition to our motion to amend to add AOL as alter ego, and assembly of documents to use in our reply | 500.00 | 3.70 | 1,850.00 |
| **06/26/2010** | | | | |
| DRS | Continued assembly of inserts to our reply to Orrick's opposition to our motion to amend | 500.00 | 4.10 | 2,050.00 |
| **06/28/2010** | | | | |
| SM | Review correspondence from M. Litvack. | 325.00 | 0.10 | 32.50 |
| SM | Discussion with DRS regarding lost profits as a measure of damages, discussions with D. Olyai regarding case schedule. | 325.00 | 0.30 | 97.50 |
| DRS | Meeting with S. Morgan to go over inserts to our reply re motion to amend; emails re Bilski; later discussion with S. Morgan re same | 500.00 | 2.00 | 1,000.00 |
| LC | Call with D. Shaub and S. Morgan on motion to compel letter. | 150.00 | 0.30 | 45.00 |
| LM | Call with S. Morgan and D. Shaub re motion to compel letter. | 425.00 | 0.30 | 127.50 |
| **06/29/2010** | | | | |
| DRS | Initial preparation for Falco, Clarizio, Minson and Armstong depositions as to specific topics and documents to cover | 500.00 | 3.00 | 1,500.00 |
| LM | Work on motion to compel request to Court and meet with D. Shaub on topics for depositions.  Meet and confer with Orrick re same. | 425.00 | 2.60 | 1,105.00 |
| **06/30/2010** | | | | |
| SM | Review correspondence from H. Rimm, call with M. Litvack. | 325.00 | 0.30 | 97.50 |
| DRS | Preparation for and meeting with Paul Arena ,Shelly Meyers ,Nate Bradley , and Lisbeth Bosshart re items on agenda, meeting with Nate Bradley and the S. Morgan , and then Lisbeth Bosshart on all cases and filings per Agenda | 500.00 | 9.70 | 4,850.00 |
| LM | Call with Litvack. | 425.00 | 0.20 | 85.00 |

Augme Technologies, Inc

Page: 4
07/31/2010
Account No: 2232-03
Statement No: 1973

Augme (Formerly Modavox) v. AOL

|  | Rate | Hours | |
|---|---|---|---|
| For Current Services Rendered | | 66.80 | 31,277.50 |

Recapitulation

| Timekeeper | Hours | Total |
|---|---|---|
| David R. Shaub | 49.40 | $24,700.00 |
| Lisbeth Merrill | 13.00 | 5,525.00 |
| Stephen D. Morgan | 1.90 | 617.50 |
| Law Clerk | 1.70 | 255.00 |
| Katya Mezek | 0.80 | 180.00 |

| 06/30/2010 | | | |
|---|---|---|---|
| DRS | *** Credit Adjustment for Hourly Rate Charges | 0.00 | -86,044.00 |
| | Total Credits for Fees | | -86,044.00 |

Advance

| 06/30/2010 | *** Credit Adjustment for Hourly Rate Charges *** | 43,022.00 |
|---|---|---|
| | Total Advances | 43,022.00 |

| 06/30/2010 | **Credit for Deferred Charges:** | |
|---|---|---|
| | Total Deferred Charges before Hourly Rate Adjustment Credit  $164,919.00 | |
| | Total Deferred Charges including Hourly Rate Adjustment Credit  $121,897.00 | -15,638.75 |
| | Total Credits for Advances | -15,638.75 |
| | Total fees and costs | -27,383.25 |
| | Previous Balance | $134,016.25 |
| | Balance Due | $106,633.00 |

Aged Due Amounts

| 0-30 | 31-60 | 61-90 | 91-120 | 121-180 | 181+ |
|---|---|---|---|---|---|
| 74,299.50 | 0.00 | 0.00 | 0.00 | 0.00 | 32,333.50 |

Case 1:13-cv-01101-GBD   Document 66-3   Filed 05/12/13   Page 1 of 9

# EXHIBIT 3

**MEMORANDUM II**
**(Augme Patent Cases)**

To: Shelly Meyers and Paul Arena
From: David Shaub
Date: December 29, 2010
Re: *Augme* Billings Management

---

      Last Friday you both stated that our bills are not acceptable because the fees

incurred by Augme continue without any reduction in amount and are, as Paul put it,

"atrocious."  My response to this issue is laid out below.

## BACKGROUND STATUS OF CASES:

      With regard to the fees incurred, I would like to point out what has been

accomplished with the time spent, on the Tacoda/AOL and Yahoo matters.  At the outset,

it is important to keep in mind that Augme has filed simultaneous suits against two of the

largest internet companies in the world - AOL and Yahoo!, and our fees reflect the costs

of litigating against such companies with resources and funds corresponding to their size.

      Augme has achieved results and wins in both the Tacoda/AOL and Yahoo! cases.

Most recently, Augme received a big win in Yahoo! when Judge Spero denied Yahoo!'s

motion for summary judgment.  So, when Yahoo! re-files it, we will be ready to defeat it.

Further, Judge Spero granted all of our requests, including amending our infringement

contentions.

      In the Tacoda/AOL case, Augme has also achieved a series of wins.  Orrick stipulated

to add AOL as a defendant to the Tacoda case when Judge Gorenstein indicated that he

did not find a reason why the motion to amend should not be granted.  This permits us to

seek damages from AOL for all integrated uses of Tacoda's technology.  We have

defeated Orrick's Rule 11 motion efforts thus far, culminating in the denial by Judge
Gorenstein of Orrick's effort to break the attorney-client privilege in Coughlin's
deposition. The suits against AOL and Time Warner were successfully stayed until the
Tacoda case is concluded. And, Judge Gorenstein recognized the major role of the
Sanctions motion in future summary judgment proceedings. While we recognize your
desire for a quick resolution, neither case is procedurally or substantively yet ripe for
resolution. Were the Tacoda case to be dismissed now, the efforts made to date would be
lost to a large extent. This includes the thousands of pieces of evidence we have amassed
which can support an infringement claim. At the same time, Tacoda/AOL will likely not
change its viewpoint on infringement until both our final infringement contentions and
final expert report become due.

   In Tacoda/AOL, AOL will continue to accept Orrick's take on the infringement
analysis until, as indicated above, our final infringement contentions and final expert
report are released. Until then, we will not be able to cause AOL any concern that it will
lose the case.


**BILLINGS MANAGEMENT**:

From here on out, our fees may be reduced by implementing the following techniques:

   1) <u>Reduction in Time Spent on Augme Matters</u>:

   As to our fees to date, please see the attached document. Specifically, billings can be
reduced further than they have been in the last two months by reducing my and Robert
Matz's time on these matters.

2

Contrary to Paul's comment, I have not sat around thinking of things to do for Augme. Rather, virtually all of my time to date, including weekends and holidays, has been devoted to in-depth work on court filings, evidence gathering and infringement analysis calling for review of thousands of technical documents needed for these cases. In fact, I am relieved that, for the first time in two years, I will not be working long hours on Augme matters this holiday season because there is no need to do so, as a result of this work being largely completed for now.

Robert's time can also be limited, as appropriate. Prior to the AOL mediation, Shelly insisted that he attend. However, on his return, he reported that his contribution was minimal. This prompted me to later provide a credit to Augme for our fees roughly equivalent to the time Robert expended to prepare and attend the meetings in New York, leaving us uncompensated for this time and effort. Further, I had planned on attending the mediation, under the impression that Augme expected the same of me. As a result, I cancelled a pre-paid trip to Europe for two weeks in the beginning of October for my wedding anniversary. Then, at the last minute, Shelly informed me that she did not need a litigator at the meeting. Thus, I ended up forfeiting the $3,600 deposit on the trip for no purpose whatsoever. These are but two examples of unnecessary costs that have been incurred.

In sum, I will be cutting back on my time devoted to the Augme matters, except where the tasks are, in my opinion, necessary and important. In the same regard, Robert's time will be cut back as well.

2)  Allow us to end the practice of doubling up the participation of attorneys at depositions and hearings, which in most instances is not necessary.

3

3)  Minimize requests for quick solutions and "urgent" assignments and, instead, consider our opinions of appropriate responses, based upon over 30 years of litigation experience.

4)  Respect when discovery and other routine matters are assigned to associates who are qualified to engage in these tasks and who are closely supervised by senior level attorneys.

**CONCLUSION**:

With the above billings management suggestions, I expect to reduce our monthly fees before deferral of our agreed 50% from an average in August/September of $187,000 to an average of below $120,000.  Since David Rosenbaum's firm does not handle day-to-day litigation work, his fees should run about the same as they have been in the past couple of months.  With our reductions, we request that Augme arrange to pay us $50,000 per month, $25,000 on or before the 5th of each month and $25,000 on or before the 20th of each month, beginning January 2011, at least until our outstanding balance is paid in full.  Likewise, we shall continue to endeavor to reduce our fees, where feasible and prudent, in the future.

In a separate memo, I plan to make several further proposals addressing our billings and related matters, in order to provide a more creative and active approach, rather than the ad hoc approach that Paul and I have followed to date.

# EXHIBIT 4

# SHAUB & WILLIAMS LLP

### ATTORNEYS AT LAW

DAVID R. SHAUB
LESLIE G. WILLIAMS
LISBETH BOSSHART MERRILL

DIANA FRANCIS
KATYA MEZEK
CASSANDRA M. LAMB

12121 WILSHIRE BOULEVARD, SUITE 205
LOS ANGELES, CA 90025

TELEPHONE: (310)826-6678
FACSIMILE: (310) 826-8042
E-MAIL: LAWFIRM@SW-LAW.COM

OF COUNSEL
DONALD G. DAVIS
ALICE A. SUN
ROBERT C. MATZ
SHIRLEY L. CHURCH
JENNIFER M. MCCALLUM*

*PATENT ATTORNEY ADMITTED IN COLORADO
DAVID ROSENBAUM**

**PATENT ATTORNEY ADMITTED IN ILLINIOS

June 20, 2011                                          **VIA EMAIL**

Dear Paul:

    I am writing to you seeking again to resolve our differences concerning the compensation to which our firm is entitled arising out of the Augme patent cases. We are striving for an amicable dialogue and an intermediate resolution that can resolve at least some of the present uncertainty between us. We are concerned that your stonewalling may leave us without cooperative options.

    First, I intend to clear the air. When we were advised that Goodwin had been selected as lead counsel, we were pleased with the choice and, based upon discussions with Shelly going back to 2008, we expected to continue to be a major provider of knowledge and/or be involved in future, smaller cases. We had entered into our original hourly fee agreement regarding Tacoda with the expectation we would receive the success fee in the form of warrants as an incentive to deferring 50% of our billable fees. As a result, we had the added incentive to be as helpful as possible to Goodwin. Although we were not informed of the particulars of our involvement after Goodwin took charge, we had every reason to believe that we would be making a contribution to the pending cases, in particular as to AOL, to assist in achieving a successful conclusion, and diligently acted accordingly.

    We were surprised then, when you accused us of delaying the file transfer and at the same time you decided to stop all payments on our account without any discussion. We were told in essence this decision was based upon your analysis that we had been overbilling. This characterization was particularly frustrating in light of the constant badgering from Shelly as litigation manager that we were not being offensive or aggressive enough against Orrick.

    We were then kept on as counsel of record but cut off from receiving any meaningful information from Goodwin and from providing any support for its efforts. This put us in a difficult position professionally because of our fiduciary obligations to Augme, and our attempts to address this issue were not taken as intended: a good faith attempt to address issues consistent with those professional obligations.

We participated in the urgent meeting demanded by Shelly during the midst of various deadlines for other clients within our firm.  Our efforts with other clients were particularly important to fill in the gap left by your abrupt stoppage of all payments.  At that meeting you proposed to pay us only $150,000.00 in full settlement of our billings totaling about $375,000.00 and you revealed your position that "of course" we are not entitled to the warrants because we no longer could cause the cases to be successful.  Further, we learned that after working for a year on the Yahoo matter for only 50% of our fees, that you now take the position that Jim Lawson had no authority to authorize us to treat our undertaking of the Yahoo infringement action on a success fee basis, i.e. in the form of warrants.  This position is not consistent with a deferment of 50% of the Yahoo fees, and thus, we adjusted our current balance accordingly.

More recently, we were again placed in a difficult position professionally.  First, upon your demand, we were forced to file motions to withdraw.  In those motions, we provided the minimum requirements under the court rules regarding the reasons.  Less information would not have been sufficient, as is evidenced from the Courts' reluctance to grant the requested orders, even with a statement of non-opposition from Goodwin.  Then we were contacted to update our previous auditor letters, which we were then required to do under SEC regulations.  We contacted you prior to providing the responses because of the difficult position the requests from you and the auditors placed us in, and not as you believe, to get an unfair advantage over you.  Again, there, we provided the minimum of what we are required to provide.  With one letter, we did not disclose the amount of the dispute, however, with the other, we were required to do so, and because of SEC regulations, we could not, having sent you a prior communication stating that $668,216.39 was currently owed, then report a different number for regulatory purposes, especially when we arguably have a stake in the share price.  Such conduct could place our firm at serious risk.  We had hoped we could temporarily resolve the dispute of non-payment, through beginning to receive some payments on account, however, your letter to us solidified what could have otherwise, perhaps, been characterized as only a potential dispute.  This forced us to have to make the disclosure.  It is unfortunate that you view our conduct in a negative light in this regard. I hope, for both of our overall benefit, that view does not interfere with our mutual resolution of our dispute.

Our most recent efforts to communicate with you have been met with silence.  We have also proposed a payment schedule of the current balance.  We understand the Company has received funding, but likely has obligations to your investors regarding those funds.  Thus, we have been ready to discuss more moderate payments to assure a balance remains on the undeferred fees as we characterize them upon the conclusion of the cases so that the disputed amounts can be resolved at that time.  If we can do that then both of us can avoid unnecessary costs and stress.

If you continue to have no open dialogue with us, then reluctantly, we will have to preserve our interests through other avenues, including filings to preserve our lien rights and providing notice of arbitration as referred to in our fee agreement.

Because we continue to be concerned about the welfare of the patent cases and Augme due to our efforts over the past three years, our continuing contractual interest in the outcome of the cases, and our professional obligations as previous attorneys of record, we intend to prepare a memo this next week, at no charge to you, that will identify evidence that directly contradicts statements by Dr. Alexander relied upon by Gupta in his reply to Augme's opposition to the

motion for summary judgment.  The memo will be sent to you and Goodwin only, and will be prepared to the best of our ability in light of not having access to the filings subject to the protective order.  Whether you or Goodwin choose to use this evidence in a sur-rebuttal, objections, oral argument, or not use it, will be up to you.


Sincerely,


David Shaub

Associated With Rosenbaum & Silvert And Jennifer McCallum
Patent Attorneys - Chicago, Il & Denver, Co

# EXHIBIT 5

Case 1:13-cv-01101-GBD-JCF Document 63-1 Filed 05/14/13 Page 12 of 95

---

### SHAUB & WILLIAMS LLP

<table>
<tr><td>

DAVID R. SHAUB
LESLIE G. WILLIAMS
LISBETH BOSSHART

STEPHEN D. MORGAN

</td><td>

ATTORNEYS AT LAW

12121 WILSHIRE BOULEVARD, SUITE 205
LOS ANGELES CALIFORNIA, 90025
TELEPHONE: (310) 826 - 6678
FACSIMILE: (310) 826 - 8042
E-MAIL : LAWFIRM@SW-LAW.COM

</td><td>

OF COUNSEL
EDWARD EVERETT VAILL
DONALD G. DAVIS
ALICE A. SUN
JENNIFER MCCALLUM*

*PATENT ATTORNEY ADMITTED IN COLORADO

</td></tr>
</table>

David R. Shaub
Shaub & Williams LLP
E-mail : dave@sw-law.com
Tel: (310) 826-6678

David G. Rosenbaum
Rosenbaum & Associates, P.C.
E-mail: drosenbaum@biopatentlaw.com
Direct Tel: (847) 770-6010

March 25, 2008

David J. Ide, CEO
Modavox, Inc.
4636 E University Drive, Ste 275
Phoenix, Az 80354

Re:    Modavox, Inc. v Tacoda, Inc.

Dear David,

This confirms you have agreed to engage Shaub & Williams, LLP (S&W Firm) and Rosenbaum Associates, P.C (R&A Firm) to represent Modavox in the above litigation to conclusion. The objective of representation is to implement a litigation strategy directed toward achieving a settlement rather than going to trial that will enhance the value of your company. At the same time we intend to perform all the litigation tasks we are obligated to perform in pursuing the litigation, including, if necessary, going to trial.

If you request that we provide legal services in other matters, the provision of those services also will be governed by this Agreement at our full hourly rates unless otherwise agreed.

As we have proposed to you, our compensation will consist of the following:

1.  50% of billed fees, plus all costs. The fees would be at the hourly rates listed below. We will use a local firm in New York that has knowledge of local procedure. However, Ms. Bosshart is admitted to practice in New York.

2. The balance of 50% of the fees are to be paid out of cash received from any settlement of the pending action.

3. Additionally, for the risk taken, we will receive warrants exercisable at the average current market price of Modavox shares for the three days before and after execution of this engagement letter (approximately $1.50/share). The number of shares obtainable by exercise of the warrants will be shares having a value equivalent to $2 million which totals approximately 1.33 million

ASSOCIATED WITH ROSENBAUM ASSOCIATES AND JENNIFER MCCALLUM
PATENT ATTORNEYS - CHICAGO, ILLINOIS, DENVER, COLORADO

shares based upon the foregoing price.

Modavox will also wire us a retainer of $25,000 for fees and $5,000 for costs upon execution of this engagement letter. It is understood that this retainer may be allocated between the S&W Firm and the R&A Firm.

The warrants shall be issued jointly in the names of the S&W Firm and the R&A Firm but held by you or your transfer agent until our efforts have resulted in a licensing agreement of Modavox' intellectual property and/or payments in settlement of the above action or judgement being rendered in favor of Modavox or other disposition acceptable to Modavox.

The number of warrants to be released to us upon realizing the above objective shall be equivalent to twice the total fees billed by us in shares at the original valuation (e.g. approximately $1.50/share) but not to exceed $2 million in shares at that valuation. Modavox will register the 1.33 million shares fully obtainable from the exercise of the warrants and pay for such registration from any settlement in the above action or will use its best efforts to piggyback their registration within one year from the execution of this engagement letter.

Modavox also agrees to cause an opinion letter to be issued to its transfer agent that the shares, if not previously registered, shall be freely tradable upon the expiration of the minimum holding period governed by Rule 144.

All other work will be performed on an hourly or fixed fee basis. At present the hourly rate ranges are as follows:

| | |
|---|---|
| Partners: | $350.00 to $400.00 |
| Of Counsel: | $315.00 to $385.00 |
| Associates: | $225.00 to $295.00 |
| Clerks/Paralegals: | $ 75.00 to $175.00 |

Certain costs, such as long distance telephone charges, courier services, copying charges, travel expenses and computer research services incurred on your behalf are billed as disbursements. Those charges are billed at the time of invoicing our charges for legal services, and they reflect an administrative add-on cost for the maintenance of the personnel and equipment involved in the providing of the services. In certain instances, where there are out-of-pocket payments, court costs,, expert consultants, expert witnesses or litigation support services, such as court reporters, such fees may be charged directly to you by the supplier, with your prior approval.

Our statements for services and reimbursements for disbursements advanced by either Firm are rendered monthly. The statements are due and payable upon receipt. It is the policy of the firms that non-payment of our invoices after a reasonable time, normally 30 days, is cause for us to terminate the attorney-client relationship and perform no further work on any matters that you have entrusted to us. Your countersignature to this letter acknowledges this policy and you agree to our withdrawal from further representation of you if the payment terms are not met.

In engaging our services you nonetheless agree that our firm reserves the right to continue representing existing clients or to undertake to represent new clients in any matter that is not adverse to the particular matters for which you are retaining our services, even if the interests of such clients in those other matters are directly adverse to your interests. This prospective consent to conflicting representation shall not apply in any instance where, as the result of our representation of you we

ASSOCIATED WITH ROSENBAUM ASSOCIATES AND JENNIFER MCCALLUM
PATENT ATTORNEYS - CHICAGO, ILLINOIS, DENVER, COLORADO

have obtained sensitive proprietary or otherwise confidential information that, if known to such other client of ours, could be used to your material disadvantage in a matter adverse to you. While we do not have any expectation of such occurrences arising, it is necessary that you understand that this situation is a possibility.

As lawyers, the S&W Firm is governed by the Rules of Professional Conduct of the California State Bar and the R&A Firm is governed by the Rules of Professional Responsibility of both the Supreme Court of the State of Illinois and the United States Patent and Trademark Office.

Each patent attorney and patent agent employed by Rosenbaum & Associates, P.C., and each attorney employed by S&W LLP as well as persons acting under their direction are under the same legal obligation of confidentiality imposed by state law and United States Federal law.

As to all matters arising under the Rules, except the matter of fees, our determination in respect of the firm ethical responsibilities is controlling. If any dispute arises as to the reasonableness of either firm's fees, or its performance of services, we agree to have the dispute submitted for non-binding resolution under the California State Bar provisions concerning arbitration of client disputes set forth in California Business and Professions Code section 6200, et seq. We believe that arbitration provides clients with an efficient, fair and inexpensive method for resolving such disputes.

There may be other attorneys involved in your matter and other patent associates who are assigned certain tasks in the providing your legal representation. All of these attorneys are duty bound to your interests, as are we. While the efforts of our attorneys will not be duplicative, each will be familiar with the matters for you that are being worked on in the event that you need to obtain information and one or the other of us is not available at a particular time.

On behalf of Modavox you hereby grant to either the S&W Firm and/or the R&A Firm, depending upon the firm rendering the service and issuing the billing statement, a lien on any and all of Modavox claims, intellectual property rights or causes of action that are the subject of any representation under this Engagement Agreement, and on any monies arising out of Client claims or causes of action, and on funds collected in any way from any source for any sums due and owing to Attorney at the conclusion of services performed.

The lien will attach to any recovery Modavox may obtain, whether by arbitration award, judgment, settlement or otherwise. Both the S&W Firm and/or the R&W Firm are authorized and may deposit to their respective client trust account any monies, checks, transfers or drafts received in payment on Modavox claims and may deduct outstanding fees, costs and expenses from any such monies received on Modavox behalf.

You agree to furnish any and all information and documents in Modavox possession, custody or control relating to the matters for which the legal services are requested, to be truthful with each firm, to fully cooperate with each firm, to keep each firm informed of developments, to abide by this Agreement, to pay all bills on time, to keep each firm advised of Client address, telephone number and whereabouts, and further grants each Firm, Modavox' Power of Attorney to sign where appropriate any documents connected with matters for which each firm represents Modavox.

You expressly acknowledge that the S&W Firm and the R&A Firm, and their agents and employees have made no promises, guarantees or representations as to any results arising from or in connection with the matters which are the subject of the representation. Neither the S&W Firm nor the R&A Firm make any such promises, guarantees or representations. Any comments that may be made concerning the outcome of the matter(s) are expressions of opinion only based on actual information in our possession at the time.

You also acknowledge that any fees or costs estimates provided before or during the term of the engagement, are or will be our best estimates at the time given and based on actual information in our possession at the time. Accordingly, the final amount of Attorney's billing statements could be more, sometimes substantially, or could be less than any such estimates. In litigation matters it is almost impossible to accurately predict projected fees and costs due to the many variables in litigation, including but not limited to factors beyond our control. Similarly, in intellectual property matters other than litigation, if we are so engaged, it is difficult to predict projected fees and costs for the prosecution of applications due to responses from government agencies or third parties. In transactional matters, it is difficult to predict the conduct of other parties to the transaction or proposed transaction or the conduct of their attorneys. Matters over which we have no control can substantially increase fees, costs and expenses.

Notwithstanding this letter, anytime you have any questions about our billing procedures or about a specific statement, you should contact one of us so that we can be responsive to your questions. Please sign and return the enclosed copy of this letter to each of us, acknowledging that our fee structure, the responsibilities of impartiality that are required of us in representing both parties to the agreement and our obligations to our existing and future clients as it applies to the matters for which you have retained us are understood.

We appreciate being selected as your attorneys and look forward to working together with you.

Very truly yours,

David R. Shaub
For Shaub & Williams LLP

David G. Rosenbaum
For Rosenbaum & Associates, P.C.

**READ, UNDERSTOOD AND AGREED TO:**

April 9, 2008
Dated: _____

By Modavox

_____
David J. Ide, CEO

ASSOCIATED WITH ROSENBAUM ASSOCIATES AND JENNIFER MCCALLUM
PATENT ATTORNEYS - CHICAGO, ILLINOIS, DENVER, COLORADO

matters which are the subject of the representation. Neither the S&W Firm nor the R&A Firm make any such promises, guarantees or representations. Any comments that may be made concerning the outcome of the matter(s) are expressions of opinion only based on actual information in our possession at the time.

You also acknowledge that any fees or costs estimates provided before or during the term of the engagement, are or will be our best estimates at the time given and based on actual information in our possession at the time. Accordingly, the final amount of Attorney's billing statements could be more, sometimes substantially, or could be less than any such estimates. In litigation matters it is almost impossible to accurately predict projected fees and costs due to the many variables in litigation, including but not limited to factors beyond our control. Similarly, in intellectual property matters other than litigation, if we are so engaged, it is difficult to predict projected fees and costs for the prosecution of applications due to responses from government agencies or third parties. In transactional matters, it is difficult to predict the conduct of other parties to the transaction or proposed transaction or the conduct of their attorneys. Matters over which we have no control can substantially increase fees, costs and expenses.

Notwithstanding this letter, anytime you have any questions about our billing procedures or about a specific statement, you should contact one of us so that we can be responsive to your questions. Please sign and return the enclosed copy of this letter to each of us, acknowledging that our fee structure, the responsibilities of impartiality that are required of us in representing both parties to the agreement and our obligations to our existing and future clients as it applies to the matters for which you have retained us are understood.

We appreciate being selected as your attorneys and look forward to working together with you.

Very truly yours,

David R. Shaub
For Shaub & Williams LLP

David G.
Rosenbaum

Digitally signed by David G. Rosenbaum
DN: cn=David G. Rosenbaum, o=Rosenbaum
& Associates, P.C., ou,
email=drosenbaum@bigpatentlaw.com, c=US
Date: 2008.03.31 14:32:42 -05'00'

David G. Rosenbaum
For Rosenbaum & Associates, P.C.

**READ, UNDERSTOOD AND AGREED TO:**

Dated: _____        By Modavox

_____
David J. Ide, CEO

ASSOCIATED WITH ROSENBAUM & ASSOCIATES, P.C.
REGISTERED PATENT ATTORNEYS- CHICAGO, ILLINOIS